FILED IN CHAMBERS
U.S.D.C. Atlanta

NOV 2 8 2022

Kevin P. Weimer, Clerk
By
Deputy Clerk

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | | |
|---|---|---|
| JUSTIN T. TOLSTON, | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | No.  1:20-CV-04221-SEG |
| | ) | |
| CITY OF ATLANTA, Et. Al. | ) | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT CITY OF ATLANTA'S MOTION FOR SUMMARY JUDGMENT

**NOW COME** *pro se* Plaintiff in opposition to Defendant City of Atlanta's motion for summary judgment. Filed contemporaneously are a motion for leave of court to file an overlength brief pursuant to Local Rule 7.1(D).

## INTRODUCTION

City of Atlanta's chief policymaking officials turned a blind eye to wanton misusage and training deficiencies for body cameras worn by Atlanta officers which manifested a culture of impunity for false arrests, excessive force, and other unconstitutional misconduct documented in complaints to an intentionally anemic internal affairs office. The known systemic failures were the invisible moving force behind all the violations of Plaintiff's civil rights on October 14, 2018.

Introduction    1

Statement of Facts    3

Argument    5

A. Chief of Police Rodney Bryant A Proper Plaintiff As He Continues The Pattern Of Indifference And Because He Is Sued In His Official Capacity Which Operates As A Suit Against The Office He Holds    6

B. Qualified Immunity    7

C. Defendants Are Liable For Negligent Hiring, Supervision, And Training Because...Civil Unrest (Counts XVII & XVIII)    7

- City of Atlanta's Chief Policymaker Was Aware Of The Casual Link ...    11

- City Officials Had Knowledge Of Widespread Abuse Of Body Worn Camera Policy Because 15% Of The OPS ...    12

- The City of Atlanta Had Actual Notice That Body Worn Camera Compliance    19

- City Of Atlanta's Unofficial Policy Of Underfunding The Official Of Professional Standards Which Was A Contributing...    21

- City of Atlanta Had An Unofficial Policy Of Failing To Investigate Instances Of Known Non-Noncompliance With Body Worn Policy And Was Thereby Deliberately Indifferent    23

- City of Atlanta Was Deliberately Indifferent For Failing To Provide All Offices With Body Worn Cameras    26

- Mayor Bottoms Signed Four Administrative Orders For Remedial Action Regarding Body Camera Compliance Only In Response To Civil Unrest Following The Death Of George Floyd    29

- The Demonstrated Failure Of Defendant City Of Atlanta Regarding Body Worn Camera Compliance Was The Moving Force Behind...    30

D. Alternatively, If Body Worn Compliance Is Not Widespread As To Be Unofficial Policy — The Blatant Violations...    35

Conclusion    36

**STATEMENT OF FACTS**

For judicial economy, the instant statement of facts are focused on the facts necessary to prove *Monell* liability as the facts supporting the underlying constitutional violations (Counts I, VII, IX) are laid out in Plaintiff's extensive brief in opposition to the motion for summary judgment filed on behalf of Defendants Lawrence Holland, Keith Wadsworth, and Chief of Police Rodney Bryant.[1] As such, the facts and arguments outlined therein are hereby incorporated by this reference.

The City of Atlanta has a population of approximately 500,00 people according to the most recent census data.[2] In 2018, the Atlanta Police Department had 1761 sworn officers. [Pl's Tr. Exh. 50 p. 8] The itemized budget was approximately 200 million dollars. [Pl's Tr. Exh. 66] The Office of Professional Standards is tasked with investigating complaints or allegations of misconduct by Atlanta police officers. [Pl's Exh. 51 at ] In December of 2020 the Office of Professional Standards was staffed by five employees. [Walton, 26:1-5]

---

[1] As Chief Bryant is sued in his official capacity only---the merit against the claims against him are sought out herein.

[2] United States Census Bureau, City of Atlanta Quick Facts, https://www.census.gov/quickfacts/atlantacitygeorgia (accessed November 2, 2022).

After being approved by Atlanta City Council in August of 2016, the City of Atlanta began implementation of body worn cameras over eight stages beginning in November of 2016 to April of 2018. [Pl's Tr. Exh. 50 p. 15] On December 14, 2017, then Chief of Police for the City of Atlanta enacted a body worn camera standard operating procedure that was in effect on October 14, 2018. [Pl's Tr. Exh. 51]

Between January 9, 2018 to September 27, 2018, the month prior to Plaintiff's use of unlawful arrest, the Office of Professional Standards opened eighty-six (86) investigations into allegations of police misconduct against officers of the Atlanta Police Department and Plaintiff identified thirteen investigations where at least one officer failed to adhere to body worn camera policy. [Pl's Tr. Exhs. 67 – 79]

On October 14, 2018, Plaintiff was violently arrested by Defendants Keith Wadsworth and Lawrence Holland as set forth in the accompany brief in opposition and charged with three offenses. [Pl's Tr. Exh. 2]

In December of 2018, Mayor Keisha Lance Bottom, who served as the city's highest elected official from 2018 to 2022, and the Atlanta City Council, were delivered a damning report—commissioned by the chief of Police and produced by the City Auditor's Office—that showed officers' compliance with body worn camera policy was between thirty-three (33) and forty-six (46) percent. [Pl's Tr. Exh. 50 p. 3] The year following the report, the instances of use of physical force

by member of the Atlanta Police Department increased by more than 70% [Pl's Tr. Exh. 81, p. 5]

On May 29, 2020, the first Friday after the murder of George Floyd, and for the next four of five days, the Atlanta Police Department SWAT team deployed chemical agents, smoke, and fired fired potentially lethal projectiles to quell "civil disturbance." [Pl's Tr. Exh. 80]

In the face of a popular uprising, Mayor Keisha Lance Bottoms signed a series of four administrative orders aimed at police reform. [Pl's Tr. Exhs. 57-60] The orders, sought to address use of force and body worn camera compliance through the creation of an advisory council established with the to goal of providing non-binding recommendations to reform police policies and procedures. [Id.]

