# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORIGA
## ATLANTA DIVISION

JUSTIN T. TOLSTON,             )
               Plaintiff,    )
                      )
v.                         )     No.  1:20-CV-04221-SEG
                      )
CITY OF ATLANTA, Et. Al.    )

## PLAINTIFF'S STATEMENT OF ADDITIONAL UNDISPUTED FACTS

Pursuant to Local Rule 56.1, the below is Plaintiff's additional set of undisputed facts for the Court's consideration of Plaintiff's response in opposition to Defendant City of Atlanta's motion for summary judgment.

**Implementation of Body Worn Cameras**

1.    APD Body-Worn Camera Rollout was implemented in stages and occurred from 2016-2018. (Pl's Exh. 60, p. 15)



      a.

2.    Atlanta Police officers in Zone 4 received body worn cameras in November of 2016. (Pl's Exh. 60, p. 15)

3. Atlanta Police officers in Zones 1 & 6 received body worn cameras in January of 2017. (Pl's Exh. 60, p. 15)

4. Atlanta Police officers in Zones 2 & 3 received body worn cameras in April of 2017. (Pl's Exh. 60, p. 15)

5. Atlanta Police officers in Zone 5 received body worn cameras in August of 2017. (Pl's Exh. 60, p. 15)

6. Between November 16, 2016 and May 15, 2018, APD officers created 491,753 videos and footage related to the use of force incidents accounted for less than 1% of all videos. (Pl's Exh. 60, p. 15)


7. Defendant Keith Wadsworth's body camera did not capture the use of force against Plaintiff. (Pl's Exh. 70; Wadsworth, 108:1-3)

8. Defendants provided five separate files of video footage captured from Officer's Wadsworth body worn camera. [Pl's Exh. 70 – 74]

9. Footage captured by Officer Wadsworth's body worn camera has the alphanumeric identifier "X81106744" in the upper righthand corner of the video footage below time and date stamp. [Pl's Exh. 70 – 74]

10. Officer Lawrence Holland's body camera did not document the use of force against Plaintiff. (Wadsworth, 108:1-3)

11. Defendants provided three separate files of video footage captured from Officer's Holland's body worn camera. [Pl's Exh. 70 – 74]

12. As an officer lays down Plaintiff's scooter and walks toward Officer Holland, he deactivates his body worn camera. [Pl's Exh. 75 at 3:17 – 3: 21]

13. Officer Thaddeus Joseph's body camera did not document the use of force against Plaintiff. (Wadsworth, 108:1-3)

14. Defendants did not produce any video footage from the body worn camera of former APD officer Thaddeus Joseph.

15. Eleven different uniformed Atlanta Police officers are pictured in body worn camera produced by Defendants.

16.

17. During the internal affairs investigation into Plaintiff's complaint, Officer Wadsworth told Investigator Walton that his "body camera was on, but it may have fell off, but it was—it was on." (Wadsworth, 108:23-25)

18. During his deposition, Officer Wadsworth testified that on October 14, 2018, he turned off his body camera to conserve battery life. (Wadsworth, 108:23-25)

19. When asked: "Is it normal practice for you to leave your camera off during the shift to conserve battery?" Officer Wadsworth testified that "I don't know if you're talking about an off-duty shift[1] or on—like regular?" (Wadsworth, 111:9-15)

20. During the internal affairs investigation into Plaintiff's complaint, when asked to explain the use of force against Plaintiff, Officer Wadsworth told Investigator Walton: "I grabbed Mr. Tolston, and in doing so I was struggling to grab him. We both feel to the ground, and I placed cuffs on him." (Wadsworth, 106:9-15)

21. According to Atlanta Standard Operating Procedure: "Officers will respect the first amendment rights of citizens as specified in this directive. They will be knowledgeable of state laws and city ordinances that are applicable in situations where first amendment activity is occurring." (Wadsworth, 126:18-25)

