RECEIVED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

NOV 28 2022

KEVIN P. WEIMER, Clerk
By: _____ Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORIGA
### ATLANTA DIVISION

JUSTIN T. TOLSTON,                     )
       **Plaintiff,**        )
                             )
**v.**                                 )    **No.  1:20-CV-04221-SEG**
                             )
**CITY OF ATLANTA, Et. Al.**           )

## PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT FOR OFFICERS KEITH WADSWORTH, LAWRENCE HOLLAND, AND CHIEF OF POLICE RODNEY BRYANT

NOW COME *pro se* Plaintiff in opposition to the above-named Defendants' motion for summary judgment. Affixed are a Motion for Leave of Court to file an overlength brief pursuant to Local Rule 7.1(D).

## INTRODUCTION

"But somewhere I read of the freedom of assembly. Somewhere I read of the freedom of speech. Somewhere I read of the freedom of the press. Somewhere I read that the greatness of America is the right to protest for rights."[1]

---

[1] *Alsaada v. City of Columbus*, 536 F. Supp.3d 216, 223 (S. D. Ohio April 30, 2021) (quoting Martin Luther King Jr., I've Been to the Mountaintop (April 3, 1968) ("This case is the sad tale of police officers, clothed with the awesome power of the state, run amok.")).

Introduction                                                                                    1

Statement of Facts                                                                              3

Argument                                                                                        8

A. Summary Judgment Standard                                                                    9

B. Qualified Immunity Standard                                                                  9

   1. Officers Wadsworth Is Not Entitled To Qualified Immunity             12
     Because...Working An Unauthorized and Unapproved Shift

   2. Defendant Officers Are Only Entitled To Modified                    13
     Qualified Immunity Due To Their Spoliation Of Evidence
     By Intentionally Deactivating Their Body Worn Cameras

C. Officers Wadsworth And Holland Falsely Arrested Plaintiff                                     18
(Count VII) Because They Lacked Arguable Probable...

   1. Officers Lacked Arguable Probable Cause To Cite Plaintiff           20
     For Prohibited Conduct In A Public Park...

   2. Plaintiff Was Free To Remain In The Park At The Moment              24
     The Vulgar Move-On Order Was Given As Any Arguable
     Probable Cause Had Dissipated

   3. Officers Lacked Arguable Probable Cause to Cite Plaintiff          31
     For Disorderly Under The Influence...

   4. Defendants Lacked Probable Cause To Cite Plaintiff For             37
     Physical Obstruction...

D. Defendants Are Liable For Excessive Force Because Officers                                    40
Were Not Entitled To Use Any Force...(Count I)

   1. Alternatively, No More Than *De Minimis* Force...                   41

E. Officers Engaged In First Amendment Retaliation...(Counts IX                                  46
& XV)

   1. Beyond Actual Damages, Plaintiff Continues To Suffer...            54

F. Defendant Officers Are Liable For False Arrest Because Any                                    55
Probable Cause Had Dissipated (Count IXX)

G. Defendant Officers Assaulted and Battered...(Count XX)                                        55

H. Defendant Officers Are Liable For State Law Malicious                                         57
Prosecution...(Count XXI)

Conclusion                                                                                      58

While working an unauthorized security shift at a peaceful festival, uniformed Atlanta Police officers—equipped with inactivated body worn cameras—forcefully rendered Plaintiff to the ground in an unprovoked and gratuitous use of force. Officers then retaliated with three fabricated and trumped-up charges for Plaintiff requesting their badge numbers to report their malfeasance, which the concussed Plaintiff tried, in vain, to do over the span nearly two hours in six separate 911 calls seeking transport to the hospital.

## STATEMENT OF FACTS

As Plaintiff is proceeding *pro se*, a factual proffer in the form of a sworn declaration is attached to supplement the foregoing document.[2] [Att. A, Pl's Decl.]

On October 14, 2018, Plaintiff rode a foldable, GoTrax electric scooter to Piedmont Park in Atlanta, Georgia, for leisure to get reprieve studies at Emory University. [Tolston, 57:16-24; Pl's Tr. Exh. 32] Plaintiff noticed a pair of women struggling to pull a cart up a substantially inclined knoll, as unbeknownst to Plaintiff, Piedmont Park was the scene of a festival on that day. [Tolston, 58:1-15]

---

[2] *Leach v. District of Colombia*, (D. 2022) (finding "Plaintiff nevertheless claims that the footage 'is an incomplete representation of the events that occurred' and it fails to 'capture entirely the events described in his Complaint.' But Plaintiff does not provide a specific, sworn counterfactual proffer.").

Plaintiff lugged the cart up the hill for the women, and in return, Plaintiff was extended an offer to enjoy the festivities alongside them in the public park. [Tolston, 58:9-19] There were thousands of people, performances, and numerous vendors. [Tolston, 58:21-25]

As darkness fell around 9PM, just moments prior to the initial contact with officers, Plaintiff broke a sweat hauling multiple bags to vehicle nearby as the group packed up. [Tolston, 63:13-19] Parched from the chivalry, Plaintiff lawfully purchased an alcoholic beverage from a vendor at the festival. [Tolston, 63:6-12]; Doc. 127] After taking a swig, or very small amount, Plaintiff discarded the beverage container onto the ground before picking it back up to throw away in a nearby trash receptacle. [Tolston, 64:1-16]

Defendant Officer Keith Wadsworth, Officer Lawrence Holland, and former Atlanta Police Officer Thaddeus Joseph were standing next to each other, faced away from plaintiff on at the top of hill providing general security. [Walton, 35:7-20; Wadsworth, 41:1-2]

A scooter was in Plaintiff's left hand and a beverage container was in the right as walked through the crowd toward the trash can *de minimis* or "incidental contact" was made with Officer Holland. [Tolston, 83:10-17; Pl's Tr. Exh. 5 p. 3]

Within seconds of the incidental contact, Officer Lawrence Holland turned around and "just lost it," as he verbally attacked Plaintiff stating: "What's your fucking problem?" [Pl's Tr. Exh. 5 p. 3] Without provocation, and in tandem with his unprofessional vulgarity, Officer Holland seized the beverage out of Plaintiff's hand before pouring the contents out onto the ground: Plaintiff stood there stunned. [Tolston, 75:9-21] Officer Holland then cursed at Plaintiff again, stating: "Keep it fucking moving." [Tolston, 77: 19-22]

In response, Plaintiff said either: "What's the issue" or "What's the problem" [Tolston, 77:23-25]

Without warning, Officer Holland said, "That's it," and grabbed arm. [Pl's Tr. Exh 4 p. 2; Pl's Tr. Exh. 3 p. 2] Officer Holland, in concert with Officer Wadsworth, slammed Plaintiff to the ground causing Plaintiff to lose consciousness. [Tolston, 26:13-18]

None of the three officers had their body worn cameras activated prior to, or during the initial interactions with Plaintiff, including the use of force that rendered Plaintiff to ground. [Pl's Tr. Exh. 35 p. 1]

Plaintiff was picked up, and walked by Officer Holland across a field, during which Plaintiff asks: "Why are you doing this?" [Pl's Tr. Exh. 16 0:23-24] Officer Holland responds: "We're done talking." [Id. at 0:26-27]

Officer Wadsworth tells Officer Holland to uncuff Plaintiff and to "do it now." [Pl's Tr. Exh. 11 Officer Wadsworth then tells Plaintiff "do not come back in this park." [Pl's Tr. Exh. 11 at 1:21-23] Plaintiff responded: "I need my scooter." Body worn camera footage then shows Plaintiff asked for the badge numbers of the officers twice in the span of nine seconds, stating: "I need everybody's badge number, I just need everybody's badge number bro." [Pl's Tr. Exh. 11 at 1:44-52]

Seconds later body worn camera footage shows an officer stating "He's gonna take a ride." [Pl's Tr. Exh. 11 at 1:49-52] Forty seconds later while handcuffed and surrounded by officers, Plaintiff clearly asks **twice**: "Am I detained or am I under arrest?" [Pl's Tr. Exh. 11 at 2:29-33] The supervising officer states: "I don't know, I'm going to have to see what the officer says" and Plaintiff responds: "Yes, sir." [Pl's Tr. Exh. 11 at 2:34-36]

That same superior officer steps aside and is seen speaking to Officer Holland a few feet away . The superior officers returns a few moments,  grab's

Plaintiff's arm, and says: "Let me talk to him over here for a minute." [Pl's Tr. Exh. 11 at 3:59-4:01] Video evidence shows the Sergeant taking Plaintiff away from the officers while Plaintiff was detained in police custody. [Id. at 4:02]

While off camera, Officer Wadsworth's body worn camera shows the three officers standing in a circle facing each other, as Officer Holland puts his hand on the body worn camera to deactivate the device. [Pl's Tr. Exh. 11 at 4:06] With Plaintiff still in the custody of the superior officer, Officer Wadsworth's deactivates his body worn camera as the footage abruptly ends. [Pl's Tr. Exh. 11 at 4:22] Video evidence shows that the superior officer was not equipped with a body worn camera. [Id. at 3:22]

While off-camera, the supervising, and superior officer offered Plaintiff a quid pro quo. [Tolston, 86:4-16; Pl's Tr. Exh. 5 p. 3], The sergeant stated: "What if I could make this all go away...and you could just go about your way," and Plaintiff understood the sergeant to mean "make this [arrest] go away,' if I wouldn't basically come down here and file a complaint against the officer who abused and battered me." [Pl's Tr. Exh. 5 p. 3] Plaintiff told the Sergeant the officer "He cussed at me, yelled at me, and then had me slammed on the ground

and handcuffed…Even if you do that, I still want his badge number 'cause he shouldn't have treated me like that." [Pl's Tr. Exh. 5 p. 3]

After "many conversations" with Officer Lawrence Holland, [Wadsworth, 37:1-6] Defendant Officer Keith Wadsworth cited Plaintiff with 10−9, disorderly while under the influence; 110-59, prohibited conduct in park; and disorderly section 7, physical obstruction of another. [Wadsworth, 8:20-24]

While in custody, body worn camera shows Plaintiff complained of head pain, and fell out of a chair and onto the floor. [Bryant, 54:1-5] Plaintiff then placed six 911 calls seeking transport to the hospital, [Pl's Tr. Exhs. 21-29] but the officers canceled the calls. [Pl's Tr. Exh. 30 pp. 1-6] Plaintiff was subsequently diagnosed with post-concussion syndrome, a neck sprain, and a head injury at the Emory University Student Health Center. [Pl's Tr. Exh. 9] The injury from the arrest, impacted Plaintiff's studies as a post-graduate student and causes ongoing mental anguish. [Pl's Tr. Exh. 10; Tolston, 34:19-20]

## ARGUMENT

Plaintiff's first outlines the standard for summary judgment and qualified immunity before discussion of the legal framework of the claims at issue. Although Defendant Officer Keith Wadsworth cited Plaintiff, a motion to amend

the original complaint, in part, to join officer Lawrence Holland is pending

before the Court. [Doc. Xx] As such, Plaintiff's motion will address his conduct as

a Defendant, in the even the Court finds his joinder just.