ARGUMENT

Plaintiff's first amended complaint, pending before the Court, makes clear that the remaining causes of action against the City of Atlanta, or its policymaking officials, are:

- Count VII (unlawful seizure liability) against City of Atlanta;

- Count X (first amendment retaliation liability) against City of Atlanta;

- Count XVI (malicious prosecution liability) against City of Atlanta;

- Count XVII (negligent hiring/failure to supervise and train) against City of Atlanta and Chief of Police Rodney Bryant; and

- Count XVIII (liability for negligent hiring)  [Doc. 88-1 pp. 12, 17, 20, 21, 28]

## A. Chief of Police Rodney Bryant Is A Proper Plaintiff As He Continues The Pattern Of Indifference And Because He Is Sued In His Official Capacity Which Operates As A Suit Against The Office He Holds

It is well settled that "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office"[3] and as Plaintiff named both the City of Atlanta and Chief of Police as Defendants in Count XVII, Plaintiff voluntarily dismisses City of Atlanta as a party Count XVII. Erika Shields was the police chief for the City of Atlanta at the time of the constitutional violations—however, Rodney Bryant became the chief after before Plaintiff filed suit. [Bryant, 9:12-16] Thus, naming the prior occupant of his office would do little as she was no longer the chief policymaker for the City of Atlanta. Moreover, Plaintiff alleges a continued attitude of deliberate indifference by the refusal of Chief of Police Rodney Bryant to implement automatic activated

---

[3] *Will v. Michigan Dept. of State Police*, 491 US 60, 71 (1989).

body worn cameras despite being aware that officers fail to active their devices "timely." [19:14–18]

## B. Monell Liability Standard

To prove municipal liability one must first establish an underlying constitutional violation.[4] Then, according to the *Monell* doctrine, "A Plaintiff must demonstrate a direct causal link between the municipal action [or deliberate indifferent inaction] and the deprivation of federal rights."[5] And "Since a municipality rarely will have an express written or oral policy of inadequately training or supervising it employees, the Supreme Court has further explained that a plaintiff may prove a city policy by showing that the municipality's failure to train evidenced a 'deliberate indifference' to the rights of its inhabitants[.]"[6]

## C. Defendants Are Liable For Negligent Hiring, Supervision, And Training Because Chief Policymakers Were Aware Of Widespread Body Camera Non-Compliance And Only Took Remedial Action In Response To Civil Unrest (Counts XVII & XVIII)

---

[4] *City of Los Angeles v. Heller*, <u>475 U.S. 796, 799</u> ("If a person has suffered no constitutional injury at the hands of the individual also does not show how body-camera training cause his—apparently Equal Protection—injury here.").

[5] *Cuesta v. School Bd. Of Miami Dade Cty., Fla.*, <u>285 F.3d 964, 967</u> (11th Ci<u>r. 2002</u>) (quoting *Gilmere v. City of Atlanta, Ga.*, <u>737 F.2d 897, 901</u> (11th Ci<u>r. 1984</u>)).

[6] *Gold v. City of Miami*, <u>151 F.3d 1346</u> (11th Ci<u>r. 1998</u>) (citing *City of Canton*, <u>489 U.S. 388-</u><u>39</u> (1989))

City of Atlanta, and its chief policymaking officials had abundant notice that Atlanta Police officers were engaged in a wide range of lawless conduct, motivated by a failure to adhere to body worn camera policy. Yet officials made no attempt to reform training or procedures, thereby ratifying them until faced with a popular uprising. The disregard for body worn camera enforcement, and the hobbling of the Office of Professional purposely gave rise to the abuse suffered by Plaintiff.

A direct line will be drawn from City of Atlanta's chief policymakers' inaction to increased constitutional violations by showing: 1) Officials were aware of the importance of body worn camera compliance in reducing allegations of misconduct; 2) officials had record notice of non-compliance by officers, including an internal report; 3) Officials deliberately continued to underfund the agency tasked with monitoring compliance; 5) Occurrences of excessive force increased the year following the internal report; and 6) Remedial action was only taken in response to civil unrest

In *Brooks v Schieb*, James Brooks claimed Defendant City of Atlanta's "internal investigatory procedures were deficient and that, consequently, the City employed a police officer who improperly arrested and assaulted him."[7] A "jury

---

[7] *Brooks v Schieb,* 813 F.2d 1192, 1192 (11th Cir. 1987).

agreed and found the City liable for Brooks' injuries."[8] The evidence at trial mainly consisted of witnesses including "four Atlanta police officer; the current commissioner and former chief of police, the current head of the office of professional standards, the past head of the office of professional standards, and a field investigator in that office."[9] Besides the witnesses "Brooks' claim against the City also relied on two pieces of documentary evidence.[10] One was the official rules promulgated by the police department for investigating complaints against police officers. Brooks' other key piece of evidence consisted of ten citizens' complaints that had been filed against Scheib, seven prior to the arrest of Brooks and three following."[11] The court ruled "the City was not at fault under any conceivable standard of liability [because] Quite simply, there is no evidence that city officials were aware of past police misconduct."[12]

In *Depew v. City of St. Marys, Georgia*, "The evidence relating to the lack of proper training, supervision, and discipline consisted of various personnel evaluation reports, employee warning reports, directives promulgated by Chief

---

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] Brooks, <u>813 F.2d 1192</u>

[12] *Id.* at 1195 (holding "Brooks adduces no evidence from which a jury could infer that these allegedly deficient procedures were the 'moving force of the constitutional violation.'" (quoting *Polk Cty. v. Dodson*, <u>454 U.S. 312, 326</u>) (1981)).