22. According to Atlanta Standard Operating Procedure: "Employees will use only that force which is reasonable and necessary to effect an arrest or restraint and to ensure the safety of the arrestee, the officers, and others." (Wadsworth, 127:5-8)

23. According to Atlanta Standard Operating Procedure: (Wadsworth, 126:18-25)

24. Nearly a year after the incident, on October 10, 2019, Defendant Officer Keith Wadsworth was interviewed concerning Plaintiff's complaint by internal officers or Office of Professional Standards interview with Investigator Gartrell Walton. [Wadsworth,

25. During the interview that was conducted, Defendant Wadsworth was questioned regarding actions taken the day Plaintiff was cited.

---

[1] Although Wadsworth used the term "off-duty," it is reasonable for the Court to infer Officer Wadsworth was referring to "extra duty" shifts.

26. Officer Wadsworth was unable to recall the length of the computer training he received regarding body worn camera procedures because it "was years ago." (Wadsworth, 39:24-25)

27. APD Office of Professional Standards should not take more than a year to investigate a complaint. (Bryant, 36:8-16)

28. In 2018, Officers activated their body cameras by double tapping the center, Wadsworth

29. Body worn cameras are manually activated. (Bryant, 43:21-23)

30. APD officers can go an entire year without having their body worn camera audited (Bryant, 24:10-15)

31. If an APD officer is "engaging" a person their body worn camera needs to be activated. (Bryant, 44:15-18)

32. In Chief Bryant entire career he has never seen an officer fail to activate a body worn camera (Bryant, 7-9)

33. Chief Bryant has done hundreds of police misconduct. (Bryant, 12:5-8)

34. On July 2, 2020, then Atlanta Mayor Keisha Lance Bottoms signed administrative order 20-28, in part, ordering "the chief operating officer to work with the interim chief of police to implement and reform police officers' compliance of body-worn cameras and standards and operating procedures to implement measure with deliberate speed which shall increase transparency to improve access to body-worn cameras. (Bryant, 17:8-17)

35. A person can file a complaint written, orally, directly to a supervisor, and anonymously to the APD Office of Professional Standards

36. Office of Professional Standards reports directly to Chief Bryant. (Bryant, 12:22-24)

37. According to Atlanta Police standard operating procedure unprofessional is misconduct and is something that an officer can be disciplined for exhibiting. (Bryant, 14-15:25-3)

38. Speaking rudely, using profanity constitutes unprofessionalism according to APD standard operating procedures. (Bryant, 15:

BWC Policy In Effect On October 14, 2018

39. The body worn camera policy outlined in APD.SOP.3133 with an effective date of December 15, 2017 and signed and approved by then chief of police Erika Shields was in effect on the date of Plaintiff's arrest on October 14, 2018.

40. Section 2 of APD.SOP.3133  body worn camera policy, effective December 15, 2017, stated: Employees issued a BWC shall wear, use, and maintain only body worn cameras (BWC) and related equipment authorized and approved by the Atlanta Police Department…The BWC shall be used during the course of regular and extra job duties, for the prupose of potential evicence in the prosection of criminal and traffic offense, departmental internal investigations, and any other sitations which the Department shall deem necessary."

41. Section 3.1 of APD.SOP.3133  body worn camera policy, effective December 15, 2017, stated: "The Chief of Plice or his/her designee shall ensure that all employees issued a BWC adhere to the guidelines and procedures listed in this directive. The Chief of Police or his/her designee, shall be the final approving authority regarding the BWC and all records and data release as it relates to media/press or general public."

42. Section 3.2 of APD.SOP.3133  body worn camera policy, effective December 15, 2017, stated: "Supervisors shall be responsible for ensuring that employees, under their command are in compliance with this directive, Supervisors shall further be responsible for inspecting all equipment pertaining to the Body Worn Cameras (BWC) which shall be issued to employees in accordance with APD.SOP.1090 "Inspection".