## A. Summary Judgment Standard

Summary judgment is appropriate, "only if the evidence presents no genuine

issue of material fact and compels judgment as a matter of law in favor of the

moving party."[3] In review of a motion for summary judgment, the Court "must

view the evidence in the light most favorable to the non-movant."[4] This includes

a duty by the Court to draw all reasonable inferences in the non-movant's favor.[5]

In evaluating the evidence, "When no video exists or where the videos do not

---

[3] *Jackson v. Sauls*, 206 F3.d 1156, 1167 (11th Cir. 2007) (In denying a Plaintiff's offensive summary motion to bar Defendants from asserting qualified immunity, the court held "Defendants' different sequence of events, if credited by a jury, clearly establishes arguable reasonable suspicion for the stop.").

[4] *Morton v. Kirkwood*, 707 F.3d 1276, 1279 (11th Cir. 2013) (finding "At their depositions, Kirkwood and Morton offered sharply clashing accounts about the shooting. [W]e therefore set forth the non-movant's account of the shooting.").

[5] *Glasscox v. City of Argo*, 903 F.3d 1207, 1208 (11th Cir. 2018) (Viewing the evidence in the light most favorable to Mr. Glasscox and drawing all reasonable inferences in his favor, we conclude that Officer Moses violated his constitutional right to be free from the excessive use of force by repeatedly tasing him even though Mr. Glasscox had ceased any resistance and was attempting to comply with Officer Moses's commands.").

answer all the questions or resolve all the details of the encounter, we review the evidence in the light most favorable to Johnson [the non-movant]."[6]

## B. Qualified Immunity

Qualified immunity is a judicially crafted shield that "represents a balance between the need for a remedy to protect citizens' rights and the need for the government officials to perform their duties without the fear of constant, baseless litigation,"[7] such that the court is not forced to second guess every *split second* decision.[8] To even assert qualified immunity, an officer must show they were acting in their discretionary duty during the alleged misconduct.[9]

Once properly invoked, the burden shifts to the Plaintiff to not only show a constitutional violation of clearly established law occurred—but also that similarly situated officers would have known the unreasonable of the actions

---

[6] *Johnson v. City of Miami Beach*, 18 F.4th 1267 (11th Cir. 2022) (holding "some events were captured on officers' body cameras and security cameras within the Miami Beach Police Department. We review *de novo* the videotape evidence that was presented to the district court at summary judgement stage.").

[7] *Kingsland v. City of Miami*, 382 F.3d 1220, 1231 (11th Cir. 2004).

[8] *See Davis v. Waller*, No. 21-11333, (11th Cir. 2022) (holding "The officers made the split-second decision to shoot in a tense and deadly crucible[.] We think Waller's split-second decision to fire a final shot was reasonable.").

[9] Find discretionary conduct source

taken under like circumstances.[10] The "essence of qualified immunity analysis is the public official's objective reasonableness, regardless of his underlying intent or motivation."[11] Meaning, "A government actor can be stripped of qualified immunity only when all reasonable government actor in the defendant's place would know that the challenged discretionary conduct violates federal law."[12]

The Georgia Constitution codifies similar qualified immunity protection that adds an malice intent element by stating: "suit against a public officer acting in his or her official capacity will be barred by official immunity unless the public officer (1) negligently performed a ministerial duty, or (2) acted with actual malice or an actual intent to cause injury while performing a discretionary

---

[10] *See Jackson v. Sauls*, 1165 (11th Cir. 2007) (holding "a police officer is entitled to qualified immunity if a reasonable police officer could have believed his or her actions were lawful in light of clearly established law and the information possessed by the officer at the time the conduct occurred."); *see also Stewart v. Baldwin Cty Bd. Of Educ.*, 908 F.2d 1499, 1503 (11th Cir. 1990) (opining "the relevant question on a motion for summary judgment based on a defense of qualified immunity is whether a reasonable official could have believed his or her actions were lawful in light of the clearly established law and the information possessed by the official at the time the conduct occurred." (citing *Anderson v Creighton*, 483 U. S. 635, 642 (1987))).

[11] *Kinglsand v. City of Miami*, 382 F.3d 1220, 1231; *see also Wilkerson v. Seymour*, 736 F.3d 974 (11th Cir. 2013) ("Although qualified immunity protects officers who are reasonably mistaken that a crime has been committed, it does not insulate officers from liability for arrests where it is clear that the conduct in question does not rise to the level of a crime.").

[12] *Adams v. Poag*, 61 F.3d 1539, 1543 (11th Cir. 1995).

duty."[13] Under the Georgia Constitution, in "the context of official [or qualified] immunity, 'actual malice' means a deliberate intent to do wrong."[14]

1. **Officers Wadsworth Is Not Entitled To Qualified Immunity Because He Is Being Sued In His Personal Capacity And Was Working An Unauthorized and Unapproved Shift**

As an initial matter—Defendant Wadsworth is barred from invoking qualified immunity as he was not acting in the discretionary duties as an officer of the law for the City of Atlanta because he was working an unauthorized shift that had not been approved. [Pl's Tr. Exh. 35 pp. 1-2] Qualified immunity is only available to officers *performing discretionary duties* and is a two-fold inquiry.[15] The "first prong of the test [is] whether the official is engaged in a legitimate job-

---

[13] Ga. Const., Art. I, Sec. II, Para. IX(d); ; *McDowell v. Smith*, <u>678 S.E.2d 922</u> (Ga. 2009) ("The doctrine of official immunity, also known as qualified immunity, protects individual public agents from personal liability for discretionary actions taken within the scope of their official authority, and done without willfulness, malice, or corruption.")

[14] *Reed v. DeKalb Cty.*, <u>589 S.E. 2d 584, 587</u> (Ga. Ct. App. Oct. 23, 2003); see also *Adams v Hazelwood*, <u>520 S.E.2d 898</u> (Ga. 1999) (holding "In the context of official immunity, actual malice means a deliberate intention to do a wrongful act[.] Such act may be accomplished with or without ill will and whether or not injury was intended.").

[15] Holloman ex rel. Holloman v. Harland, <u>370 F.3d 1252</u> (11 th Cir. 2004) (

related function" and "the second prong of the test" is whether the officer is

"pursuing his job-related goals — in an **authorized** manner. (emphasis added).[16]

Although adorned in his APD uniform — Officer Wadsworth was not

sanctioned by the state to be working as officer for the City of Atlanta during the

encounter with Plaintiff and was later disciplined for unpermitted behavior. [Pl's

Tr. Exh. 35 p. 2] Consequently, he is sued in his personal capacities, and therefore

is not entitled to qualified immunity.

### 2. Defendant Officers Are Only Entitled To Modified Qualified Immunity For The Spoliation Of Evidence By Intentionally Deactivating Their Body Worn Cameras

As technology advances with society so too must the law — therefore, the

Court should endorse a modified view of qualified immunity whereby law

enforcement officers are estopped from asserting qualified immunity against

civil rights claims that arise from events where spoliations occurs and the officer

is unable to overcome the rebuttable presumption the spoliation was done to

destroy or intentionally fail to preserve evidence.

---

[16] *Holloman,* 370 F.3d 1266-67 ("In considering whether an act of allegedly excessive force fell within a police officer's duties, [we] ask whether they have the power to attempt to effectuate arrests.").

Spoliation "refers to the destruction or failure to preserve evidence that is necessary to contemplated or pending litigation. Such conduct creates the presumption that the evidence would have been harmful to the spoliator."[17] Georgia courts have noted: "notice of potential liability is not the same as notice of potential litigation."[18]

In *Baxley v. Hakiel Industries, Inc.*, a manager of a bar with three cameras who had served a motorist that subsequently was involved in an accident, "took steps to investigate the day after it occurred, yet failed to preserve the recordings of the pertinent events and allowed any potential videotaped evidence to be destroyed."[19] The Georgia Supreme Court held: "Thus, because Brewsters's manager was aware of the potential for litigation and failed to preserve whatever

---

[17] *Baxly v. Hakiel Indus.*, 647 S.E.2d 29 (Ga. 2007) (citing O.C.G.A 24-4-22)

[18] *Clayton Cty. V. Austin-Powell*, 740 SE.2d 831 (Ga. Ct. App. 2013); *see also* Whitfield v. Tequila Mexican Restaurant, 748 S.E.2d 283 (Ga. Ct. App. 2013) (holding "A spoliation claim cannot be pursued unless the spoliating party was under a duty to preserve evidence. And our appellate courts have time and time again emphasized that that to meet the standard for proving spoliation, the injured party must show that the alleged tortfeasor was put on notice that the party was contemplating litigation." (quotations omitted)).