Keele, and the testimony of various witnesses."[13] The "evidence also demonstrated that officers had little incentive to learn the policy and directives of the police department. If an officer failed an examination on the department's policy and directives, he remained in the same position, with the same duties, and he received the same wages."[14]

In *Depew*, the court noted: "The mayor and council showed no inclination to change police policy. In fact, while the mayor and council members were aware of prior complaints of excessive force, they continued to assert that the department's supervision was satisfactory and that the officers were doing a good job."[15] Ultimately, Eleventh Court of Appeals found: "while the city provided rules and regulations for the operation of its police department, these rules were violated on numerous occasions. The city, however, failed to rectify the situation."[16]

The "continued failure of the city to prevent known constitutional violations by its police force is precisely the type of informal policy or custom that is actionable under section 1983."[17] The court held "evidence revealed sufficient

---

[13] *Depew v. City of St. Marys, Georgia*, 787 F.2d 1496 (11th Cir. 1986).
[14] *Id.* at 1498.
[15] *Id.*
[16] *Id.*
[17] *Id.* at 1499.

prior incidents where the police had used excessive force to put the city on notice. Yet, the city failed to take proper remedial action." Thus, a tier of fact could have found "the city's officials implicitly ratified a custom which resulted in plaintiffs' injuries."

Here in Counts XVII and XVIII, as in *McDowell*, Plaintiff is, in part, "asking this Court to extend liability to inadequate budgeting practices."[18] Plaintiff's primary theory of *Monell* liability is that City of Atlanta's documented deliberate indifference toward body worn camera compliance was intentionally exacerbated by hobbling the entity tasked with body worn camera compliance. The atmosphere of impunity, in turn, was the moving for behind all of underlying constitutional violations.

- **City of Atlanta's Chief Policymaker Was Aware Of The Casual Link Between Body Worn Camera Compliance And Excessive Force**

If "a picture is worth a thousand words, a video from the body-worn camera of a law enforcement officer during a 'contact' giving rise to litigation may be worth a thousand pictures."[19] A "body-worn camera provides a technological aide to better serve the community by protecting both police officers and citizens. An

---

[18] 392 F.3d 1291.
[19] *Emmons v. City of Escondido*, 168 F. Supp.3d 1265 (S. D. Cal. Mar. 2, 2016).

accurate depiction of the contacts between the police and community improves public safety, provides an objective means for evidence gathering, and serves as a valuable training tool for police officers."[20]

Former Atlanta Chief of Police, Erika Shields once testified: "It's incumbent upon all law enforcement agencies to have body-worn cameras and to consistently audit them so that we can vet out any misappropriate behavior before it escalates." [Att. A Shields, 14:14-24] She further testified that in a typical use of force investigation an investigator would "gather any camera footage that you can, whether it's body-worn camera or off a light." [Att. B, Shields, 29-30:22-2] Current Chief of Police Rodney Bryant testified that he "absolutely" was aware body worn camera compliance was an issue. [Bryant, 18:25 to 19:1-2] Defendant City of Atlanta and Chief of Police Rodney Bryant have record notice that body worn camera procedures are inadequate.

- **City Officials Had Knowledge Of Widespread Abuse Of Body Worn Camera Policy Because 15% Of The OPS Eighty-Six Miscellaneous Investigations Involved Body-Worn Camera Non-Compliance**

Plaintiffs seeking municipal liability under § 1983 for a failure to train must put forth evidence "that the municipality knew of a need to train and/or supervise

---

[20] Emmons v. City of Escondido, 168 F. Supp.3d 1265 (S. D. Cal. Mar. 2, 2016).

in a particular area and the municipality made a deliberate choice not to take any action."[21]

In *Mcdonel v. City of Detroit*, (E. D. Mich. 2021), the plaintiff alleged "the City's training was deficient because 'the City could and should have trained officers, supervisors, and investigators to review body cams, particularly when they had substantial complaints[.]"[22] However, in granting summary judgment for the City, the court noted that the plaintiff most fatally did "not actually name the constitutional injury caused by the City's alleged failure to train at all."[23]

Here, Plaintiff sampled 86 Office of Professional Standards files in a 9-month span of 2018 and in order to demonstrate the breadth of Defendant City's deliberate indifference, it is necessary to briefly discuss each investigation individually:

I.    The OPS file 18-C-0016, an investigator wrote: "Officer Jackson did not have his body worn camera on for any portion of this incident"

---

[21] *Martin v. City of Macon Ga., 702 F.App'x 941, 944* (11th Cir. 2017).

[22] *McDonel v. City of Detroit*, 19-11508 (E. D. Mich. Aug. 13, 2021).

[23] *McDonel*, . (finding "McDonel does not frame the claims as addressing an alleged failure to train the defendants in identifying probable cause under the interference statute or avoiding retaliatory stops—the two underlying constitutional claims at issue here.").

and the officer was subsequently written up for the violation.  [Pl's Tr. Exh. 67]

II.    In OPS 18-C-0066, when asked if his body worn camera was activated the accused officer responded: "No, the battery was on low and would not record…Because I had it on at work that day, and we do not have a charging station at the mini precinct. [Pl's Tr. Exh. 68 p. 1] However, the officer was not disciplined or otherwise reprimanded as the underlying allegation was not sustained [Id. at 4]

III.   In OPS file 18-C-0152--MISC it was alleged that "Sergeant Zoel Murphy refused to provide his name and badge number when the complainant requested the information on 01/21/2018" and "he was equipped with his BWC, but he didn't have it activated during this incident because 'everything happened quickly[.]"[24] [Pl's Tr. Exh. 69 pp. 1, 3] While the body worn camera allegation was sustained, the underlying allegation of failing to provide his identity was not. [Id.