43. Section 3.3 of APD.SOP.3133  body worn camera policy, effective December 15, 2017, stated: "Supervisors shall take immediate corrective action when necessary, regarding the use and/or misuse of BWC equipment, and BWC data/images in accordance with APD.SOP.2020 'Disciplinary Process'."

44. Section 3.6 of APD.SOP.3133  body worn camera policy, effective December 15, 2017, stated: "Employees at the rank of sergeant and below who are assigned a BWC shall be required to wear and use

the BWC during the course of their regular and extra duties. Employees at the rank of lieutenant or higher shall have the option, but are not required to wear and/or use the BWC during the course of their regular and extra job duties."

45. Section 3.8 of APD.SOP.3133 body worn camera policy, effective December 15, 2017, mandated: "All employees regardless of rank shall be required to attend BWC training. All training regarding BWC shall be conducted by instructors that have successfully completed the BWC training."

46. Section 4.1.2 of APD.SOP.3133 body worn camera policy, effective December 15, 2017, stated: "Employees shall be trained by the designated instructors in the areas listed to include, but not limited to: "Reasonable Expectation of Privacy," "BWC Hardware/Equipment," "BWC Software" and the "Operation of BWC."

47. Section 4.3.2 of APD.SOP.3133 body worn camera policy, effective December 15, 2017, stated: "Employees shall place the BWC in event (recording) mode upon arriving on scene of a call for service requiring recording of an incident, or when interacting with the public in a law enforcement capacity which the officer and/or his or her supervisor deems necessary to record and document."

48. Section 4.3.4 of APD.SOP.3133 body worn camera policy, effective December 15, 2017, states: "The Atlanta Police Department recognizes that employees safety is paramount and understands that events can take place without notice. Employees shall place their BWC into event (recording) mode for the following circumstances to include, but not limited to: a. Vehicle and Pedestrian stops;[] c. Field interviews; [and] h. While interviewing suspects, victims, or witness"

49. Section 4.3.5 of APD.SOP.3133 body worn camera policy, effective December 15, 2017, states: "If there is a non-activation or interruption of recording by employees arriving on scene of an incident requiring activation of the BWC, or if an employee does not place the BWC in event (recording) mode while interacting with the public in a law enforcement capacity deemed necessary

by the employee and/or his or her supervisor , the employee shall begin recording the event as soon as practically possible and document the circumstances in a written reporting explaining the delay in activation or interruption in the recording of the incident in accordance with APD.SOP.3060 'Report Writing'."

50. Section 4.3.5 of APD.SOP.3133 body worn camera policy, effective December 15, 2017, states: "Employees may activate the BWC anytime they believe its use would be appropriate and/or valuable to document an incident, or as instructed by their supervisor. The BWC shall be placed in event (recording) mode as soon as it is practically possible for employees to do so in order to capture an event."

51. Section 4.5.3 of APD.SOP.3133 body worn camera policy, effective December 15, 2017, states: "Employees shall not interfere or intentionally block the ability of the BWC to record an encounter."

52. Section 4.6.3 of APD.SOP.3133 body worn camera policy, effective December 15, 2017, states: "All employees who are assigned a BWC, dock the device in the appropriate designated areas and upload all video footage and data before the end of their shift."

53. Section 4.6.4 of APD.SOP.3133 body worn camera policy, effective December 15, 2017, states: "Employees shall tag a particular piece of video footage regarding a case in the following manner: 1. Add a category tag to the footage; 2. Add the case number for identification purposes of each video tagged; and ensure that the video footage has been uploaded onto the APD approved storage network before the end of the employee's shift."

54. Section 4.11.3 of APD.SOP.3133 body worn camera policy, effective December 15, 2017, states: "Any violations regarding this written directive, and as it pertains to local, state, or federal laws shall be documented and submitted to The Office of Pression Standards (OPS) for further review in accordance with APD.SOP.2020 'Disciplinary Process'."