[19] 647 S.E.2d 30

videotaped evidence may have been captured [a] rebuttable presumption arose against Brewsters."[20]

In *Clayton County v. Austin-Powell,* the Georgia Court of Appeals reversed a spoliation instruction where it was alleged that an officer's "failure to have a working videotape in his police vehicle and failure to record the chase constituted spoliation."[21] The court found "the trial court abused its discretion in granting the motion and imposing discovery sanctions because there was no video of the pursuit to spoliate and the county had no notice that Austin-Powell was contemplating litigation at the time of the alleged spoliation."[22]

Here, as soon as Defendant Officers picked Plaintiff up off the ground—Plaintiff stated he intended to sue them. Defendants had actual notice of the intent of Plaintiff to pursue legal recourse. [Tolston, 125:13-16] Thus, like in *Baxel* at that moment, Officer Holland and Officer Wadsworth had a duty to preserve video footage due to the actual knowledge of potential litigation. Even if, like in *Austin-Powell,* the initial use of force was not captured due to misconduct prior to knowledge of the intent to sue—both Officer Holland and Officer Wadsworth

---

[20] *Id.*
[21] 740 SE.2d 835
[22] Austin-Powell, 740 SE.2d 837.

subsequently deactivated and reactivated their body worn cameras. [Pl's Tr. Exhs. 11 – 18] The Court need not look further than the number of video body worn camera video files provided for the two Defendant Officers.

City of Atlanta produced five separate files of video footage from Officer Wadsworth's body worn camera, which were all recorded after the use of force— and after Plaintiff informing them that litigation was forthcoming. [Pl's Tr. Exhs. 11 – 15] The first four of the abruptly-ending videos, collectively totaling more than forty minutes of footage, depict Plaintiff while in custody. [Pl's Tr. Exhs. 11 – 14] The final video shows Officer Wadsworth walking through the park after releasing the Plaintiff with a copy of a citation. [Pl's Exh. 15] In 2018, as now, Atlanta Police Department body worn cameras are manually activated and deactivated. [Bryant, 43:21-23] This means Officer Wadsworth activated his body camera four times, and deactivate his camera at least four times while Plaintiff was in custody. [Pl's Tr. Exhs. 11–14]

Without any authorized deactivation, Defendants should have produced one-continuous and uninterrupted body worn camera video from Officer Wadsworth device. However, Defendant Wadsworth is shown exiting a bathroom in one of the videos. [Pl's Tr. Exh. 13 at 0:00 - 0:10] His need to relieve

himself accounts for one deactivation so City of Atlanta should have produced no more than two files from Wadsworth's device depicting Plaintiff in custody. However, four separate videos files were produced from Wadsworth's vantage point of Plaintiff in custody. Thus, the gaps in Defendant Wadsworth's footage after the use of force, namely during the alleged retaliation, caused by the intentional premature deactivation of his body worn camera, spoliated video evidence despite Wadsworth being aware of forthcoming litigation.

Similarly, Defendants produced three separate body worn camera files for Defendant Lawrence Holland—who is not depicted exiting a bathroom in any of the three recordings. [Pl's Tr. Exhs. 16 – 18] Officer Hollands first video begins with the camera view obstructed by his vest in violation of department policy. [Pl's Tr. Exh. 16 at 0:00-10] In the clip, Plaintiff requests "everybody's badge number" and states the intention to sue. [Pl's Tr. Exh. 16 at 1:30-33] The clip abruptly ends as Officer Holland's hand nears the body camera device, presumably to deactivate it. [Pl's Tr. Exh. 16 at 3:19-21] His intentional premature deactivation was captured by Officer Wadsworth body worn camera. [Pl's Tr. Exh. 11 at 4:06] The next two Holland video files show Plaintiff, who was initially outside, in custody inside a building while complaining of injury. [Pl's Tr. Exhs. 17-18] Therefore, like Defendant Wadsworth, Officer Holland also violated his

duty to preserve footage and spoliated evidence by prematurely deactivating his camera despite actual knowledge of forthcoming litigation.

Defendants Holland and Wadsworth should be estopped from asserting qualified immunity and instead should only be afforded a modified qualified immunity if they can rebut the spoliation presumption. Like in *Baxley* where a rebuttable presumption arose, unless Defendants can overcome the presumption that officers intentionally deactivated their body worn cameras to forgo collecting evidence to be used in the instant litigation—then estopping the officers from invoking qualified immunity would be the only appropriate remedy for spoliation at this summary judgment stage. Without such a just remedy, Plaintiff will be foreclosed from seeking such an instruction in front of a jury despite the record being clear that Defendant's violated their duty to preserve.

## C. Officers Wadsworth And Holland Falsely Arrested Plaintiff (Count VII) Because They Lacked Arguable Probable Cause To Cite Plaintiff For Any Offense

Plaintiff's arrest was unlawful because Defendant Officers lacked probable cause to cite Plaintiff for any offense, let alone three trumped-up charges to cover-up officers' overaction to *de minimis* that culminated in forcibly rendering Plaintiff to the ground. The fabrication of probable cause is made obviously

apparent by examining Defendant Officers' concocted and conflicting account of events and actions following the arrest.

It is clearly established, and "There is no question that an arrest without probable cause to believe a crime has been committed violates the Fourth Amendment."[23] The Supreme Court has held "Whatever its precise form, if the proceeding is tainted—as here, by fabricated evidence—and the result is that probable cause is lacking, then the ensuing pretrial detention violates the confined person's Fourth Amendment rights[.]"[24] Consequently, an arrest without probable cause bars an officer from shielding from liability by asserting qualified immunity against a false arrest claim.[25]

In the context of a 1983 claim, "an officer need not have actual probable cause, but only 'arguable' probable cause."[26] And "Arguable probable cause exists where reasonable officers in the same circumstances and possessing the same knowledge as the Defendant could have believed that probable cause

---

[23] *Madiwale v. Savaiko*, 117 F.3d 1323, 1324 (11th Cir. 1997).

[24] *Manuel v. City of Joliet, Ill.*, 137 S.Ct. 914, n. 8 (2017).

[25] *Williamson v. Mills*, 65 F.3d 155, 158 (11th Cir. 1995) (holding "An officer in Millie's shoes could not have reasonably concluded that he had probable cause to arrest Williams…Because Mills lacked even arguable probable cause to arrest Williamson, Mills was not entitled to qualified immunity against William's claims of false arrest.").

[26] *Brown v. City of Huntsville*, Ala., 608 F.3d 725 (11th Cir. 2010) (citing *Holmes v. Kucynda*, 321 F.3d 1073, 1079 (11th Cir. 2003)).

existed to arrest."[27] In determining "Whether an officer possesses probable cause or arguable probable cause depends on the elements of the alleged crime and the operative fact pattern."[28] Under Georgia law, the "a jury decides whether [arguable] probable cause exists, and the trial court determines the issue only when the material facts are undisputed."[29]

Here, by contrasting the language of the ordinances with the evidence on the record, namely Defendant Officers' own words, it is clear that Defendants Holland and Wadsworth lacked probable cause to cite Plaintiff for prohibited conduct in a park 110-59, disorderly under the influence 10-9, and physical obstruction of another 106-81.7. Plaintiff was walking through a festival when *de minimis* contact was made with officers in a crowd of people on an inclined hill. [Tolston, 64:7-17] Under those facts, officers did not have probable cause to cite Plaintiff for any offense.

1. **Officers Lacked Arguable Probable Cause To Cite Plaintiff For Prohibited Conduct In A Public Park Because Nothing About Plaintiff's Conduct Was Prohibited By The Ordinance**

---

[27] *Lee*, 284 F.3d 1195 (quoting *Scarbrough v Myles*, 245 F.3d 1300, 1302 (11 th Cir. 2001)).
[28] Brown, 608 F.3d 735.
[29] *Dixon v. Krause*, 773 SE.2d 40, 43 (Ga. Ct. App. 2015) (citing O.C.G.A. 51-7-43 "Lack of probable cause shall be a question of the jury, under the direction of the court.")

Nothing about Plaintiff's conduct contravened the *overly broad* City of Atlanta Ordinance 110-59, prohibited conduct in a park that was a one of the moving forces behind Plaintiff's arrest. [Pl's Tr. Exh. 6]

City of Atlanta Ordinance 110-59, attached hereto, is comprised of more than thirty different subparts prohibiting everything from skating to erecting tents.[30] [Pl's Tr. Exh. 6] In the case at bar, the citation issued by Officer Wadsworth is silent on the specific subsection of the ordinance that was allegedly violated, leaving Plaintiff—and the Court—to guess. [Pl's Tr. Exh. 1]

Of the more than thirty subsections of prohibited conducted outlined in the ordinance, subsection six, which outlaws "disobeying a lawful order," and subsection thirty, which prohibits "use of off road vehicles...to include all terrain vehicles and motorcycles," are the most remotely applicable. [Pl's Tr. Exh. 6] However, here, as discussed herein, *see* infra. C(2), Plaintiff did not disobey a lawful order and Plaintiff's scooter was not a off-road vehicle.

Plaintiff was walking through a festival in a public park when *de minimis* contact was made with officers. [Tolston, 64:7-17] By both Officer Holland's and

---

[30] Courts have yet to opine on the constitutionality of the city ordinance or its application.

Plaintiff's accounts—Plaintiff stood there stunned. [Tolston, 75:6-25; Pl's Tr. Exh. 3 p. 2]. Officer Holland then snatched a drink out of Plaintiff's hand. [Id.] Officer Holland claimed he disposed Plaintiff of the beverage and poured it out with the intent to "charge[]" Plaintiff for "the [prohibited conduct in] park violation" because allegedly: "the thing was you couldn't drink any beverages unless you were actually at the festival." [Pl's Tr. Exh. 3 p. 2]. Officer Holland dispossessed Plaintiff of the drink within seconds of contact. [Tolston, 75:22-25 to 76:1-3]

The ordinance does not prohibit possession of alcoholic beverages—and even if it did—Defendants have stipulated that alcoholic beverages were lawfully sold at the festival on that day. [Doc. 127]. Therefore, at the moment Officer Lawrence Holland disposed Plaintiff of the beverage, he lacked arguable probable cause despite manifesting the *mens rea* to charge Plaintiff with prohibited conduct.