---

[24] The investigator wrote: "I could not locate any BWC video from Sgt. Z. Murphy's body camera for this incident. I found two recordings from earlier in the night at the same location where Sgt. Z Murphy was speaking to an intoxicated male."

at 1] The investigation took nearly a year from 3/5/18 to 4/8/19 [Pl's Exh. 69 p. 4]

IV.   In OPS file 18-C-0195-MISC, the investigator noted: "Mr. Hasse complained about Officer Stanley accusing him of being drunk in public, refusing to issue him a breathalyzer, committing malpractice by not taking a report from his friend and for placing him in her patrol car without probable cause." [Pl's Exh. 70 p 2] Sargeant Apple responded to the scene and was similarly accused of acting in appropriately during the false arrest. [Id. at 2-4]

      a.  The allegation for failure to comply to body worn camera policy was sustained, while the underlying accusations of acting in appropriate via a false arrest were not. [Pl's Exh. 70 p. 1]

V.   In OPS file 18-C-0322-MISC it was alleged that a woman "had been thrown to the ground by unknown offices[.]" [Pl's Exh. 71 p. 1] However, the investigator marked that there was "no" body worn camera footage of the event and the case file index does shows there was no body worn camera footage. [Id. at 2, 5] However, neither

officer were investigated for body worn camera non-compliance and the officers were also exonerated. [Pl's Exh. 71 pp.3-4]

VI.     In OPS 18-C-0325-MISC the investigator wrote "No BWC footage," despite the fact "Sergeant Dingle had to be called to the scene." [Pl's. Tr. Exh. 72 p. 1]

   a. The allegation for falsely citing the complainant was not sustained. [Id. at p. 3]

VII.    In OPS 18-C-0331-MISC at the investigator wrote "During my investigation [into a traffic accident] I discovered that no video was located. I will be investigating this matter further," and according checked "no" on the OPS response form. [Pl's Exh. 73 p. 1-2] The allegation of failure to adhere to body worn camera policy was sustained. [Id. at 3]

VIII.   In OPS 18-C-0332-MISC, the investigator wrote: "There appears to no further BWC of this incident. BWC footage does not show the transaction between Officer Bradshaw and Ms. Core as it appears to have been turned off prior to their interaction placing him in violation of…APD.SOP.3133 Body Worn Cameras (BWC)[.]" [Pl's Tr. Exh. 74 p. 2] The officer was exonerated for the underlying

allegations of approximate action required during the motor vehicle accident response. [Id. at p.1]

IX.    In OPS 18-C-0339-MISC it was alleged "Sergeant Z. Kramer, Investigator T. Bacon, Investigator D. Camp, Investigator C. Gurley and Officer S. Gordon failed to properly investigate an armed robbery which lead to the improper detention and arrest of the complainant on 08/07/2017." [Pl's Tr. Exh. 75 p. 2] Despite no mention of body camera footage existing in the file and the call response section on body worn camera footage remained unchecked—all accused were exonerated and not investigated for failure to adhere to body worn camera policy. [Id. at pp. 1-5]

X.     In OPS 18-C-0341-MISC, In that same investigation, Officer Edre also answered in the negative when asked "Did you have your body camera on while you were listening to Stribling and Officer Durmishi's conversation?" [Pl's Tr. Exh. 76 p. 1] Despite the investigator marking "no" body worn camera footage existed, the file does not indicate that either officer was disciplined for failing to adhere to body worn camera policy. [Id. at 4-5]

XI.   In OPS investigation 18-C-0405-MISC the investigator wrote: "Upon viewing BWC video, only the tail-end of the event was captured. Although another unnamed officer was on scene, no additional video footage." [Pl's Tr. Exh. 77 p. 2]  The officer was reprimanded for failure to adhere to body worn camera policy. [Id. at p. 1]

XII.  In OPS investigation 18-C-0462-MISC concerns an investigation from a July 19, 2018 interaction where a citizen alleged an APD officer "acted inappropriately by stopping and harassing" as "he was walking down Hill St. toward a Baptist church that gave out food[.]" [Pl's Tr. Exh. 78 p. 1]

      a. The officer received a written reprimand for the failure to adhere to body worn camera and radio use policies—but he did not receive discipline for he the unlawful seizure allegation. [Id. at 4]

XIII. OPS investigation 18-C-0488-MISC, a woman sent a letter "to make a claim against the Atlanta Police department swat team for destroying my home and property while removing [a] mental health patient." [Pl's Exh. 79 p. 1] However, not the SWAT Team Supervisor, the SWAT assist commander, nor the other two SWAT

officers involved in the raid were equipped with body worn cameras.
[Id. at 2-5]During the OPS investigation 18-C-0488-MISC, under
penalty of perjury, Officer Jordan Pearson responded in the
affirmative when asked "At the time of the incident had you been
issued a body worn camera?"[25]  [Pl's Exh. 79 p. 6]

The thirteen investigation identifies nearly a score of instances of body worn
camera non-compliance out of only a sampling of eighty-six "miscellaneous"
reports of police misconduct from 2018. This means that roughly 15% of the files
that were disclosed had some form of body worn camera noncompliance issue —
if a body worn camera was issued altogether.