55. Section 4.10.1 of APD.SOP.3133 body worn camera policy, effective December 15, 2017, states: "The Chief of Police or his or

her designee shall determine and approve a BWC Compliance Administrator."

56. Section 4.10.4 of APD.SOP.3133 body worn camera policy, effective December 15, 2017, states: "The Compliance Administrator shall conduct a random audit of at a minimum 25 pieces of BWC data on a weekly basis. The data shall be analyzed and a report documenting the findings shall be generated monthly."

57. Section 4.10.5 of APD.SOP.3133 body worn camera policy, effective December 15, 2017, states: "The audit should be reflective of the department and include multiple samples for review. The report shall further address any training or written directive issues resulting from the audit, and provide recommendations regarding compliance and accountability."

58. Section 4.7.1 of APD.SOP.3133 body worn camera policy, effective December 15, 2017, states: "Employees issued a BWC shall take their device to any and all approved department extra jobs. Furthermore, employees shall adhere to all aforementioned guidelines and procedures regarding the BWC while performing their extra job duties."

59. Section 4.7.4 of APD.SOP.3133 body worn camera policy, effective December 15, 2017, states: "Any use of force incident captured by the BWC must be uploaded by a supervisor before the end of the extra job shift. Supervisors and employees shall adhere to guidelines in accordance with APD.SOP.3010 'Use of Force'."

60. Section 4.8.1 of APD.SOP.3133 body worn camera policy, effective December 15, 2017 requires that "BWC recorded data shall remain stored on a secured APD approved storage network…The retention guidelines are as follows: []ed. Use of force w/ no arrest 30 months f. Arrest 5 years[]."

**Use of Force Summary**

61. "In 2019, most of Use of Force incident involved officers using physical force to obtain control of an arrestee. The use of Physical

Force increased from 231 incidents in 2018 to 390 incidents in 2019 (+70%) when attempting to control perpetrators." (Pl's exh. 61, p. 3)

62. "The 2019 analysis shows that force usage is down in the categories of OC Spray, Firearm, and Taser. According to the 2019 Use of Force Analysis, Physical Force and Asp Baton usage are up slightly."

## Performance Audit: Atlanta Police Department Body-Worn Cameras

63. The December 2018 report stated: "We undertook this audit because body worn cameras enhance the tranperency and accountability of interactions between citizens and the police. The chief of police requested we conduct a performance audit to assess compliance with the department's body-worn camera policy and recommend metrics for monitoring program compliance." (Pl's Exh. 60, p. 3)

64. The December 2018 Auditor Report found "In our random sample of 150 videos, 61% were activated and 47% were deactivated according to policy. Overall, we estimated that 30%-46% of videos complied with both activation and deactivation procedures." (Pl's Exh. 60, p. 3)

65. The December 2018 Auditor Report advised: "we recommend that the chief of police: clarify the policy regarding recording all incidents, update policy to remove

66. The report noted: "Supervisors are responsible for ensuring that officers comply with camera policies; however, supervisors reviewed only 2% of all videos uploaded between November 2016 and May 2018. Departmental procedures do not specific a formal process regarding the number of video to ensure review or include criteria to ensure compliance with recording policies." (Pl's Exh. 60, p. 3)

67. December 2018 Auditor Report states: "Supervisors are responsible for ensuring employees under their command use the

cameras according to policy and training. They are also responsible for retrieving, uploading, and categorizing footage from use of force events."

68. The December 2018 Auditor Report stated "This report address the following objectives: Do body-worn camera users comply with the Atlanta Police Department's standard operating procedures? [and] What metrics should the Atlanta Police Department consider when assessing officers' compliance with policy and best practices?"