On the other hand, Officer Wadsworth testified the prohibited conduct was Plaintiff "operating a scooter—causing a risk to others." [Wadsworth, 26-27:25-2] The citation handwritten by Defendant Wadsworth on that night states: "Justin Tolston, was operating an electric scooter and made physical contact with Ofc. Holland + Ofc. Joseph, Mr. Tolston was holding a miller lite alcoholic

beverage which was half empty. When we asked to move Mr. Tolston refused. Mr. Tolston then obstructed by grabbing Ofc. Holland hands."[31] [Pl's Tr. Exh. 1] Officer Wadsworth testified that Plaintiff was riding the scooter and he "seen [Plaintiff] physically crash into them." [Wadsworth, 24:5-10]

However, all three officers were standing next to each other and facing away from Plaintiff at the time contact was made and could not have seen Plaintiff. [Walton, 49:15-19] Investigator Gartrell Walton—who spent more than a year investigating the officers' misconduct—concluded it would have been "impossible" for Defendant Wadsworth to determine whether Plaintiff was walking or driving the scooter. [Walton, 35:7-20] Corroborating this fact, Officer Holland made no mention for the scooter specifically being the reason for citing Plaintiff for prohibited conduct when he "turned around" and disposed Plaintiff of property. [Pl's Tr. Exh. 3 p. 2]

Finally, Plaintiff's electric scooter did not constitute an "off road vehicle" as defined by the ordinance—and even if it did: Plaintiff was walking and not operating the scooter when the *de minimis* contact was made with officers. [Tolston, 64:7-17] Moreover, video footage shows a person on a seated scooter,

---

[31] Although the citation states "miller lite" the offense report narrative states "bud light." [Pl's Tr. Exh. 2]

*actually riding the device,* recklessly cross from the grass, onto a paved path, and back onto the grass—just a few feet in front crashing into Plaintiff while being escorted by officers. [Pl's Tr. Exh. 16 at 0:16-22] None of the officers chased after him, slammed him to the ground, or even told him to cease his conduct. [Id.] In the light most favorable to Plaintiff, beyond demonstrating malign intent toward Plaintiff, the failure of officers to enforce the law against a person engaged in similar conduct is evidence that the conduct was not prohibited at all.

Although City of Atlanta's ordinance itself is likely unconstitutionally broad and the citation does not list the subsection violated—even if for *arguendo,* the Defendant Officers' differing accounts are accepted as true—Plaintiff's conduct did not run afoul of the black letter law of the Ordinance 110-59.

### 2. Plaintiff Was Free To Remain In The Park At The Moment The Vulgar Move-On Order Was Given As Any Arguable Probable Cause Had Dissipated

Even if officers had probable cause after the *de minimis* contact, which they did not, said arguable probable cause would have dissipated by the time Officer Holland gave Plaintiff the vulgar move-on order. Surely the probable cause dissipated by the time Officer Wadsworth—requested Plaintiff be uncuffed and told to leave the park. [Pl's Tr. Exh. 11 at 1:21 -23]

Arguable probable cause is a fluid concept "that may also dissipate after an officer makes a warrantless arrest [or seizure]" based on additional facts.[32] Beyond the Eleventh Circuit Court of Appeals the Fifth Circuit,[33] Seventh Circuit,[34] Ninth Circuit,[35] and First Circuit[36] adhere to some form of the probable cause dissipation doctrine.

It is well also settled that "Plaintiffs have a constitutionally protected liberty interest to be in parks or on other city lands of their choosing that are open to the public generally."[37] While police officers are at liberty to issue

---

[32] *Barnett v. MacArthur*, 956 F.3d 1291 (11th Cir. 2020).

[33] *McConney v. City of Houston*, 863 F.2d 1180, 1185 (5th Cir. 1989) ("[O]nce a responsible officer actually does ascertain beyond a reasonable doubt that one who has been so arrested is not intoxicated, the arrestee should be released.").

[34] *BeVier v. Hucal*, 806 F.2d 123, 128 (7th Cir. 1986) ("The continuation of even a lawful arrest violates the Fourth Amendment when the police discover additional facts dissipating their earlier probable cause.").

[35] *Nicholson v. City of Los Angeles*, 935 F.3 685, 691 (9th Cir. 2019).

[36] *Thompson v. Olson*, 798 F.2d 552, 556 (1st Cir. 1986) ("an affirmative duty to release arises only if the arresting officer ascertains beyond a reasonable doubt that the suspicion (probable cause) which forms the basis for the privilege to arrest is unfounded.").

[37] *Catron v. City of St. Petersburg*, 658 F.3d 1260 (11th Cir. 2011) (holding "Plaintiffs have sufficiently alleged that the City has deprived them of liberty interests in two ways, by 1) enforcing the trespass ordinance to prohibit them from having access to a specific park [Williams Park] as ordinarily used by the public; and 2) carrying out a policy of enforcing the ordinance to prohibit their use of all parks in the City open to the public generally) (citing *City of Chicago v. Morales*, 527 U.S. 41 (1999))); see also *Occupy Fort Myers v. City of Fort Myers*, Case No. 2:11-cv-00608-Ftm-29DNF (M. D. Fla. Nov. 11, 2011) (holding "A public park is among those venues which have historically been

"move-on orders" to persons on public property, the constitution in contravened when such orders are accompanied by a threat of arrest or harassment.[38] A "person who is told to leave one place but remains free to go anywhere else that he wishes can undoubtedly terminate his encounter."[39]

Accordingly, the Supreme Court and Eleventh Circuit Court of Appeals have recognized "a person is not seized within the meaning of the Fourth Amendment when in response to a show of authority, without physical force, the subject does not yield."[40] An intentional seizure of a person "readily bears the meaning of a laying on of hands or application of physical force to restrain movement even when it is ultimately unsuccessful."[41]

In *Peery v. City of Miami*, a case concerning alleged violation of a consent decree, people without homes sued alleging that the issuance of move-on orders given to inhabitants of public parks by Miami police officers was intended to

---

[38] considered public forums closely associated with the free excessive of expressive activities.").

[38] *Peery v. City of Miami*, 977 F.3d 1061, 1072 (11th Cir. 2020).

[39] *Id.* at 1072.

[40] *Wilson v. Northcutt*, 987 F.2d 720, 722 (11th Cir. 1993) (holding "Mrs. Wilson was not subjected to physical force. Furthermore, she did not yield or submit when the deputies commanded her to come out of the bathroom. We conclude that Nancy Wilson was not seized, thus was no violation of a Fourth Amendment right.") (citing *California v. Hodari D.*, 499 U.S. 621, 626 (1991) (ruling "a policeman yelling 'Stop, in the name of the law!' at a fleeing form that continues to flee. That is no seizure.")).

[41] *Carr v. Tatangelo*, 338 F.3d 1259, 1268 (11th Cir. 2003) (quoting *Hodari D.*, 499 U.S. 626).

harass and annoy the population.[42] However, in ruling for the city, the Eleventh Circuit Court of Appeals held "There is no evidence that the move-on orders were either systematic or intended to annoy [and] there is no evidence that police threatened the subject of the move-on orders with arrest" as the move-on orders "ordinarily occurred to facilitate needed cleaning."[43]

In *Wilson v. Northcutt*, a woman in mental distress died of a self-inflicted gunshot wound when officers retreated down a hallway after failing to gain entry to the locked bathroom she was hiding in during the execution of a failure-to-appear bench warrant stemming from a speeding ticket.[44] The Eleventh Circuit held that "Wilson had not been seized and thus there was no Fourth Amendment violation."[45]

In *Skop v. Atlanta*, a woman was arrested for "obstructing a police officer in the lawful discharge of his official duties, and refusing to obey an order from an officer directing traffic."[46] First the court found: "there is no indication that she in any way impeded or obstructed Officer Brown in the pursuit of his lawful duties,

---

[42] 977 F.3d 1072.

[43] *Id.*

[44] *Wilson v. Northuctt*, 987 F.2d 719.

[45] *Id.* at 722.

[46] *Skop v. City of Atlanta*, 485 F3.d 1133, 1138(11th Cir. 2007).

let alone that she forcibly resisted police." Skop also argued that the second allegation "was manufactured after the fact in order to buttress an unpersuasive obstruction charge."

In *Barnett v. MacArurthur*, a woman "twice took a breathalyzer test, and both times the result were a blood alcohol level of 0.000" and even though "there was no evidence that she was impaired by any other drug or substance, she was detained for eight hours." In *Barnett*, during a traffic stop for speeding, Barnett admitted "she had a glass of wine with dinner" and agreed to "the field sobriety tests, some of which occurred outside the view of Deputy MacArthur's dashboard video camera."

Here, any arguable probable cause that may have existed after the initial contact dissipated prior to arrest because according to both Officer Wadsworth and Officer Holland---Plaintiff was given a move on order after the initial *de minimis* contact.