- **The City of Atlanta Had Actual Notice That Body Worn Camera Compliance Was Wholly Inadequate And Failed To Act**

In December of 2018, the City of Atlanta Auditor's Office produced a report
that showed body worn camera compliance was below 50% percent.   The
December 2018 Auditor Report found "In our random sample of 150 videos, 61%
were activated and 47% were deactivated according to policy. Overall, we

---

[25] Although the OPS case number at the top of Officer's Pearson is incorrect and
concerns an unrelated investigation—the case disposition, file index, and complaint
summary show the correct file number.

estimated that 30%-46% of videos complied with both activation and deactivation procedures." [Pl's Exh. 50, p. 3]

Here, like in *Depew*, the City Council and Mayor were put on notice by receiving an actual copy of the report. [Pl's Tr. Exh. p. 7] Although supervisor have a role in monitoring and reporting body worn camera compliance the report noted: "Supervisors are responsible for ensuring that officers comply with camera policies; however, supervisors reviewed only 2% of all videos uploaded between November 2016 and May 2018. Departmental procedures do not specific a formal process regarding the number of videos to ensure review or include criteria to ensure compliance with recording policies." [Pl's Tr. Exh. 50 pp. 2-3]

The year following the report, instances of physical excessive force—the very type of force alleged by Plaintiff—increased 70% from the year prior. This shows a direct correlation between the use of body worn cameras and instances of misconduct. [Pl's Tr. Exh. 80 p. 5] The report, produced in response to an Open Records Act request, shows that instances of use of force increased from 231 instances in 2018 to an eye-popping 390 instances of force used in the calendar year. With only approximately 1700 officers—meaning nearly one in five or 22%

of Atlanta Police Department  officer engaged in force in a single year. That is

undoubtedly an unacceptable rate of occurrence for any civilized society.

- **City Of Atlanta's Unofficial Policy Of Underfunding The Official Of Professional Standards Which Was A Contributing Motivating Factor Behind Plaintiff's Violations**

In *McDowell v. Brown*, the Plaintiff was required to prove "DeKalb's policy

was to understaff the field division, and that this practice left the division unable

to execute medical transports."[26] But "Although McDowell produced evidence

that the Jail had staffing problems, the record provides no evidence that the field

division consistently failed to transport non-emergency cases to Grady." Next the

court assessed whether "the municipality's action was taken with the of requisite

degree of culpability [as] McDowell cannot rely on a generalized policy of

understaffing." In order to succeed, the court ruled that McDowell had to show

"The County must have a deliberate intent to inadequately staff the field division."

However, the "isolated incident [did] not demonstrate evidence of the County's

"persistent" or "widespread" policy of understaffing the Jail so as to delay the

transfer of inmates to Grady."  Finding the County "had no notice of the

consequences 'based on previous violations of federally protected rights.'"[27]

---

[26] *McDowell v. Brown*, <u>392 F.3d 1285, 1290</u> (11th Cir. 2004).

[27] *Id*. at 1291 (citing Bd. Of County Comm'rs v. Brown, <u>520 U.S. 399, 403</u> (1997)).

The City of Atlanta, with a 200-million-dollar police budget, can only afford skeleton crew to police more than 1700 other police officers which is clearly inadequate on its face. Such a deliberate understaffing was a motivating factor that contributed to the violations suffered by Plaintiff by fostering an atmosphere of impunity. .

In 2018, the City of Atlanta has 1,761 uniformed officers, [Pl's Tr. 50 p. 3] yet in December of 2021 the office of Professional Standards was staffed by only five investigators in 2011. [Walton, 26:1-4] Mayor Bottoms consulted with the Chief of Police Rodney Bryant to hire an additional 250—but none of the additional 250 officers would go to staffing the Office of Professional Standards. [Bryant, 108-109:18-23] Meaning—the organization already unable to timely complete investigations—would be asked to take on the responsibility of investigating

Due to this fact it took the Office of Professional Standards nearly a year to interview the arresting officer, Defendant Keith Wadsworth. Chief Bryant testified that excessive force investigations should not take more than a year to complete for initiation to adjudication. [Bryant 36:12-16] Here, it took nearly a year in a half from when Plaintiff's complaint was filed in October of 2018 until a letter of reprimand was issued to Officer Wadsworth on March 16, 2020. [Bryant, 155:2-12]

Such understanding a delay of twice the length of time that an investigation should be completed demonstrates that the City of Atlanta has an unofficial policy of providing funding for the Office of Professional Standards.

- **City of Atlanta Had An Unofficial Policy Of Failing To Investigate Instances Of Known Non-Noncompliance With Body Worn Policy And Was Thereby Deliberately Indifferent**

For a failure to supervisor claim, a "plaintiff must show one of the following: (1) personal participation; (2) a history of widespread abuse that puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so, (3) a supervisor's custom or policy that results in deliver indifference to constitutional rights; or (4) the facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so."[28] And "to be sufficient to notify the supervisor, the deprivations must not only be widespread, they also must be obvious, flagrant, rampant and of continued duration rather than isolated occurrences."[29]

---

[28] Clark v. Fye, (M. D. Ga. 2019) (internal quotations omitted) (citing *Cottone v. Jenne*, 326 F.3d 1352 (11th Cir. 2003)).

[29] Gray v. Bostic, 458 F.3d 1295, 1398 (11 th Cir. 2006).

The culture of impunity was so rife regarding non-compliance an officer readily admitted how he flouted the policy, as an investigator wrote: "Officer Henry said it's not necessary. He advised that he does not record< [sic] 'General Citizen Encounter' when he is sitting in his vehicle although he knows that it is required by policy." [Pl's Tr. Exh. 78 pp. 2-3] Likely to the officers' surprise — he was written up for the offense. [Id. at 5]

In another instance, an officer demonstrated the need for training in stating: he failed to record a conversation concerning threats because "I did not believe that this was a formal conversation between Police and Citizen contact." [Pl's Tr. Exh. 76 p. 2] The officer was not investigated for failing to adhere to body worn camera policy. [Id.]