**Body Camera Non-Compliance Notice** (Pl's Exhs. 300 -

69. In OPS investigation **18-C-0488-MISC**, a woman sent a letter "to make a claim against the Atlanta Police department swat team for destroying my home and property while removing [a] mental health patient." (Bates 10851)

70. During the OPS investigation 18-C-0488-MISC, under penalty of perjury, SWAT Team Supervisor Charles Ayeni responded "No, I was not" when asked "At the time of this incident were you were a BWC?" (Bates 10858)

71. During the OPS investigation 18-C-0488-MISC, under penalty of perjury, Officer Jordan Pearson responded "Yes, ma'am" when asked "At the time of the incident had you been issued a body worn camera?" (Bates 10852)

72. During the OPS investigation 18-C-0488-MISC, under penalty of perjury, Officer Jordan Pearson responded "Yes, ma'am" when asked "Did you record this call?" (Bates 10852)

73. During the OPS investigation 18-C-0488-MISC, under penalty of perjury, SWAT Officer Fred Watson responded "No, ma'am" when asked "Were you required to wear a BWC in this unit?" (Bates 10858)

74. During the OPS investigation 18-C-0488-MISC, under penalty of perjury, SWAT Officer Fred Watson responded "No" when asked "At the time of this incident were you were a BWC?" (Bates 10864)

75. During the OPS investigation 18-C-0488-MISC, under penalty of perjury, SWAT Officer Fred Watson responded "No, We don't'

have BWC assigned to the SWAT Unit. I haven't been issued a BWC" when asked "Were you required to wear a BWC?" (Bates 10864)

76. During the OPS investigation 18-C-0488-MISC, under penalty of perjury, Assistance SWAT commander Willie Adams responded "No" when asked "At the time of this incident were you were a BWC?" (Bates 10870)

77. During the OPS investigation 18-C-0488-MISC, under penalty of perjury, Special operations SWAT unit Officer Robert Bailey responded in the "No, we don't have them issued" when asked "at the time of this incident were you were a BWC?" (Bates 10876)

78. During the OPS investigation 18-C-0488-MISC, under penalty of perjury, Special operations SWAT unit Officer Robert Bailey responded in the "That is correct" when asked "So you're not required to wear a BWC?" (Bates 10876)

79. During the OPS investigation 18-C-0488-MISC, under penalty of perjury, the accused officer answered in the affirmative when asked "Did you record this call?" (Bates 10582)

80. In OPS investigation **18-C-0462-MISC** concerns an investigation from a July 19, 2018 interaction where a citizen alleged an APD officer "acted inappropriately by stopping and harassing" as "he was walking down Hill St. toward a Baptist church that gave out food[.]"

81. In OPS 18-C-0462-MISC the Letter of Written Reprimand stated: "Officer R. Henry did not active his body worn camera during this incident and in violation of APD.SOP.3133 — Body Worn Camera – 4.3.4"

82. In OPS investigation **18-C-0405-MISC** an officer was only reprimanded after being "investigated on a complaint involving a dispute on a 911 call" and found to have "violated work rule 4.2.33 Conformance to Directives for not turning on [his] Body Worn Camera at the beginning of the incident when [he] arrived on scene." The reprimand further stated: "Your camera was found to be turned on at the end of the 911 call."

83. In **OPS 18-C-0365-MISC,** on June 11, 2018, an OPS investigator checked the box indicating "No" "Body Worn Camera Video" existed from a May 7, 2018 complaint regarding the removal of a homeless person sleeping on the sidewalk. The officer subject of the OPS complaint was from zone five.

84. In **OPS 18-C-0341-MISC**, an officer failed to record a conversation with a citizen concerning threats during an extra job stating: "No at the time of the conversation I did not believe that this was a formal conversation between Police and Citizen contact."

85. The officer in investigation 18-C-0341 also answered in the negative when asked "Did you have your body camera on while you were listening to Stribling and Officer Durmishi's conversation?"

86. The OPS investigator in OPS 18-C-0341 marked that "No" "Body Worn Camera Video" existed regarding the incident which was subject of the complaint.