Defendant Wadsworth testified that after the initial contact and dispossession of Plaintiff's beverage—Plaintiff was "told to continue about, I guess, your movements throughout the park." [Wadsworth, 24:5-10] After the initial contact, Officer Holland allegedly told Plaintiff: "Sir, you have to remove

yourself from the park." [Pl's Tr. Exh. 3 p. 2] Plaintiff contends that Officer Holland told Plaintiff to "Keep it fucking moving." [Tolston, 77:14-18; Pl's Tr. Exh. 5 p. 2] The profane vulgarity was unprofessionalism prohibited by Atlanta standard operating procedures for which an officer can be subject to discipline but was nonetheless a move-on order. [Bryant, 14-15:25-12]

Most indistinguishable from *Wilson v. Northcutt*, Plaintiff did not yield to Defendants' unprofessional, prohibited, and profane move-on command. Unlike in *Wright*, where officers investigating someone with an outstanding warrant or conducting police business—Defendant Officers were watching performances while standing around for "general security." [Wadsworth, 41:1-2] Unlike in *Barnett*, Plaintiff was not given a breathalyzer, or otherwise seized pending the completion of field sobriety tests which would not have even required Mirandizing Plaintiff.[47]

Thus, at the moment Officer Holland cursed at Plaintiff with the vulgar command to "keep it fucking moving"—Plaintiff was free to leave and no longer

---

[47] See *Clark v. State*, 658 S.E.2d 372, 374 (Ga. Ct. App. 2008) ("A police officer is not required to precede the administration of field sobriety tests with the *Miranda* warning that the suspect has a right to refuse to perform the tests, unless the suspect is 'in custody' for *Miranda* purposes.") (quoting *State v. Kirbaba*, 232 Ga. Ct. App. 502 S.E.2d 314 (1998)).

seized. Therefore, any arguable probable cause had since dissipated because at that very moment, by the issuance of the of command itself, there was no reason to believe that Plaintiff had committed any crime. Arguable probable cause had been extinguished because Plaintiff was lawfully present in Piedmont Park and had the constitutional right to remain in the park. [Pl's Tr. Exh. 33]

Finally, after being walked across a field and asking the reason for the detention—Officer Wadsworth instructs Officer Holland to uncuff Plaintiff. Officer Wadsworth gives Plaintiff another move-on order while Officer Holland was uncuffing Plaintiff. In response, Plaintiff twice asks for his scooter, if she has my scooter, I'll never come back, but that's out of line." [Pl's Tr. Exh. 11 at 1:25-30]

Out of nowhere, Officer Holland yells at Plaintiff to "shut up," which prompted Plaintiff to "ask for everybody's badge number" to "sue." [Id. at 1:40-45] One of Plaintiff's previously cuffed hands is seen freestanding, as Plaintiff gestures while talking. [Id.] Despite asking for badge numbers multiple times— none of the officers identified themselves. [Pl's Tr. Exh. 11 at 1:40-52] Seconds later Plaintiff is charged. [Pl's Tr. Exh. 11 at 1:50 – 53] Under the totality of circumstances, the record is clear that any arguable probable cause had

dissipated after the initial contact because Defendant Officers informed Plaintiff that he was free to leave via a move-on order.

### 3. Officers Lacked Arguable Probable Cause to Cite Plaintiff For Disorderly Under The Influence As Plaintiff Was Not Disorderly Or Impaired

Defendants Wadsworth and Holland lacked probable cause to cite Plaintiff for violation of the City of Atlanta ordinance governing disorderly conduct under the influence because Plaintiff was not disorderly and was only cited in retaliation for demanding officers' badge numbers after suffering a traumatic brain injury.

For public safety, both the Supreme Court and Eleventh Circuit Court of Appeals have upheld the power of the state to enact public intoxication, or disorderly under the influence statutes that allow for removal of "seriously intoxicated" people from public places."[48] However, "By 2011, it was clearly

---

[48] *Church v. City of Huntsville*, <u>30 F.3d 1335, 1347</u> n. 5 (11th Cir. 1994) (holding "We 'do not question the power of the government to remove a helplessly intoxicated person from a public street, although against his will, and to hold him until he has regains his powers. The person's own safety and the public interest require this much. A public intoxication statute is constitutional insofar as it authorizes a police officer to arrest any seriously intoxicated person when he is encountered in a public place.'" (quoting *Powell v. Texas*, <u>392 U.S. 514</u> (1968))).

established that words alone cannot support probably cause for disorderly conduct—including profanity regarding police officers."[49]

In *Kingsland*, the party accused "was 'observed with bloodshot eyes, slurred speech, and a strong odor of cannabis emitting from her breath.'"[50] And "Although the arrest affidavit was completed after the Breathalyzer tests had been administered, the affidavits contains no mention of the negative Breathalyzer results."[51] Kingsland "dispute[d] without supporting evidence whether she had bloodshot eyes and slurred speech, and implies that the officers included these allegedly false facts to support their case for her arrest."[52] Kingsland further claimed "that if she did in fact exhibit these characteristics, they resulted from the trauma of the accident and her subsequent continual crying."[53]

---

[49] *Alston v. Swarbrick*, 954 F.3d 1312, 1319 (11th Cir. 2020).
[50] *Kingsland v. City of Miami*, 382 F.3d 1222, 1222 (11th Cir. 2004).
[51] *Id.* at 1235 n. 5.
[52] *Id.* at 1226. ("If the officers' assessment that Kingsland's eye were bloodshot, that her speech was slurred, and that either she or her truc smelled of cannabis were undisputed or supported by evidence other than the defendants' testimony, we would have no problem agreeing with the district court's conclusions.").
[53] *Id.* at 1235 n. 5.

In *Johnson v. DeKalb Cty.*, a woman was filming her friend's arrest when an a officer became "visibly irritated by her questions and her filming."[54] She asked for the officers name for a second time  but "Officer Fulton refused to provide her with his named and instead knocked the phone out of her hand." After she picked up her phone, and "While standing against the wall, Ms. Johnson again held her phone up to film, and asked Officer Fulton for his name. Officer Fulton then said 'that's it,' and arrested Mrs. Johnson." Mr. Johnson approached the scene and after stating "this is some bullshit," and questioning officers' actions, he was arrested for disorderly conduct. In denying summary judgment the court held that "Under the Plaintiffs' version of the facts, Mr. Johnson "merely questioned Officer Fulton's conduct, made two profane statements, asserted his rights under the First Amendment, and did not physical resist or threaten him."

In *Davis v. Williams*, <u>451 F.3d 759</u> (11th Cir. 2006), Davis approached officers performing a traffic stop outside of his house and "with his hands in the air, the following exchanged occurred:

> Davis: Officer I'm the homeowner. What's the problem.
>
> Becht: Get away from here.
>
> Davis: .Officer, I live here

---

[54] *Johnson v. DeKalb Cty.*, (N. D. Ga. June 7, 2018), No. 1:17-CV-2601-TWT,

Becht: Leave now."[55]

When Davis asked a follow-up question, Becht's response was "'Leave now or I'll arrest you.'" And "When Davis asked Becht why he would be arrested, Becht again ordered him to leave." [56] In response "Davis turned toward the house, but asked if he could speak with Becht's superior" and at that same time "one of Davis' guests asked for Becht's badge number."[57] However, "Betche's response again was to tell Davis that if he continued to say anything, he would be arrested." As "Davis started toward the house, [B]echt and Bright grabbed Davis from behind, twisted his arms behind his back and handcuffed him." The Eleventh Circuit held that the facts "cannot support a finding of even arguable probable cause for either obstruction of justice or disorderly conduct."[58]

In *Church v. City of Huntsville*, homeless individuals filed a 1983 class action seeking, in part, injunctive and declaratory relief as "The plaintiffs complain[ed] that they are frequently arrested for intoxication, detained overnight, and then released without ever seeing a magistrate or having an 'opportunity to raise any

---

[55] *Davis v. Williams*, <u>451 F.3d 759, 760</u> (11th Cir. 2006).

[56] *Davis v. Williams*, <u>451 F.3d 759</u>.

[57] *Id*. at 759.

[58] *Id*. at 766 (ruling "the district court's opinion must be reversed because the court improperly resolved factual disputes against Davis and ignored material facts crucial to his case.").

of their valid and substantial defenses to these charges.'"[59]Although unsuccessful, the suit was notably supported by testimony from the Plaintiffs including one who testified: "that City police officer 'say you're drunk when you're not drunk. Whether you're drunk or not.'"[60]

Here, Atlanta City Ordinance 10-9 states: "It shall be unlawful for any person within the corporate limits of the city to be disorderly while under the influence on the streets, sidewalks, or other public places." [Pl's Tr. Exh. 7] The six subsections of Atlanta City Ordinance 10-9 enumerate specific conduct that constitutes disorderly conduct under the influence. [Id.] Since the citation is silent, again, on the alleged violation [Pl's Tr. Exh. 1]—three possibly relevant subsections are: (1) Any person who acts in a reckless manner so as to create an unreasonable risk of harm to himself, to other persons or to property in the vicinity while under the influence of alcohol or drugs; (3) Any persons who, without provocation, uses to or of another, in such a person's presence, fighting words, or who shall panhandle while under the influence of alcohol or drugs; (4)

---

[59] *Church v. City of Huntsville*, 30 F.3d 1332, 1343 (11th Cir. 1994) (holding "The constitution does not guarantee the homeless that their problems will be addressed, nor does it protect them from enforcement of ordinances and laws unless that enforcement violates a specific constitutional right. Nothing in the videotape, or elsewhere in the record, indicates that the Council authorized or condoned any violation of plaintiffs' constitutional rights."). At 1347 n. 8

[60] *Church*, 30 F.3d. 1347 n. 7.

Any person who shall act in a violent or tumultuous manner toward another so as to endanger the life, limb, health, health or property of another while under the influence of alcohol or drugs.  [Pl's Tr. Exh. 7]

In this case, Officer Wadsworth testified that the legal basis for citing Plaintiff with disorderly conduct was "based off of [Plaintiff's] disoriented state and [Plaintiff's] slurred speech and the odor of alcohol." [Wadsworth 21:10-14] However, Plaintiff's speech was not slurred and did not smell of alcohol so these facts are in dispute. [Att. A] In review of video footage, Defendant Wadsworth testified "I can't make that distinction right now" when asked if Plaintiff's speech was heavily slurred—but he easily identified that Plaintiff was upset about being arrest. [Wadsworth, 163:13-15] Video evidence shows after the use of force, Plaintiff is clearly heard stating "Like, why are you doing this?...This is crazy." [Wadsworth, 146-47:25-9]

Moreover, like in *Kingsland*, any perceived impairment to Plaintiff's speech was a direct result of the head injury suffered at the hands of Defendant Officers. Plaintiff was not under the influence of any drugs or narcotics. [Tolston, 65:12-15] Furthermore, body worn camera shows, Dr. Jason Schneider, who was inches away from Plaintiff's face, stated he did not smell alcohol on Plaintiff's breath.