In yet another instance, in this eight-month period, an officer testified that a Sergeant came to the scene — however the file index makes no mention of the officers' body worn camera recording or an investigation into the lack thereof. [Pl's Tr. Exh. 79 pp. 7-8]

1. City of Atlanta Was Deliberately Indifferent For Failing To Provide All Offices With Body Worn Cameras

Despite knowledge of the importance of body worn cameras — the City of Atlanta did not provide all officers with body worn cameras, including those in

the most violet unit in the entire police Department. During the OPS investigation

18-C-0488-MISC, in which four SWAT officers including the supervisor and

commander were not equipped with body worn cameras, SWAT Officer Fred

Watson admitted: "We don't have BWC assigned to the SWAT Unit. I haven't been

issued a BWC[.]" [Pl's Tr. Exh. 79 pp. 2- 5]  In 18-C-0325-MISC, the officer was also

not assigned a body worn camera despite in July of 2018 [Pl's Tr. Exh. 72 p. 2]

2. **City of Atlanta Had An Unofficial Policy Of Misclassifying Allegations of Excessive Force Complaints Which Was A Contributing Moving Force Behind Plaintiff's Violations**

In at least two reports accusations of excessive force were clearly claim, but

the investigators failed to even charge the allegation let alone investigate it.  In

investigation 18-C-0066-MISC, the complainant's email—*directed to then Chief of*

*Police Erika Shields*, included an allegation of excessive force in stating: "He asked

me to leave and started pushing me out of line. I asked him to not put his hands

on me and he pushed me with even more force. I asked Officer Pearson for his

badge number, he answered he that he did not have to give it to me…" [Pl's Tr.

Exh. 68 p. 3]  However, that charge of excessive force was never formally alleged

against the accused officer.

Also, since the complaint was directed to the chief policymaker for the City

of Atlanta—there is little doubt that Defendant City was on notice of both non-

compliance with body worn camera policy — but also tis connection to accusation of excessive force.

Similarly, in 18-C-0322-MISC, and like the conducted alleged in suit at bar, a woman alleged she had been forcibly rendered to the ground by unknown officers. [Pl's Exh. 71 p. 1] However, the record is devoid of any evidence the investigator leveled such a charge against the accused officer. Without any formal charge of use of force — or failure to adhere to body worn camera policy — both the officers were exonerated. [Id. at 5]

Although the December 2018 Auditor's Report, discussed herein, noted how "Footage related to use of force incidents accounts for less than 1% of all [BWC] videos" [Pl's Tr. Exh. 50 p. 16] the two aforementioned accusations of excessive — out of the eighty-six (86) miscellaneous investigations from 2018 — amounts to a 2.3% rate of occurrence. This is statistically significant and likely indicative of a much higher rate of occurrence as this sampling is out of those that would not be deterred in seeking justice. The report also noted the misclassification of allegations as here. The report stated:

Here,  like in both OPS investigations, an officer was not charged with an excessive force allegations. Despite Wadworth's offense narratives clearly stating: 'Officer Holland grabbed Mr. Tolston while trying to escort him out of the park" —

Officer Holland was not formally charged with the allegation of excessive force. [Pl's Tr. Exh. 35 p. 1; Pl's Tr. Exh. 2 p. 1] These three examples from a sample of only 86 show that an unofficial policy of misclassification of complaints—in conjunction with deliberate was a motivating of internal affair allegations. City of Atlanta's unofficial policy of misclassification motivated Defendant Officers to batter and falsely arrest Plaintiff without the cameras on, because any violation of excessive force would likely be collapse into body worn camera allegation—or no allegation at all.

3. City of Atlanta's Body Worn Camera Training Requirement Inadequate

"To establish a 'deliberate or conscious choice' or such 'deliberate indifference,' a plaintiff must present some evidence that the municipality knew of a need to train." Whether a municipality failed to adequately train officers is a question to be presented to a jury.[30]

In *Kerr. V City of West Palm Beach*, a case involving *Monell* liability as relates to the police use of canine units, the first question before the court was "whether the City of West Palm Beach and its former police chief failed to establish an

---

[30] *Kerr v. City of West Palm Beach*, 875 F.2d 1546, 1548 (1989) (finding "The jury also found against the City of West Palm Beach and its former police chief, concluding that they had inadequately trained and supervised the canine unit and 'encouraged an atmosphere of lawlessness' out of which the plaintiffs' injuries arose.").

adequate program of training for the canine unit." In finding that a trier of fact

could conclude the City had inadequate training, the court noted Plaintiff's

evidence such as the need for "continual, rigorous training in law enforcement

techniques;" that canine force was used at a higher than in other municipalities;

and that canine excessive force was occurred "to apprehend individuals suspected

only of minor misdemeanor offense."

The "Supreme Court recognized that the frequency of constitutional

violations, may itself, provide sufficient circumstantial evidence that a

municipality has chosen to allow its officers to act without adequate training."[31]

The "Prior incident also must involve facts substantially similar to those at hand

in order to be relevant to a deliberate-indifference claim."[32]

The City of Atlanta's training is deficient on its face because it does not offer

annual training and even the chief policymaker is utterly lacking in competency.