87. The there is no indication in the investigative file for OPS 18-C-0341 that the officer was disciplined for failing to active her body worn camera.

88. In **OPS 18-C-0339-MISC** it was alleged "Sergeant Z. Kramer, Investigator T. Bacon, Investigator D. Camp, Investigator C. Gurley and Officer S. Gordon failed to properly investigate an armed robbery which lead to the improper detention and arrest of the complainant on 08/07/2017." (Bates 9610)

89. In OPS 18-C-0339-MISC, the incident narrative states, in part, "On August 7, 2017, at around 0012 hours, I, Officer S. Gordon (Unit #1501) was dispatched to a pedestrian robbery." (Pl's Exh. X, Bates 9686) and the complaint summary states: "Zone 5 units responded to 410 14th St. NW to investigate a pedestrian Robbery. A report was completed by Officer Gordon." (Bates 9686)

90. In OPS 18-C-0339-MISC, the investigator neither marked "Yes" nor "No" on the OPS investigative form asking if "Body Worn Camera

Video" existed the incident which was subject of the complaint. (Bate 9637)

91. In OPS 18-C-0339-MISC, there is not mention of body worn camera from Officer Gordon who arrived on the scene and there is no record that Officer Gordon was disciplined for failing to activate his body own camera during the criminal investigation. (Pl's Exh. X)

92. In **OPS 18-C-0332-MISC**, a February 2, 2019 Letter of Written Reprimand stated in part: "On 6/10/2018 Officer Andrew Bradshaw did fail to conform with the APD.SOP.3133 Body Worn Camera Directive. Officer Andrew Bradshaw failed to record the entire incident that occurred on 6/10/18. Officer Bradshaw did start the recording at the beginning of his call but later during the call turned off the camera and was missing visible footage from the incident." (Bates 9553)

93. In OPS 18-C-0332-MISC, the investigator wrote: "BWC footage shows Officer Bradshaw speak with Officer Everson for approximately two (2) minutes (captured in buffer with no volume) before he activates his body worn camera." (Bates 09493)

94. In OPS 18-C-0332-MISC, the investigator wrote: "There appears to e no further BWC of this incident. BWC footage does not show the transaction between Officer Bradshaw and Ms. Core as it appears to have been turned off prior to their interaction placing him in violation of…APD.SOP.3133 Body Worn Cameras (BWC)." (Bates 09493)

95. In **OPS 18-C-0331-MISC** at the end of the Summary of Complaint the complaint read "This Investigator was unable to locate any body worn camera footage of this incident on Evidence.com." (Bates 09476)

96. In OPS 18-C-0331-MISC the investigator wrote: "1. Officer Hayslette advised me that his camera was in buffer mode and working properly to the best of his knowledge. [6]. Officer

Hayslett is in violation of APD.SOP.3133 Section 4.3.2" (Bates 09481)

97. In OPS 18-C-0331"Ms. Sumlin came into the office and reported that on that same day (12/19/17) she had been thrown to the ground by unknown officers while in the trunk of her car." Ms. Sumlin advised that she believes a gun was pointed in her face...Lt. Bruce was on scene." (Bates 9183)

98. The OPS investigator in OPS 18-C-0331 marked that "No" "Body Worn Camera Video" existed regarding the incident which was subject of the complaint. (Bates 09177)

99. The OPS investigator in OPS **18-C-0325**, concerning a June 27, 2018 traffic encounter, marked that "No" "Body Worn Camera Video" existed regarding the incident which was subject of the complaint. (Bates 9399)

100. The OPS investigator in OPS 18-C-0325 wrote: "I find that there is no video evidence and no witness statement to support the allegation of SPO. William Glaspie asking Mr. Anthony Cotton if he was 'stupid'." (Bates 9403)

101. SPO William Glaspie, subject of compliant OPS 18-C-0325, answered in the negative when asked in a July 17 2018 OPS investigation interview "Do you have a City of Atlanta Police body camera assigned to you?" (Bates 9395-96)

102. The OPS investigator in OPS **18-C-0322**, concerning a June 27, 2018 traffic encounter, marked that "No" "Body Worn Camera Video" existed regarding the incident which was subject of the complaint. (Bates 9399)

103. OPS file **18-C-0322** concerned alleged inappropriate action by Officers Mayfield and Starks of Zone 4 during "a vehicle stop involving a carjacking suspect on 06/10/18."