[Pl's Tr. Exh. 13 at 12:12-22] Like in *Johnson* and in *Davis*, Plaintiff was merely asking Officer Holland the reason for his actions.

Although contested, Officer Wadsworth further testified that Plaintiff "began getting into Officer Holland's face when you were escorted out of the park." [Wadsworth, 24:10-11; Att. A] But according to his own words, Plaintiff did not allegedly get into the Officer Holland's face—until actively being escorted out the park. As aforementioned none of Plaintiff's conduct was disorderly or prohibited and therefore officers had no legal basis to escort Plaintiff from the park.

Plaintiff was not administered any form of breathalyzer or filed sobriety test. [Tolston, 86:22-24] Officer Wadsworth testified he could not recall whether Plaintiff was belligerent prior to arrest. [Wadsworth, 49:25 to 50:1-3] Like in *Church*, officers here allege Plaintiff was drunk and disorderly, when indeed Plaintiff was not. Plaintiff was only cited, after requesting their badge numbers.

### 4. Defendants Lacked Probable Cause To Cite Plaintiff For Physical Obstruction Of Another Because The Was Unlawful. Alternatively, Plaintiff Did Not Resist Or Otherwise Obstruct Officers.

Where there no lawful arrest, there can be no obstruction as a citizen is justified in the use of force, including with a weapon, against police officers in

self-defense to stop an unprovoked attack by officers.[61] The Georgia Supreme Court has even upheld the damaging of government property incident to the common-law right "to resist an unlawful arrest."[62]

Here, City of Atlanta Ordinance 106-81, entitled disorderly conduct, is comprised of thirteen subsections of outlawed conduct. [Pl's Tr. Exh. 8] Unlike the other two offense, the citation accuses Plaintiff of violating the seventh subsection of the which makes it unlawful to: "Interfere by acts of physical obstruction, or another 's pursuit of a lawful occupation." Defendant Officer Keith Wadsworth testified that Plaintiff was cited for physical obstruction under code section 106-81.7 for "physical obstruction of a lawful arrest." [Wadsworth, 8-9:25-1]

Officer Wadsworth testified: "As Officer Holland attempted to escort [Plaintiff out the park]," — "[Plaintiff] then grabbed onto Officer Holland in an attempt to resist." [Wadsworth, 24:11-13]  This is disputed as Plaintiff did not

---

[61] *Watts v State*, <u>578 SE.2d 231, 233</u> (Ga. Ct. App. Feb. 11, 2003) (Holding "In this case, Watts's testimony that he was the victim of an unprovoked attack by officers who sprayed him with pepper spray, a substance to which he was allergic, and that he employed the only means he had to make them stop spraying him was sufficient to warrant a charge on self-defense.").

[62] *Glenn v State*, <u>849 SE.2d 409, 411</u> (Ga. 2020) (declaring: "We hold that the common-law right to resist an unlawful arrest includes the right to use proportionate force against government property to escape an unlawful detention following the arrest."

grab any officer. [Tolston, 82:23-25] Indistinguishable from *Johnson* and *Davis*, Plaintiff's seizure occurred moments after Plaintiff inquired as to the reason for officers' attention by stating either: "What's the issue" or "What's the problem?" [Tolston, 77:23-25] Unlike *Ruch*, Plaintiff was not interfering with general security duties of officers in any capacity.

For *arguendo*, like the Plaintiff in *Glenn v. State*, even if Plaintiff did resist, as stated herein, Defendants' arrest of Plaintiff lacked arguable probable cause and *ipso facto* there can be no physical obstruction because there was no lawful basis for the underlying arrest itself.

### D. Defendants Wadsworth And Holland Are Liable For Excessive Force Because Officers Were Not Entitled To Use Any Force. Alternatively, The Forced Used Was Excessive Because It Concussed Plaintiff Who Was Not Resisting, Did Not Pose A Risk, And Was Accused Of Minor Offenses

When adjudicating "an excessive force claim, we look to 'whether an officer's conduct in making an arrest is objectively reasonable or if it is an overreactive, disproportionate action for the situation.'"[63] The factors when evaluating any other use of force: (1) the severity of the suspect's crime, (2) whether the suspect poses an immediate threat of harm to others, (3) whether the

---

[63] *Huebner v. Bradshaw*, 935 F.3d 1183, 1191 (11th Cir. 2019) (quoting *Stephens v. DeGiovanni*, 852 F.3d 1298, 1315 (11th Cir. 2017).

suspect is actively resisting arrest or trying to flee, (4) the need for the use of force, (5) the relationship between the need for force and the amount of force used, (6) how much injury was inflicted."[64] In determining whether force was excessive the court judges actions at the time moment force was used.[65]

In *Thorton v. City of Macon*, the "Officer Coleman was dispatched to Mullis' house to address civil dispute, and had 'the general duty'—and authority—'to enforce the law and maintain the peace.'"[66] But since, "Thorton had committed no crime and had not threatened anyone...the officers were not justified in using any force."[67]

Here, Plaintiff submits that three separate uses of physical force that excessive for which redress is sought. The 1) initial or first physical use of excessive force was the seizure of Plaintiff's beverage and by extension, Plaintiff's hand; 2) The second use of excessive force was Officer Holland grabbing Plaintiff's arm; and 3) The third final relevant use of excessive physical

---

[64] *Wade v. Daniels*, No. 18-12371 (11th Cir. 2022)

[65] *Glasscox*, 903 F.3d 1215 (holding "The video shows that Mr. Glasscox grabbed the taser *after* the fourth shock began. Any resistance offered after the use of force is irrelevant to the reasonableness of the force employed. (original emphasis)).

[66] *Thorton*, 132 F.3d 1395 (citing *Duncan v. State*, 294 S.E.2d 365, 366 (Ga. App. Ct. 1982)).

[67] 445 F.3d 1333.

force was Officer Wadsworth, in concert with Officer Lawrence Holland, rendering Plaintiff to the ground. [Pl's Tr Exh. 3 p. 2]

Indistinguishable from *Thorton*, officers have the duty—and authority—to provide "general security" for emergencies. [Wadsworth, 41:1-2] However, officer lacked arguable probable cause as any had surely dissipated by the time force was used. Thus, any force was *per se* unconstitutional as Defendant Officers lacked arguable probable cause needed for use force to arrest, supra. C.

### 1. Alternatively, No More Than *De Minimis* Force Was Necessary As Plaintiff Was Not Resisting, Accused Of Minor Crimes, and Unarmed

For mere *arguendo*, even if Plaintiff avers the use of force was unprovoked and that Defendants had arguable probable cause to make an arrest—which they did not—the use of force was gratuitous and unconstitutionally excessive as less intrusive verbal commands were available.

It is well settled that "When an officer lawfully arrests an individual for the commission of a crime, no matter how minor the offense, the officer is entitled under controlling Supreme Court precedent to effectuate a full custodial arrest."[68] However, "probable cause to arrest does not justify using excessive

---

[68] *Lee v. Ferraro*, 284 F.3d 1188, 1196 (11th Cir. 2002).

force to detain a suspect."[69] *De minimis* force is allowed in making an arrest "because the right to make an arrest necessarily carries with it the right to use 'some degree of physical coercion or threat thereof,' and 'the typical arrest involves some force and injury.'"[70]

While being placed in a hot car[71] and "painful handcuffing alone doesn't constitute excessive force,"[72] the Eleventh Circuit has "repeatedly ruled that a police officer violates the Fourth Amendment, and is denied qualified immunity, if he or she uses gratuitous and excessive force against a suspect who is under control, not resisting, and obeying [lawful] commands."[73] However, "[T]he

---

[69] *U.S. v. Kapperman*, 764 F.2d 786, 790 n. 4 (11th Cir. 1985); see also *Harrigan v. Metro Dade Police Dept. Station #4*, 977 F.3d 1185 (11 th Cir. 2020) (finding "The vehicle was stationary at a red light [as] he sat in the stolen Ford pickup truck. Without provocation, Officer Rodriguez opened fire. Then, and only then, did Harrigan drive [f]leeing the intersection and leading the officers on a high-speed chase. [U]nder this set of facts, a federal jury still could find for Harrigan on his 1983 claim without undermining—much less negating—his aggravated-assault and fleeing-to-allude convictions.")

[70] *Sebastian v Ortize*, 918 F.3d 1304, 1308 (quoting Rodriguez, 280 F.3d 1351 (quoting Graham 490 U.S. 396

[71] Compare *Lee*, 284 F.3d 1196 with *Patel v. Lanier Cty. Ga.*, 969 F.3d 1173, 1178, (11th Cir. 2020)

[72] *Huebner*, 935 F.3d 1191 (holding "Even though Huebner exhibited no meaningful flight risk, and even though her crime as relatively minor, the force employed by McDonough here wasn't remotely unusual or disproportionate."); see Rodriguez v. Farrell, 280 F.3d 1341, 1351-52 (11 th Cir. 2002) (holding it was not excessive when an officer "grabbed plaintiff's arm, twisted it around plaintiff's back, jerk[ed] it high to the shoulder and then handcuffed plaintiff as plaintiff fell to his knees").

[73] *Saunders v. Duke*, 766 F.3d 1262, 1265 (11t h Cir. 2015); see also *Piazza v. Jefferson County, Alabama*, 923 F.3d 947 (11t h Cir. ) (opining "How do we know, then, when force

application of *de minimis* force, without more, will not support a claim for excessive force in violation of the Fourth Amendment."[74]

In considering the need for force and whether a person poses a threat, the court will often assess the conduct of the receipt of force *at the time* the force is utilized, which means force is unconstitutional against an individual is not actively resisting or has ceased at the moment force is employed.[75]

In *Patel v. City of Maidson*, Officer "Parker contend[ed] Patel's alleged resistance prompted Parker to sweep Patel's legs out from under him and throw him to the ground, ultimately permanently partially paralyzing him."[76] Footage existed but the "video recordings from two police dashboard cameras [was] unable to definitely resolve the parties dispute about whether [P]atel resisted [O]fficer Eric Parker's efforts to secure and frisk him."[77] Thus the court affirmed

---

is reasonable and when it is excessive in relation to its purpose? [O]nce a prisoner [or arrestee] has stopped resisting there is no longer a need for force, so the use of force thereafter is disproportionate to the need.").