The aforementioned numerous examples of violations of the City of Atlanta's body

worn camera policy itself shows that training was inadequate, but a review of the

training for those involved makes that readily apparent. Section 3.8 of Shields

Policy, mandated: "All employees regardless of rank shall be required to attend

---

[31] *Id.* at

[32] Mercado v. City of Orlando, 407 F.3d 1152, 1162 (11 th Cir. 2005)

BWC training. All training regarding BWC shall be conducted by instructors that have successfully completed the BWC training." [Pl's Exh. 51 p. 3]

The City of Atlanta does not require annual body worn camera training. Officer Holland's training records shows he completed a four-hour body worn training course on April 19, 2017, the year he became a peace officer, and another two-hour body worn training course on January 21, 2020. [Pl's Tr. Exh. 62 pp. 1-3] Officer Wadsworth completed a four-hour on April 19, 2017, the year he became a police officer, and a two-hour training on February 5, 2020. [Pl's Tr. Exh. 61 p. 1-2] But both officers have more BWC training than Chief of Police Rodney Bryant— whose file shows while he has sixteen (16) hours in grant writing—he possesses none in the form of body camera training. [Pl's Tr. Exh. 62 p. 6] The lack of training might explain his inability to understand the metrics that he is suppose to [Bryant, 22:3-4].

- **Mayor Bottoms Signed Four Administrative Orders For Remedial Action Regarding Body Camera Compliance Only In Response To Civil Unrest Following The Death Of George Floyd**

"On May 25, 2020, George Floyd was murdered by a Minneapolis police officer. His unjust death at the hands of police sparked protest around the country that called attention to the disparate treatment of people of color by law

enforcement and demanded justice and police reform."[33] During that time "Major cities across the United States saw large protests and civil rights demonstrations. The Black Lives Matter movement ("BLM"), founded in response to the [f]atal shooting of Trayvon Martin in 2012, gained significant support[.]"[34] In response to "civil unrest and anti-police protest that began following the death of George Floyd"[35] officials at all levels of government began to take action.[36] In Connecticut, a special session of the legislature was called and "Governor Lamont invoked Floyd's murder to urge lawmakers to 'enact legislation to promote greater transparency and accountability for law enforcement.'" [37] The governor claimed

---

[33] *Huffman v. City of Boston,* Case No. 21-cv-10986-ADB (D. Mass. June 27, 2022).

[34] *Smith v. State,* No. 61 (Md. Ct. App. 2022); see *United States v. Buchananan,* No. 1:20 CR 388 (N. D. Ohio Aug, 1, 2022) ("On May 30, 2020, a large group of individuals gathered in downtown Cleveland to protest the death of George Floyd at the hands of a Minneapolis police officer."); see also United States v. Wood, Criminal Action No. 20-56 MN (D. Dele. July 20, 2021) ("On May 25, 2020, George Floyd died while in the custody of the Minneapolis Police Department. As a result, protests were held around the country. One such protest was held in Wilmington, Delaware on May 30, 2020.); In re Jantzen Verastique, No. 05-22-00397-CV (Tex. Ct. App. 5 th Dist. May 13, 2022) (holding "Verastique's petition alleged she was 'ambushed' by DPD officers 'armed with pepper ball launchers' and arrested during a protest following the May 2020 'murder of George Floyd by Minneapolis Police Officers.")

[35] *Martin v. Warren,* No. 20-cv-6538-CJS (W. D. NY. Aug. 26, 2020); see also *Sasso v. City of Dallas,* No. 3:20-cv-1398-S (N. D. TX. June 1, 2020) (holding "This is an application for temporary restraining order regarding Dallas's curfew. George Floyd died under the knee of a Minneapolis police officer on May 25. Protests ensued across the nation. Some turned violent, including in Dallas."

[36] *Conn. State Police Union v. Rovella,* Docket No. 20-35330-cv (2nd Cir. 2022).

[37] *A.C. v. Raimondo,* 494 F. Supp.3d 170, 174, 177 (D. RI Oct. 13, 2020);

the law "would give police 'an enhanced opportunity to work collaboratively with their unions, with us as a legislature, and with their citizens to address the issues of police accountability and transparency.'"[38]

During the unrest even a pair of attorneys were "arrested for bombing a New York City police department vehicle during a protest sparked by the death of George Floyd."[39] At that same time, the undersigned attorney was crisscrossing the country as a legal observer through the non-profit Equity in Justice Institute. [Tolston, 41:17-20]

In Atlanta, on May 29, 2020, the first Friday after George Floyd was killed, a "Supervisor' Use of Force Incident Supplement Form" documents that "Atlanta Police SWAT Team was deployed to assist with a riot situation at and around the area of Centennial Olympic Park...multiple member of the team deployed cannister of OC/CS chemical agent. Chemical agents and less lethal blunt projectiles were deployed to either disperse large and unruly crowds, to deter

---

[38] *Id.*

[39] *United States v. Mattis,* <u>963 F.3d 285</u> (2nd Ci<u>r. 2020</u>) (holding ""The strong public reaction to Floyd's murder made clear that the legislature was responding to an important and pressing societal ill. The name of the law –'An Act Concerning Police Accountability—makes that purpose plain as do the circumstances surrounding its passage.").

looters and/or for denying access to certain areas." [Pl's Exh. 80 p. 7] In total—twenty-four canisters of chemical agent were used that night. [Id.]

The following day on May 30, 2020, in another nearly identical report—Atlanta SWAT was deployed again and ultimately use fourteen canisters of chemical agent and four canisters of smoke was deployed "as an obstruction [sic] – to limit visibility, enhance the effects of chemical agents, and to mask police tactical movements." [Pl's Exh. 80 p. 10]

Undeterred, the people returned to protest on May 31, 2018, and in response—Atlanta Police SWAT team was deployed to quell the civil unrest. In "total 26 canisters of OC/CS were deployed, 3 cannisters of smoke and (8) 40mm less than lethal impact projectiles" were deployed. [Pl's Exh. 80 p. 13]

On the next two days—the voice of the oppressed continued to echo through the streets of Atlanta. On June 1 and 2, the SWAT team for the City of Atlanta was deployed—and both days—officers fired smoke, chemical gas, and potentially lethal projectiles.