104. Investigative OPS file **18-C-00269** has a 05/07/2018 "complaint received" date and was an investigation "into the allegation that Officer Cedric Lowe [of Zone 5] acted inappropriately by leaving a child unattended in a vehicle while he arrested the child's father." ( Bate 8851)

105. In 18-C-0269 a mother emailed to complain that her dehydrated, soiled child that was left in a car seat for 1.5 hours and that she arrived while the car was hooked up to be towed with her drenched child still inside. She further stated that she "submitted a complaint via the online portal last week April 25, 2018, and I have not received confirmation that it has been received. I called the day I submitted and left a voicemail and have not received a call back." (Bates 08854, 8857)

106. The officer accused in OPS file 18-C-0269, alleged that he checked on the child. (Bates 8856)

107. The investigator in 18-C-0269 wrote "The only other area of concern with reference to this investigation is how the BWC was used. Off. Lowe active his BWC when he arrested the suspect and shut if off after the suspect was secured in his vehicle. Had the officers BWC been permitted to continually record until the suspect was turned over to the custody of the jail, we may have been able to well substantiate or dispel the allegations of this complaint." (Bates 8846)

108. The investigator in 18-C-0269 further wrote: "During the OPS investigation, Q/A session Off. Lowe was asked why he chose to activate his BWC before he made arrest and deactivate the BWC after he was back in the patrol vehicle. Off. Lowe explains that he was working overtime during the encounter [a]nd he was tying to conserve the battery of his BWC[.] Off. Lowe also states that he was not issued a personal charger with his BWC, so he had no way to ensure that he had a full battery for his regular 8-hour tour besides conserving battery life by shutting the BWC off when he felt that an encounter was going smoothly. Unfortunately, everything else that allegedly took place on this scene is not available for review." (Bates 8846)

109. In OPS file **18-C-0195**, the Investigator Sgt. Giles wrote: "It was determined during the investigation that Sergeant Apple did violate departmental policies during the incident by not activating his body worn camera when responding to a supervisor request."

110. In OPS file 18-C-0195, Investigator Giles noted: "According to Officer Stanley's body worn camera, Mr. Hasse complained about Officer Stanley accusing him of being drunk in public, refusing to issue him a breathalyzer, committing malpractice by not taking a report from his friend and for placing him in her patrol car without probable cause." (Bates 8156)

111. In OPS file 18-C-0195, Investigator Giles found: "While speaking to Sergeant Apple, Mr. Hasse asking him if his body camera was recording, Sergeant Apple said no, but hers is." (Bates 8156)

112. The OPS investigator in OPS **18-C-0322**, concerning a June 02, 2017 traffic encounter, marked that "No" "Body Worn Camera Video" existed regarding the incident which was subject of the complaint. (Bates 9399)

113. The OPS investigator in OPS **18-C-0166**, concerning a June 27, 2018 traffic encounter, marked that "No" "Body Worn Camera Video" existed regarding the incident which was subject of the complaint. (Bates 8078)

114. The "Disciplinary Complaint Folder Index" does not list body worn camera footage from either of the two accused officers in OPS complaint file 18-C-0166. (Bates 8074)

115. There is no mention of any body worn camera footage from either of the two Zone 6 (Bates 8077, "Z6") officers in the entire OPS complaint file 18-C-0166. (Pl's Exh. Xx, *generally*)