[74] *Nolin v. Isbell*, 207 F.3d 1254, 1257 (11th Cir. 2000).

[75] *Glasscox*, 903 F.3d 1215 (holding "The problem for Officer Moses is that the repeated taser shocks—issued after Mr. Glasscox ceased driving recklessly and eluding law enforcement—were objectively unreasonable because at this stage we cannot say that Mr. Glasscox was resisting, at the latest, after the second taser shock."

[76] *Patel v. City of Maidson*, 959 F.3d 1332, 1332-33.

[77] *Id*. at 1332.

that "the district court correctly concluded that summary judgment was not appropriate."[78]

In *Piazza v. Jefferson Cty., Ala.*, a "visibly intoxicated," arrestee that was refusing to follow officers' commands but had "neither threatened nor attempted to harm the officers" brought suit for excessive force. While the Eleventh Circuit did not question the officers "split-second decision to deploy his taser once following several unsuccessful attempts to lead Hinkle into his cell" the court reversed summary judgment holding "we see no legitimate basis for the second shock, particularly consideration (1) that the first shock had immobilized Hinkle and (2) the minimal threat to order safety, and security that Hinkle posed even from the outset."[79]

In *Helm v. Rainbow City, Alabama*, (11th Cir. 2021) an officer claimed not to have heard cries that the "out of control female" he repeatedly tased into unconsciousness while "pinned down by four or five officers" — was in actuality,

---

[78] *Patel*, 959 F.3d 1333 (ruling "Because neither the Court nor the video recordings can resolve these diametrically opposed accounts of what happened).

[79] *Piazza v. Jefferson Cty., Ala.*, 923 F.3d 947 (Is it excessive to tase for a second time a man who, as a result of an initial shock, is lying motionless on the floor and has wet himself, and who presented only a minimal threat to begin without? Undoubtedly, yes.").

a teenage concert goer who was in the midst of seizures.[80] The minor, who was never charged with a crime, testified she told officers: "'What is going on? Y'all let me go. I don't know what is going on but I cannot breathe,' before blacking out."[81]

The lawsuit included an excessive force claim on behalf of the female minor's mother who presented at the scene "yell[ing] 'that's my daughter, she's having a seizure,' but an officer tackled her midsentence before she entered the lobby.[82] Another officer handcuffed Helm with her arms behind her back and her face to the ground."[83] The court ruled the officers were not entitled to qualified immunity.

Here, Plaintiff was unarmed, outnumbered three to one, with hands occupied, and did not verbally or physically threaten officers. Although Officer Holland is "small guy" at five feet seven inches and approximately 145 to 165 pounds, and Officer Wadsworth stood 6 feet or taller and possibly as much as 200 pounds. [Pl's Tr. Exh. 5, p. 8]  Unlike in *Piazza*, Plaintiff did not try to resist and was not under the influence. Like in *Rainbow City*, Plaintiff did not receive

---

[80] *Helm v. Rainbow City, Alabama,* <u>989 F.3d 1268, 1269-70</u> (11th Cir. 2021)
[81] *Id.*
[82] *Id.*
[83] *Id. at* 1272.

the luxury of a threat, or any warning at all, prior to the use of force. [Tolston, 78:1-7] Defendant Officer Wadsworth testified that he could not recall whether Plaintiff was informed of being under arrest prior to officers initiating it. [Wadsworth, 122:21-24]

In retaliation for requesting the basis for the move-on order, Officer Holland grabbed Plaintiff's arm. [Pl's Tr. Exh 4 p. 2; Pl's Tr. Exh. 3 p. 2] Officers Holland and Wadsworth stated the reason for grabbing Plaintiff's arm was to escort Plaintiff out of the park. [Id.] However, Plaintiff maintains Officer Holland only proclaimed, "That's it" and nothing more before the use of force on Plaintiff's arm. [Tolston, 78:1-7] The physical force used caused a neck injury, and traumatic brain injury. [Pl's Tr. Exh. 9] As the case in Patel, Plaintiff alleges there no resistance whatsoever as Plaintiff was standing idle. As in Patel, according to Officer Holland, a leg sweep was used. Thus, under these facts, even if probable cause existed—there was absolutely no need to render Plaintiff to the ground without so much as a warning.

### E. Defendants Wadsworth And Holland Engaged Malicious Prosecution (Count XV) For Amendment Retaliation (IX) When Plaintiff Was Taken Off-Camera By A Superior Officer Given A Quid Pro Quo

Defendants are liable for malicious prosecution because they trump-up charges out of retaliatory animus for requesting their badge numbers. As here,

"Where a federal claim for malicious prosecutions is alleged[,] state law supplies the essential elements."[84] In Georgia, "In order to prevail on a claim for malicious prosecution, a plaintiff must show the following: (1) a criminal prosecution (2) instigated without probable cause, (3) with malice, (4) pursuant to a valid warrant, accusation, or summons, (5) that terminated in the plaintiff's favor, and (6) caused the plaintiff damage."[85]

It is well settled "that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out."[86] Thus, "Official reprisal for protected speech offends the Constitution because it threatens to inhibit exercise of the protected right."[87] In order to succeed on a first amendment retaliation claim, a plaintiff must show: 1) engagement in constitutionally protected speech, 2) "adverse conduct that would likely deter a person of ordinary firmness from

---

[84] *Dixon v. Krause*, 773 SE.2d 40 (Ga. Ct. App. 2015) (citing *Uboh v. Reno*, 141 F.3d 1001, 1004
[85] *Id.* at 40 (citing *McNeel v. Home Depot, Inc.*, 621 SE.2d 474 (Ga. Ct. App. Aug. 30, 2005); *and* O.C.G.A. 51-7-40).
[86] *Hartman v. Moore*, 547 U.S. 250, 256 (2006).
[87] *Hartman*, 547 U.S. 256 (quoting *Crawford-El v. Britton*, 523 U.S. 574, 588 n. 10 (1998)).

engaging in such speech," and 3) a causal connection between the protected speech. [88]

Plaintiff has combined the malicious prosecution claim with the first amendment claim since here, the protected speech fueled the retaliatory or maligned prosecution.

In *Jones v. Warner,* the Georgia Court of Appeals was faced with analogous facts concerning false arrest and malicious prosecutions claims involving the very statute at issue here.[89] In *Jones,* a woman approached an officer stationary in his patrol car to ask for directions.[90] The officer, occupied on his radio at the time, provided directions to the woman.[91] She again, attempted to speak with the officer, who ultimately arrested the woman.[92] The court held "a question of fact remains as to whether Warner had probable cause to charge Jones with disorderly conduct. It follows that the trial court erred when it granted Warner summary judgment on Jones' claim for malicious prosecution."[93]

---

[88] *Brannon v. Finkelstein,* 754 F.3d 1269, 1274 (11th Cir. 2014).
[89] *Jones v. Warner,* 686 S.E.2d 836, 837 (Ga. Ct. App. 2009).
[90] Id. at
[91]
[92] 686 S.E.2d 837.
[93] *Jones v. Warner 838*

In *Wilkerson v. Seymour*, a woman was at a bar when she heard the establishment broadcast her license plate information over the loudspearker due to a parking issue.[94] Wilkerson went outside where Officer Seymour advised "that she was just in time to prevent her car from being towed." Instead of moving the car immediately after the first prompt to do so, she complained stating "'But that's—that's not right'" while "using the words 'hell' and 'damn' at least once."[95] After "Officer Seymour asked Wilkerson a second time to move her car, Wilkerson responded in a louder than conversational tone that she wanted Officer Seymour's name and badge number. At that point, Officer Seymour placed Wilkerson under arrest."[96]

Wilkerson was cited for violation a DeKalb County Code that prohibited "any person to act in a loud and boisterous, reckless, unruly or violent manner for the purpose of insulting, degrading, or inciting another or a group of individuals  in a public place."[97] In denying the officer summary judgment the court held "the only alleged profanity were the words 'hell' and 'damn,' neither of which were directed specifically at Officer Seymour. This at least created a

---

[94] *Wilkerson v. Seymour*, 736 F.3d 976, 976 (11th Cir. 2013).
[95] *Id*. at 976.
[96] *Wilkerson*, 736 F.3d 977.
[97] *Id*. at 978.

question of material fact as to whether a reasonable officer could have believed that Wilkerson used insulting or degrading language."[98]

In *Hegeman v. Harrison*, a woman claimed, "that she was peacefully protesting the inauguration of Pretendent Trump and filming an altercation between an NOPD officer and an unarmed man when Officer Larry Adams charged at her, pushed her, and tackled her to the ground[.] After telling Officer Adams that she could not breathe, she briefly lost consciousness."[99] Hegeman brought suit alleging false arrest in violation of her First Amendment right to freedom of expression.[100] She alleged that the arresting officers tackled her to the ground, unprovoked, because she was filming the police while participating in an anti-Trump protest.[101]

The district court agreed with the Plaintiff in reversing the district court's grant of summary judgment holding "a material disputed fact issue exist[ed] as to whether Hegeman's arrest was supported by probable cause and dismissal of Hegeman's freedom of expression claim is inappropriate." Body worn camera

---

[98] Id.

[99] *Hegeman v. Harrison*, No. 18-613 (E. D. La. Mar. 20, 2019).