Two day later, on June 4, 2020, Mayor Bottoms signed her first of a series of four orders. [Pl's Tr. Exhs. 57 – 60] Administrative Order 2020-17, stated, in part, "there exists a need to examine the City of Atlanta's use of force polices and

procedures." [Pl's Tr. Exh. 58] The order created "an advisory council comprised of community members and partners, both existing and potential, which shall make recommendations for any operation or legislative changes to the City of Atlanta's use of force policies and procedures." [Pl's Tr. Exh. 58 p. 2]

On June 15, 2020 Mayor Bottoms signed Administrative Order 2020-18. [Pl's Tr. Exh. 57] The order stated in part: "recent incidents of persons needlessly facing injury and death at the hands of APD officer have shown [t]he urgent need for reform within the Atlanta Police Department to rebuild the trust so desperately need through the community[.]" [Pl's Tr. Exh. 57 p. 2] On body worn cameras, it stated: "Since the time I took office, APD body worn camera usage has increased from approximately fifty percent (50%) to ninety four-percent (94%)." Those very metrics are the data Police Rodney Bryant was unsure how they were calculated— despite being explicitly tasked with fulfilling the public safety authority delegated to him by his appointment to chief. On June 25, 2020, Mayor Bottoms signed Administrative Order 2020-28. [Pl's Tr. Exh. 60] On July 1, 2020 Mayor Bottoms signed Administrative Order 2020-27. [Pl's Tr. Exh. 59] The order mandated the Chief engage with organizations to perform "a comprehensive examination of policing in the City of Atlanta. [Id. p. 2]

Here, the temporal proximity between the protests that swept the city and Mayor Bottoms administrative orders that reference the convulsed nation is deniable. In the light most favorable to the Plaintiff, given the nationwide action taken, and the reference to "recent shootings" it is clear that Mayor Keisha Lance Bottom signed the four Administrative Orders in response to the killing of George Floyd.

**No Reason Justifies The Deliberate Indifference Of Mayor Keisha Lance Bottoms Failing To Act Aggressively Against The Scourge Of Police Misconduct Sooner**

It took tens of thousands of people marching through the streets of one of the largest metropolises in the United States before the highest elected official took action to address abuse at the hands of state sanction peace officers. A year and a half of inaction passed between the time the City Council and then Mayor Bottoms were given actual record notice of body worn camera deficiencies via the Auditor's report. But for George Floyd, and the likes of angels such as Breonna Taylor, and Ahmed Aubrey—action may never have been taken. It is a telling indictment of the times—and of the officials in power—a 9-minute long cellphone video of a Black man being snuffed out under the knee of a white officer is the catalyst for elected officials to make the right, just decision and not the politick one.

**D. The Demonstrated Failure Of Defendant City Of Atlanta Regarding Body Worn Camera Compliance Was The Moving Force Behind All Of Defendant Officers' Constitutional Violations Against Plaintiff Evidenced By Analogous OPS Investigations**

The City of Atlanta has created a culture whereby so long as an officers' body worn camera is inactive—any misconduct will be subsumed by misclassifying the offense entirely, or by disciplining the camera non-compliance while ignoring the underlying complaint of misconduct. The widespread and pervasive nature of the failure to adhere to body worn policy was the motivating factor behind the unlawful seizure, first amendment retaliation, malicious prosecution, and excessive force exerted against Plaintiff. The Court need not look further than the previously identified investigations.

In 18-C-0325-MISC and 18-C—0195-MISC, the investigator from the understaffed and under-resourced Office of Standards did not sustain the underlying allegation of a false arrest. Similarly, here, officers were not even investigated for the failure to have probable cause or the allegation of excessive force. Similarly, like Plaintiff's first amendment retaliation and malicious prosecution claim—in 18-C-0325-MISC a woman was denied an officer identify after not hearing it. Here, officer just plainly refused when Plaintiff asked. [Pl's Tr. Exh. 11 at 1:49-52] Thus, the failure to activate body worn camera is likely to lead

to increased police misconduct across the board due to City of Atlanta's indifference.

**D. Alternatively, If Body Worn Compliance Is Not Widespread As To Be Unofficial Policy—The Blatant Violations Of At Least Nine Officers During Plaintiff's Arrest Demonstrates The Need For Training Is Blatantly Obvious**

In some instances, a single event can show that the need for training is so blatantly obvious to impugn knowledge on the state.[40] Here, no less than nine officers violated body worn camera policy. Body worn camera policy shows that officers were suppose to have their camera activated while engaging Plaintiff. The policy mandates officers upload and tag their footage to ensure it is properly preserved at the end of their shift. [Pl's Tr. Exh. 51 p. 2] Video shows at least nine officers—and it is undisputed that the three known officers violated body worn camera policy. [Pl's Tr. Exh. 35 p. 1]

CONCLUSION

Plaintiff has created a mosaic by which the Court to view how City of Atlanta was on notice about at least a dozen complaints in the eight months preceding Plaintiff's arrest for the exact type of misconduct alleged. The City, and its chief policymaker Rodney Bryant—who has completed hundreds of

---

[40] *Oklahoma City v. Tuttle,* 471 U.S. 810, 813 (1985).

investigations—continue a pattern of intentional indifference by failing to implement automatically activating body worn cameras and by continuing to underfund the Official of Professional Standards.

WHEREFORE, Plaintiff respectfully prays the Court Deny Defendants' motion for summary judgment.


Respectfully,

/s/

*Justin T. Tolston, JD LLM*
7925 Meredith Ave
Omaha, NE 68134
justin@icitypap.com
402.889.9800
Plaintiff