116. In OPS file **18-C-0152** it was alleged that "Sergeant Zoel Murphy refused to provide his name and badge number when the complainant requested the information on 01/21/2018" and inappropriately responded to a citizen informing him about a fight at a bar while working an extra duty shift. (Bates 7997)

117. In OPS file 18-C-0152 Lt. Graham wrote: "I could not locate any BWC video from Sgt. Z. Murphy's body camera for this incident. I found two recordings from earlier in the night at the same location where Sgt. Z Murphy was speaking to an intoxicated male." (Bates 8052)]]

118. In OPS file 18-C-0152, the "Notice Of Proposed Adverse Action" outlining a two-day suspension stated: "Subsequent investigation

revealed that you were equipped with your BWC but did not have it active during this incident because, according to you, 'everything happened quickly.'" (Bates 8061-62)

119. In **OPS 18-C-0066**, the accused officer answered in the affirmative when asked "On January 14, 2018 were you wearing your body Worn Camera?" (Bates 12410)

120. In OPS 18-C-0066, when asked if his body worn camera was activated the accused officer responded: "No, the battery was on low and would not record…Because I had it on at work that day, and we do not have a charging station at the mini precinct, so I could not charge it before my extra job." (Bates 12410)

121. There is no indication from the file that the officer in OPS investigation 18-C-0066 was disciplined for failing to have their body worn camera activated.

122. The OPS file **18-C-0016**, an investigator wrote: "Officer Holloway had his body worn camera on and recording for the full duration of this incident. Officer Jackson did not have his body worn camera on for any portion of this incident." (Bates 11884)

123. The OPS file 18-C-0016, the complaint regarded "the allegation that Officer Holloway acted inappropriately during the arrest of the complainant on June 8, 2017.

Identification

124. In OPS file 18-C-0224 a citizen "was concerned by the way he was stopped and interacted with" and "The Office of Professional Standards would subsequently sustain Lt. Elis for failing to provide identification as required in Work Rule 4.2.23" (Bates 8672)

125. However, in finding the allegation was "Not Sustained" in OPS file 18-C-0224, the investigator wrote: "Viewing the BWC of Officer Gardner, Mr. Washington does not object to the way Lt. has positively identified himself." (Bates 8673)

Captured Incident

1. OPS 18-C-0426-MISC concerned an investigation from an interaction where the OPS investigator found "that the Body Worn Camera (BWC) captured the entire investigation of this incident from start to finish [and] BWC shows Ofc. Berry and Sgt. Turner explained to the complaint that he was getting a citation [BWC] shows Ofc. Berry never 'slammed' the door of the ambulance[.]"

2. In OPS 18-C-0386  the investigator wrote in bold: "Body worn cameras of all involved captured the entire incident."

3. In OPS 18-C-0379 the investigator wrote in bold: "I reviewed the body camera footage from the call and at no time did I see Officer Sutton act inappropriately during the call."


Shields Deposition

Under Georgia law a party need not show an individual was unavailable to use deposition testimony from a prior actions — however, a must only show that prior action involved the same parties and "concerned substantially the same issues." "The deposition of a party of a party or of anyone who, at the time of taking the deposition, was an officer, director, or managing agent of a public or private corporation which is a party may be used by an adverse party for *any* reason."

4. Investigators with the  Atlanta Citizen Review Board should review body worn camera footage as part of their investigations. (Shields, 33:22-24)

5. It is generally harder for an officer's supervisor to be objective versus an independent investigator. (Shields, 28:13-19)

6. In a typical use-of-force OPS investigation an investigator "gather any camera footage that  you can, whether it's body-worn camera or off a light[.]" (Shields, 29-30:22-2)

7. Supervisors can assist in internal affairs investigations by pulling the body-worn camera and providing it to internal affairs. (Shields, 31-32:22-8)

8.   According to Chief of Police Erika Shields "It's incumbent upon all law enforcement agencies to have body-worn cameras and to consistently audit them so that we can vet out any misappropriate behavior before it escalates. (Shields, 14:14-24)