[100] *Id.*

[101] *Id.*

footage, or the lack thereof, played a pivotal factor in the court's decision,[102] including on the issue of material facts as to whether Plaintiff refused to follow commands, was told of being under arrest, or resisted officers.[103] In denying summary judgment for the officer, the court held: "Accordingly, the footage does not conclusively disprove the plaintiff's account of the incident."[104]

In *Redd v. City of Enterprise*, arose out of an interaction between officers and travelling ministers proselytizing on a sidewalk.[105] In that case, Officer Nelms exited his patrol car, approached the pair, and "told Reed that there had been a complaint that the two men had been stepping into the roadway while preaching."[106] Another officer arrived and "informed Redd that he and Anderson would have to stop preaching."[107] Redd requested to speak to the officers' supervisor, who was unavailable, and returned to preaching.

---

[102] *Hegeman*, No. 18-613 (holding "Although footage captured on other officers' body camera does not depict officer Adams tackle the plaintiff to the ground or place pressure on her neck and back, the footage also does not show how Ms. Hegeman arrived on the ground or depict her body for the entire duration in which it remained on the ground.").

[103] "Moreover, the footage does not show Ms. Hegeman disobey Officer Adam's orders. Finally, while Officer Adams claims that Hegeman was resisting arrest, the footage does not indicate that he told Hegeman she was under arrest before he grabbed her."

[104] *Hegeman v. Harrison*, No. 18-613.

[105] *Redd v. City of Enterprise*, 140 F.2d 1380, 1380 (11th Cir. 1998).

[106] 140 F.2d 1381.

[107] *Id.*

The officer again "told Anderson and Redd that they would have to stop preaching or they would be arrested." After confirming they were on public land and reiterating the threat of arrest—"Anderson walked back to the street corner and recommenced preaching loudly. Nelms then arrested Anderson."[108] The pair brought suit against the officers in the official and individual capacities asserting "the police officers violated Anderson's rights under the First and Fourth Amendments to the Constitution by arresting him for disorderly conduct without probable cause.[109]

In this case, although combining the two causes of action, the facts are straightforward. According to Atlanta Standard Operating Procedure: "Officers will respect the first amendment rights of citizens as specified in this directive. They will be knowledgeable of state laws and city ordinances that are applicable in situations where first amendment activity is occurring." [Wadsworth, 126:18-25] Here, like the preachers on the corner in *Redd*, or the woman picketing against a president in *Hegeman*, Plaintiff was merely protesting abuse at the hands of the State by requesting the officers' identities.

---

[108] *Redd*, 140 F.2d 1381 "Anderson asked if they were standing on the public sidewalk. Crawford answered that they were. Anderson asked if the officers intended to arrest him for preaching on a public sidewalk. Crawford answered in the affirmative."
[109] *Id.* at 1381.

Plaintiff twice asked officers for their badge numbers moments after Wadsworth had just instructed Officer Holland to uncuff Plaintiff. Thus, Plaintiff was likely being released at that moment. However, seconds after requesting their identities to "sue"—Officer Holland proclaimed "he's gonna take a ride."

In a second act of retaliatory prosecution for protected speech, Plaintiff was presented in front of a superior officer that in no uncertain terms, offered Plaintiff a "quid pro quo" whereby Plaintiff was offered freedom in exchange for not getting the badge numbers to report the officers' conduct. [Tolston, 86:9-16] The sergeant stated: "What if I could make this all go away…and you could just go about your way," which Plaintiff understood that to mean "make this [arrest] go away,' if I wouldn't basically come down here and file a complaint against the officer who abused and battered me." [Pl's Tr. Exh. 5 at 3]

Body worn camera footage partially corroborates this account as it shows Plaintiff being taken off-camera by an officer equipped with an inactive device. [Pl's Tr. Exh. 11 at 3:58-4:01] Moment prior to being taken off camera—Plaintiff asks whether the seizure is a detention or arrest. [Pl's Tr. Exh. 11 at 2:29-33] At that same time, Officer Holland is seen deactivating his body worn camera. [Pl's Exh. 11 at 4:06] While off camera, at that time is when Plaintiff was offered a quid

pro quo whereby the unknown superior officer offered to allow Plaintiff to leave in exchange for not reporting the conduct of the officers involved in the use of force against Plaintiff. [Tolston, 86:9-16]

After the move-on order was given, Plaintiff asked: "What's the problem?" [Tolston, 77:22-23] According to Officer Wadsworth, after the move-on order, Plaintiff stated: "What's your problem?" or "What's your issue with me." [Pl's Tr. Exh. 4 p. 2] Officer Holland proclaimed "That's it" and Plaintiff was rendered to the ground. In testament to the malign intent of Defendants—the offenses for which Plaintiff was cited was the only instance in his entire career where Defendant Wadsworth cited an individual with those three offenses stemming from a single incident.

### 1. Beyond Actual Damages, Plaintiff Continues To Suffer Mental Anguish, Emotional Distress, And Reputational Harm As A Result Of Being Humiliated

Damages do not only include the physical injuries—but the consequences of the injury.[110] Such damages include: "non-physical injuries such as humiliation, emotional distress, mental anguish and suffering that, if found to be

---

[110] *Wright v. Shepard*, 919 F.2d 666, 669 (11th Cir. 1990) (Finding "He described nightmares of Livingston's returning and beating him and of crying when people talked to him about the incident. He claimed that he had lost his house, lost his job, and lost his wife, who feared that Livingston might return and attack him again.").

present, are within the ambit of compensatory damages."[111] Plaintiff received an

EMS bill, and never recovered the scooter seized by officers. In addition, Plaintiff

suffered a 16-month prosecution as a result of the actions of the arrest in the

instant matter, and continues to suffering ongoing reputational harm as well as

mental anguish. [Pl's Tr. Exh. 82]

## F. Defendant Officers Are Liable For False Arrest Because Any Probable Cause Had Dissipated (Count IXX)

Count IXX of the amended complaint seeks to hold Defendants Lawrence

Holland and Keith Wadsworth liable for false arrest pursuant to Georgia state

law § 51-7-1. As the case with federal law, Georgia courts recognize probable

cause dissipation.[112] As discussed herein, *infra.* C, Defendant Officers lacked

probable cause and are thus liable for Count IXX.

## G. Defendant Officers Assaulted and Battered By Rendering Plaintiff To The Ground Without Legal Justification (Count XX)

Count XX of Plaintiff's amended complaint seeks to hold Defendants Keith

Wadsworth and Lawrence Holland liable for battery and assault. [Doc. 88-1 pp.

---

[111] *Id.*

[112] *McLarty v. State*, 516 S.E.2d 818 (Ga. Ct. App. 1999) (holding the "argument that probable cause dissipated because the last supply of drugs to him on August 13 had probably been used up fails not only because Scholtz testified she saw drugs there immediately before or on August 16, but also because the continuing nature of McLarty's usage created a reasonable belief that the conditions described in the affidavit still prevailed[.]").

31-32] Under the common, recognized as a civil tort in Georgia, "a harmful or offensive touching" constitutes battery and touching is "offensive" when the "touching is one which proceeds from anger, rudeness, or lust."[113] Furthermore, an employer may liable if they ratified the conduct.[114] However, in order to hold the employer liable, one must show the employer "should have known that the employee's reputation for [assault] and that it was foreseeable that the employee would engage in [assault] but he was continued in his employment."[115]

As discussed herein, *supra*. C, officers lacked probable cause and as such were not authorized to asserting any force over Plaintiff. There is no dispute that Defendants Holland and Wadsworth rendered Plaintiff to the ground causing a concussion was harmful and offensive. A trier of fact could find that Officers Wadsworth and Holland battered Plaintiff.

The City of Atlanta is liable because Officer Holland had numerous complaints that put the City of Atlanta on notice of propensity to engage in such misconduct. Officer Holland had been an officer less than two years when he arrest Plaintiff but had already racked up two citizen complaints in his

---

[113] *Newsome v. Cooper-Wiss, Inc.*, 347 S.E.2d 619, *cert. denied* (Ga. Ct. App. 1986).
[114] *Fowler v. Sunrise Carpet Indus., Inc.*, 911 F. Supp. 1560, 1585 (N. D. Ga. 1996).
[115] *Harvey v. McLaughlin*, 400 S.E.2d 635 (Ga. Ct. App. 1990).

disciplinary history. He would go on to more than double that, while adding four complaints of excessive force. [Pl's Tr. Exh. 65 p. 1] Officer Wadsworth has two use of force complaints against him and two additional "citizen complaints," but all of which occurred after Plaintiff's arrest. [Pl's Tr. Exh. 64 pp. 2-3] Therefore, a trier of fact could find that the City is liable because they were aware Defendant Officer Holland would engage in misconduct prior to his unlawful arrest of Plaintiff.

### H. Defendant Officers Are Liable For State Law Malicious Prosecution Because Plaintiff Was Cited Out Of Malicious Retaliation (Count XXI)

Count XXI of Plaintiff's amended complaint seeks to hold Defendants Keith Wadsworth and Lawrence Holland liable for state law malicious prosecution pursuant to Georgia state law § 51-7-40. [Doc. 88-1 p. 32-33] As discussed herein using statutory and caselaw authority, *supra*. E, Officers Holland and Wadsworth engaged in a malicious scheme to charge Plaintiff for three charges in retaliation for attempting to report their conduct. As such, they are liable for malicious prosecution since they acted with malice and without probable cause.

## CONCLUSION

Although credibility is an ultimate decision for a jury given the summary judgment standard—it should not go lost on the Court that despite the passage of more than three years' time, Plaintiff's account of retaliatory charges after an unprovoked attack by officers following *de minimis* contact in a crowd of thousands of people at a festival in Piedmont Park has remained consistent. More importantly, the events are corroborated by six 911 calls, incomplete body worn camera footage, medical records, statements given during the internal affairs investigation, and deposition testimony. Therefore, Plaintiff respectfully requests the Court should DENY Defendants' motion for summary judgment.

Respectfully submitted,

/s/

*Justin T. Tolston, JD LLM*
7925 Meredith Ave
Omaha, NE 68134
justin@icitypap.com
402.889.9800
Plaintiff