IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JUSTIN T. TOLSTON,                      )
          **Plaintiff,**           )
                              )
                              )
v.                                      )    **No.  1:20-CV-04221-SEG**
                              )
CITY OF ATLANTA, Et. Al.                )

## STATEMENT OF ADDITIONAL UNDISPUTED FACTS FOR PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS KEITH WADSWORTH, LAWRENCE HOLLAND, AND CHIEF RODNEY BRYANT

**NOW COMES** *pro se* Plaintiff in this Statement of Additional Facts to state:

1. On October 11, 2019, in a tape-recorded Officer of Professional Standards interview, Officer Holland stated: He, Officer Wadsworth, and Officer Joseph were standing on "top of the hill located in Piedmont Park" standing "shoulder to shoulder" "all just watching the performances" when the initial contact was made with Plaintiff. [Pl's Tr. Exh. 3 at 2; Pl's Tr. Exh. 19 at 1:28-37]

2. The citation issued by Officer Wadsworth does not state the subsection of city ordinance 110-59 that Plaintiff allegedly violated. [Pl's Tr. Exh. 1]

4.    Piedmont Park was the site of a festival on October 14, 2018.

5.    just moments prior to the initial contact with officers, Plaintiff broke a sweat hauling multiple bags to vehicle nearby as the group packed up. [Tolston, 63:13-19]

6.    Officer Keith Wadsworth, Officer Lawrence Holland, and former Atlanta Police Officer Thaddeus Joseph were standing next to each other, faced away from plaintiff on providing general security. [Walton, 35:7-20; Wadsworth, 41:1-2]

7.    After the initial contact, Officer Holland and Joseph turned around "stunned" and Plaintiff "just stood there stunned." [Pl's Tr. Exh. 20 at 2; Pl's Tr. Exh. 19 at 1:37-41]

8.    Plaintiff was walking when the initial contact was made. [Att. A, Pl's Decl.]

9.    Possession of an alcoholic beverage during a festival is not prohibited by city ordinance 110-59. [Pl's Tr. Exh. 6 pp. 1-2]

10.    Officer Wadsworth was working an unapproved shift on October 14, 2018. [Pl's Tr. Exh. 35 p. 1]

11.   Officer Wadsworth testified that Plaintiff's prohibited conducted was "operating a scooter—causing a risk to others." [Wadsworth, 26:24-25 to 27:1-2]

12.   Although officer's handwritten citation states Plaintiff was holding a "miller lite" his offensive narrative states it was a bud light. [Pl's Tr. Exh. 1 p. 1; Pl's Tr. Exh. 2 p. 1]

13.   Officer Wadsworth was disciplined for working an unapproved shift on October 14, 2018. [Pl's Tr. Exh. 35 p. 1]

14.   Officer Wadsworth was disciplined for failing to notify a supervisor about the use of force. [Id.]

15.   Plaintiff placed 911 calls seeking transport to the hospital. [Pl's Tr. Exhs. 21 – 26]

16.   Officer Holland disposed Plaintiff of a beverage within seconds of contact.

17.   Plaintiff was not administered any form of breathalyzer or filed sobriety test [Tolston, 86:22-24]

18.   Officer Wadsworth testified he could not recall whether Plaintiff was belligerent prior to arrest. [Wadsworth, 49:25 to 50:1-3]

19. Plaintiff was never given a breathalyzer or administered any field sobriety tests.

20. Investigator Gartrell Walton testified it would have been "impossible" for Defendant Wadsworth to determine whether Plaintiff was walking or driving the scooter. [Walton, 35:7-20]

21. While in Officer Holland's custody, Plaintiff asks: "Why are you doing this?" [Pl's Tr. Exh. 16 0:23-24] and Officer Holland responded: "We're done talking."

22. video footage shows a person on a seated scooter, *actually riding the device*, recklessly cross from the grass, onto a paved path, and back onto the grass—just a few feet from while being escorted by officers. [Pl's Tr. Exh. 16 at 0:16-22]

23. After being walked across an open field, Officer Wadsworth tell Officer Holland to uncuff Plaintiff and to "do it now." [Tolston, 82:14-20]

24. While Plaintiff is being uncuffed, Officer Wadsworth tells Plaintiff: "do not come back in this park." [Pl's Tr. Exh. 11 at 1:21-23]

25. In the span of nine seconds Plaintiff twice asks for officers' badge numbers and seconds later Officer Holland proclaims "He's gonna take a ride." [Pl's Tr. Exh. 11 at 1:49-52]

26. Plaintiff then twice asks "Am I detained or am I under arrest?" [Pl's Tr. Exh. 11 at 2:29-33]

27. Officer Holland is about five feet seven inches and approximately 145 to 165 pounds, and Officer Wadsworth stood 6 feet or taller and possibly as much as 200 pounds.

28. Even the supervising officer was unsure as he stated: "I don't know, I'm going to have to see what the officer says" — Plaintiff responded "Yes sir." [Pl's Tr. Exh. 11 at 2:34-36]

29. The supervising officer stepped away and returned a few moments later telling Officer Wadsworth: "Let me talk to him over here a minute." [Pl's Tr. Exh. 11 at 3:58-4:01]

30. At that time, Wadsworth's body worn camera captures Officer Holland deactivate his body worn camera. [Pl's Tr. Exh. 11 at 4:06]

31. While off-camera, the supervising, and superior officer offered Plaintiff a quid pro quo. [Tolston, 86:4-16; Pl's Tr. Exh. 5 p. 3]

32. The sergeant stated: "What if I could make this all go away...and you could just go about your way," and Plaintiff understood the sergeant to mean "make this [arrest] go away,' if I wouldn't basically come down here and file a complaint against the officer who abused and battered me." [Pl's Tr. Exh. 5 p. 3]

33. Five separate video files were provided from Officer Wadsworth's body worn camera. [Pl's Tr. Exhs. 11 – 15]

34. Three separate video files were provided from Officer Holland's body worn camera. [Pl's Tr. Exhs. 16 -18]

35. Body worn cameras are manually activated. [Bryant, 43:21-23]

36. Dr. Jason Schneider replied: "No I didn't," when Officer Wadsworth asked: "did you smell any alcohol or anything?" [Pl's Tr. Exh. 12 at 12:14-12:20]

37. Officer Holland stated he seized Plaintiff's beer and poured it out allegedly because "the thing was you couldn't drink any beverages unless you were actually at the festival." [Pl's Tr. Exh. 3 at 2]

38. Alcohol was being sold at the festival in Piedmont Park on October 14, 2018. [Doc. 127]

39. Officer Wadsworth admitted he tackled Plaintiff during his internal affairs interview. [Walton, 77:9-12]

40. Plaintiff was not warned that Plaintiff was being walked out the prior to Officer Holland grabbing Plaintiff's arm. [Tolston, 78:1-5]

41. Plaintiff was not told he was being walked out the park. [Tolston, 78:1-5]

42. Plaintiff was not told "put your arms behind your back" prior to being grabbed. [Tolston, 78:1-5]

43. Plaintiff was never told "You're under arrest." [Tolston, 78:1-5]

44. The incident narrative section of the Offense Report, signed by Keith Wadsworth six days after Plaintiff's arrest states: "After not leaving [the park] the decision was made to escort Mr. Tolston out of Piedmont Park. Ofc. Holland grabbed Mr. Tolston by the arm while trying to escort him out of the park[.]" [Pl's Exh. 2 at 1]

45. In body worn camera footage, Officer Wadsworth says he "had to slam" Plaintiff. [Pl's Exh. 11 at 0:21-23]

46. On July 2, 2020, then Atlanta Mayor Keisha Lance Bottoms signed administrative order 20-28, in part, ordering "the chief operating officer to work with the interim chief of police to implement and

reform police officers' compliance of body-worn cameras and standards and operating procedures to implement measure with deliberate speed which shall increase transparency to improve access to body-worn cameras. (Bryant, 17:8-17)

47. Officer Wadsworth deactivated his body worn camera at least three times while Plaintiff was in custody. [Pl's Tr. Exhs. 11-14]

48. Officer Holland deactivated his body worn camera at least twice while Plaintiff was in custody. [Pl's Tr. Exhs. 16-18]

49. According to Atlanta Police standard operating procedure unprofessional is misconduct and is something that an officer can be disciplined for exhibiting. [Bryant, 14-15:25-3]

50. Speaking rudely, using profanity constitutes unprofessionalism according to APD standard operating procedures. [Bryant, 15:1-3]

51. Plaintiff was diagnosed with a post concussion syndrome from the Emory Student Health Center following the use of force. [Pl's Tr. Exh. 9]

52. The traumatic brain injury impacted Plaintiff's Master of Laws studies. [Pl's Tr. Exh. 10]

53. All charges against Plaintiff were dismissed after Plaintiff appeared in-person to contest the charges. [Pl's Tr. Exh. 82]

54. Plaintiff was not under the influence of any narcotics festival. [Tolston, 65:12-18]

55. Plaintiff suffers from ongoing trauma related to the use of force and subsequent arrest. [233:18-20]

/s/

*Justin T. Tolston, JD LLM*
7925 Meredith Ave
Omaha, NE 68134
justin@icitypap.com
402.889.9800
Plaintiff

53.   All charges against Plaintiff were dismissed after Plaintiff appeared in-person to contest the charges. [Pl's Tr. Exh. 82]

54.   Plaintiff was not under the influence of any narcotics festival. [Tolston, 65:12-18]

55.   Plaintiff suffers from ongoing trauma related to the use of force and subsequent arrest. [Tolston, 233:18-20]

*/s/*

*Justin T. Tolston, JD LLM*
7925 Meredith Ave
Omaha, NE 68134
justin@icitypap.com
402.889.9800
Plaintiff

**ATTACHMENT A**
**PLAINTIFF'S SWORN DECLARION**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEOR
### ATLANTA DIVISION

JUSTIN T. TOLSTON,            )
                 Plaintiff,      )
                       )
v.                         )      No.  1:20-CV-04221-SEG
                       )
CITY OF ATLANTA, Et. Al.    )

## PRO SE PLAINTIFF'S SWORN DECLARATION IN SUPPORT OF PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

**COMES NOW**, Plaintiff under penalty to swear and declare:

1. Plaintiff's speech was not slurred on October 14, 2018;
2. Plaintiff did not get into Officer Holland's face;
3. Plaintiff did not argue with officer; and
4. Plaintiff was walking at the time *de minimis* contact was made with Officer Holland;

Plaintiff's Attachment B

Shields Deposition Excerpts

In The Matter Of:

# *Griffin vs. City of Atlanta*

Deposition Of:

# *Erika Shields*

Taken On:

## *12/4/2020*

Pope Reporting & Video, LLC
2741 Pangborn Road
404-856-0966

**www.popereporting.com**



EXPERIENCED · PROFESSIONAL · DEPENDABLE

Griffin vs. City of Atlanta       Erika Shields       12/4/2020

1     A.    I did, yes.

2     Q.    And then after -- I think we covered this

3 some, but not all. After sergeant, you were promoted

4 to lieutenant?

5     A.    That's correct.

6     Q.    And then after lieutenant, you were promoted

7 to major?

8     A.    That's correct.

9     Q.    And then I guess at this point -- at that

10 point it's appointments, and so then you were

11 appointed next to deputy chief?

12     A.    Correct.

13     Q.    And then deputy chief -- you were appointed

14 to chief of police.

15     A.    Correct.

16     Q.    Okay. As of April 5th, 2019, were you the

17 chief of police?

18     A.    Yes, I was.

19     Q.    And, again, this is a fairly broad question,

20 so feel free to just hit the high points, but what

21 are --

22     A.    Okay.

23     Q.    -- what are your duties as the chief of

24 police?

25     A.    You're responsible for the performance of

Griffin vs. City of Atlanta                Erika Shields                12/4/2020

```
1    repeating that one more time, sir?

2    BY MR. KAHN:

3         Q.   Sure.   Sure.   To what do you attribute the

4    city's problem with police-on-citizen violence?

5         A.   I think that you will find isolated

6    incidents where an officer either operates in poor

7    judgment, loses their temper.   I don't think it's

8    systemic within the department.   I don't think it's --

9    I don't think it's widespread or condoned by their

10   colleagues.   But I do think individuals on an

11   individual basis will engage in behavior that clearly

12   is inappropriate and, more significantly, not

13   necessary.

14        Q.   What sort of policy changes do you think are

15   necessary to eliminate police officers' use of

16   excessive force on citizens within APD?

17        A.   I think for any agency we have been

18   afforded -- we have been afforded finally a window

19   into police operations on a day-to-day basis through

20   body-worn camera.   And I think that it's incumbent

21   upon all law enforcement agencies to have body-worn

22   cameras and to consistently audit them so that we can

23   vet out any misappropriate behavior before it

24   escalates.

25             So I think that it's there.   The solution is
```

 1   there.  We just need to leverage it appropriately.

 2        Q.    And that's a good segue into my next

 3   question, I think.  Would you agree that one of the

 4   most important tools to combat the use of excessive

 5   force is a strong stance on disciplining police

 6   misconduct?

 7        A.    You have to -- yes.  You have to hold

 8   officers accountable when they're wrong.

 9        Q.    Do you agree that without proper discipline,

10   police officers can use force with impunity?

11        A.    Yes.

12        Q.    Where do you stand on a zero-tolerance

13   policy for police officers' use of excessive force?

14        A.    I think that it's not that black and white,

15   that every situation has mitigating factors.  And so

16   you have an obligation to look at all of the factors

17   to see what brought the officer to the space where

18   they used force.  And I -- you can have guidelines,

19   but you definitely need to take the time to look at

20   each incident individually.

21        Q.    Okay.  Should police departments keep a

22   lookout for officers who are repeatedly accused of

23   excessive force?

24        A.    They go on early warning and -- which is

25   a -- to your phrase, a lookout.  It's flagging them as

Case 1:20-cv-04221-SEG   Document 172-1   Filed 12/02/22   Page 18 of 64
Case 1:20-cv-02514-VMC   Document 131-7   Filed 10/13/21   Page 32 of 114

Griffin vs. City of Atlanta                    Erika Shields                    12/4/2020

```
 1    mitigating factors that are going to determine whether

 2    or not more people need to be assigned to the case.

 3        Q.    Okay.  Is it fair to say by the end of a

 4    typical -- to the extent one can be typical -- that by

 5    the end of a typical OPS use-of-force investigation,

 6    the OPS investigator likely has the most knowledge

 7    about the matter?

 8        A.    They should, certainly.  They should.

 9        Q.    Now -- and I may be using this phrase

10    incorrectly, but is the chain of command typically

11    involved in an OPS investigation?  And I guess by

12    that, what I'm trying -- what I mean -- I guess what

13    I'm really looking for is, like, is -- if an officer

14    is accused of excessive force, is -- are his

15    supervisors involved in the process?

16        A.    They -- if they were a witness to it or they

17    were working that night and they responded to the

18    scene, I would expect them to be interviewed.  So if

19    they had any touch points with the actual incident

20    itself, it would be fair to expect them to be

21    interviewed.

22              If they did not, then, yes, they would be

23    afforded the file once it comes out of the Internal

24    Affairs to review for disciplinary recommendations.

25        Q.    Did the -- do the supervisors take any
```

1    play -- any part in the investigation process?

2    Interviewing witnesses?  Looking at body camera

3    footage?  Collecting photographs?

4        A.    Certainly, they could assist.  They could

5    assist in pulling the body-worn camera.  So if I work

6    Zone 6 as a supervisor, I could assist in pulling the

7    body-worn camera footage, providing it to Internal

8    Affairs.

9             I mean, they could assist if there was, I

10   guess, some legwork that needed doing.  But for the

11   most part, it would be handled by -- I would expect it

12   to be handled by Internal Affairs.

13       Q.    Are you familiar with the ACRB investigation

14   process?

15       A.    I think -- I am, yes.  I -- there were some

16   discussions on modifying it, and I don't know that

17   those were ever adopted.  But we're trying to -- one

18   of the things we're trying to do is adopt a technology

19   platform so that the investigations can be streamlined

20   to both case -- places.  But that's not -- that's not

21   operational yet.

22       Q.    I guess let me take a step back.  Can you

23   explain what role ACRB serves?

24       A.    It allows -- I think first and foremost it

25   allows people who are not comfortable going to the

Plaintiff's Attachment D

Wadsworth Deposition Excerpts

KEITH WADSWORTH - December 13, 2021

1

1         IN THE UNITED STATES DISTRICT COURT
       FOR THE NORTHERN DISTRICT OF GEORGIA
2                 ATLANTA DIVISION

3    JUSTIN T. TOLSTON,               )
                                      )
4                    Plaintiff,       )
                                      )   CIVIL ACTION FILE
5         vs.                         )
                                      )   NO. 1:20-CV-04221
6    CITY OF ATLANTA, GEORGIA,        )
     et al.,                          )
7                                     )
                     Defendants.      )
8    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _)

9

10

11

12

13        Deposition of KEITH WADSWORTH, taken on behalf

14   of the Plaintiff, at Wheeler Reporting Company,

15   Inc., 1600 Northside Drive, N.W., Suite 250,

16   Atlanta, Georgia, commencing on December 13, 2021,

17   at 1:45 p.m., before Christy L. Freyberg, Certified

18   Court Reporter, Registered Professional Reporter and

19   Notary Public within Georgia.

20

21

22   _____

23             WHEELER REPORTING COMPANY, INC.
                 1600 Northside Drive, N.W.
24                       Suite 250
                 Atlanta, Georgia  30318
25                    (404) 351-4577



Case 1:20-cv-04221-SEG   Document 172-1   Filed 12/02/22   Page 22 of 64
Case 1:20-cv-04221-SEG   Document 153-1   Filed 08/11/22   Page 8 of 255

KEITH WADSWORTH - December 13, 2021

8

 1    obstruction of another.

 2         Q.    How many times in your career have you

 3    cited someone from a single event with all three of

 4    those offenses?

 5                MS. PARKS:  Objection.

 6         Q.    Answer the question.

 7         A.    With all three, never.

 8         Q.    Turning back to my question about how did I

 9    obstruct anyone, can you please read the sentence that

10    starts, "Officer Holland grabbed Mr. Tolston."

11         A.     Sentence starting with, "Officer Holland"?

12    "Officer Holland grabbed Mr. Tolston by the arm while

13    trying to escort him out of the park, but

14    Mr. Tolston obstructed by grabbing both of Officer

15    Holland's arms while attempting to resist."

16         Q.    Thank you.  Why wasn't I charged with

17    resisting arrest if I resisted?

18         A.    You was charged with resisting arrest.

19         Q.    Can you read the charges at the top again?

20         A.    Charges 10-9, disorderly while under the

21    influence; charges 110-59, prohibited conducted in

22    city -- in park; and charges 106-81.7, disorderly

23    conduct section 7, physical obstruction/another.

24         Q.    What's physical obstruction of another?

25         A.    So in that code section 106-81.7, it's



KEITH WADSWORTH - December 13, 2021

24

1    contact with you on October 14th, 2018?

2              MS. PARKS:  Objection as to form.

3        Q.    Answer the question.

4        A.    Repeat the question, please.

5        Q.    What happened that precipitated my arrest

6    on October 14th, 2018?

7        A.    You drove a scooter into Officer Holland,

8    Officer Joseph, and you were told to continue about, I

9    guess, your movements throughout the park.  You

10   refused.  You began getting into Officer Holland's face

11   when you were escorted out of the park.  As Officer

12   Holland attempted to escort you, you then grabbed onto

13   Officer Holland in an attempt to resist.

14       Q.    You were standing next to Officer Holland

15   and Officer Joseph, you stated; correct?

16       A.    Yes.

17       Q.    Did you see me ride my scooter?

18       A.    Yes.

19       Q.    You saw me physically on the scooter?

20       A.    I seen you physically crash into them.

21       Q.    Was I driving the scooter or was the

22   scooter being walked?

23       A.    You were driving the scooter.

24       Q.    You're stating I was on a scooter, and did

25   I have anything in my hand?



Case 1:20-cv-04221-SEG   Document 172-1   Filed 12/02/22   Page 24 of 64
Case 1:20-cv-04221-SEG   Document 153-1   Filed 08/11/22   Page 26 of 255

KEITH WADSWORTH - December 13, 2021

26

1   you and Officer Holland were having.

2       Q.    So you didn't hear me being asked to leave

3   the park?

4       A.    On that date I can't recall.

5       Q.    So how do you know the conversation between

6   me and Mr. Holland is the reason I was arrested?

7             MS. PARKS:  Objection.  That

8       mischaracterizes Officer Wadsworth's

9       testimony.  He did not state that.

10      Q.    If you were unable to hear the conversation

11  between Officer Holland and myself, how did I obstruct?

12            MS. PARKS:  Objection.

13      Q.    Answer the question.

14      A.    Repeat the question, please.

15      Q.    If you were unable to hear the conversation

16  between Officer Holland and myself, what grounds were

17  there for probable cause for my arrest?

18      A.    You were being escorted out the park.

19      Q.    Why was I being escorted out the park?

20      A.    For prohibited conduct in the park.

21      Q.    What lawful ground did I have to be

22  escorted out of the park?

23            MS. PARKS:  Objection.  Asked and

24      answered.

25      Q.    What prohibited conduct was I engaged in?



Case 1:20-cv-04221-SEG   Document 172-1   Filed 12/02/22   Page 25 of 64
Case 1:20-cv-04221-SEG   Document 153-1   Filed 08/11/22   Page 27 of 255

KEITH WADSWORTH - December 13, 2021

27

1       A.      Operating or -- operating a scooter --
2   causing a risk to others.  Causing a reasonable risk to
3   others.
4       Q.      Let me turn your attention to Plaintiff's
5   Exhibit 18.  What are you looking at?
6               MS. PARKS:  And if you'll please give
7           the witness time to examine the exhibit in
8           its entirety --
9               MR. TOLSTON:  Okay.
10              MS. PARKS:  -- just to go through the
11          pages.
12      Q.      (By Mr. Tolston)  Officer Wadsworth, have
13  you had time to review the document?
14      A.      No.
15      Q.      Why didn't you have your body camera
16  activated?
17              MS. PARKS:  Objection.  The witness is
18          reviewing the exhibit that you plan to ask
19          questions about so please give him time.
20              MR. TOLSTON:  This document is
21          unrelated to the exhibit.
22              MS. PARKS:  I'm sorry?
23              MR. TOLSTON:  This question is
24          unrelated to the exhibit.  It's just a
25          general question.



KEITH WADSWORTH - December 13, 2021

41

1      Q.      What were your duties on October 14, 2018?

2      A.      General security.

3      Q.      Performing general security, based on your

4   training and experience, is your body camera supposed

5   to be activated?

6      A.      Activated or on.

7      Q.      What's the difference?

8      A.      On is on.  Activated is recording.

9      Q.      When is the circumstance in which your body

10  camera would be on but not recording?

11     A.      Could you repeat that question?

12     Q.      You said there is a distinction between on

13  and recording.

14     A.      Yes.

15     Q.      When would your camera be on but not

16  recording?

17     A.      When would my camera be on but not

18  recording?

19     Q.      Correct.

20     A.      As soon as I take it off the dock and put

21  it on my chest, it would be on.

22     Q.      Okay.  And what would you have to do to

23  start that recording?

24     A.      Three years ago.  It's a different body

25  camera.  Double tap.  Tap the center twice.



Case 1:20-cv-04221-SEG   Document 172-1   Filed 12/02/22   Page 27 of 64
Case 1:20-cv-04221-SEG   Document 153-1   Filed 08/11/22   Page 37 of 255

KEITH WADSWORTH - December 13, 2021

37

1    Q.    When were you made aware of conversations
2 between myself and Mr. Holland that gave you the
3 perception that I did not follow a lawful command from
4 Officer Holland?
5    A.    During the entire incident, many
6 conversations.
7    Q.    Did you ever put your hands on me?
8    A.    Yes.
9    Q.    Why?
10    A.    Because you grabbed an officer while he was
11 going out with his lawful duties.
12    Q.    But you don't recall what was said prior to
13 me being grabbed?
14    A.    Again, it was three years ago.
15    Q.    How much time elapsed between the
16 incidental contact to your use of force during my
17 arrest?
18    A.    Approximately 30 seconds.
19    Q.    And in that 30 seconds you weren't able to
20 hear the conversation between Mr. Holland and myself?
21    A.    Again, it was three years ago.  It was
22 three years ago.  I really don't remember it.
23    Q.    If you couldn't hear the conversation
24 between Officer Holland and myself, how could you know
25 that my speech was slurred?



KEITH WADSWORTH - December 13, 2021

49

1      Q.      What types of shifts are you required to
2  have your body camera in recording mode?
3      A.      Regular shifts and extra jobs.
4      Q.      You cited me for being under the influence.
5  How drunk was I?
6      A.      I don't recall.  It was three years ago.
7      Q.      Do you even know if I was drunk?
8      A.      Again, this was three years ago.  This was
9  three years ago.
10     Q.      Were my words intelligible?  Could you
11 understand what I was saying?
12             MS. PARKS:  Objection.  Asked and
13         answered.
14     Q.      Answer the question.
15     A.      I don't recall.  It was three years ago.  I
16 don't recall.
17     Q.      Was I stumbling all over the place?
18     A.      So your question is were you stumbling all
19 over the place?
20     Q.      Correct.
21             MS. PARKS:  Objection as to form.
22             You may answer if you understand the
23         question.
24     A.      I don't understand the question.
25     Q.      Was I acting belligerent preceding my


WHEELER
R E P O R T I N G
COURT REPORTING & VIDEO

Case 1:20-cv-04221-SEG   Document 172-1   Filed 12/02/22   Page 29 of 64
Case 1:20-cv-04221-SEG   Document 153-1   Filed 08/11/22   Page 50 of 255

KEITH WADSWORTH - December 13, 2021

50

1    arrest?

2        A.    Man.  It was three years ago.  This is just

3    hard to recollect everything from three years ago.

4        Q.    You said earlier you generally remember

5    this arrest; correct?

6        A.    Partially.  I believe I said I partially

7    remember.

8        Q.    Why didn't you transport me to Grady

9    Medical Center, Grady Memorial Hospital, on October

10   14th, 2018?

11            MS. PARKS:  Objection.

12       A.    From what I remember, there were no units

13   to -- you said why didn't I transport you to Grady?

14       Q.    Correct, correct.

15       A.    Because you were not in custody at that

16   point in time.

17       Q.    So I had been released from custody at the

18   time I requested transport to the hospital?

19       A.    Repeat the question.

20       Q.    You just stated I was not in custody when I

21   requested transport to Grady Memorial Hospital.

22       A.    When you requested transport or when you

23   requested to be seen?

24       Q.    When I requested transport to Grady

25   Memorial Hospital.



Case 1:20-cv-04221-SEG   Document 172-1   Filed 12/02/22   Page 30 of 64
Case 1:20-cv-04221-SEG   Document 153-1   Filed 08/11/22   Page 122 of 255

KEITH WADSWORTH - December 13, 2021

122

1    defenses to which you cited before, Mr. Wadsworth?

2        A.    Repeat that one more time.

3        Q.    Walk me through the steps step by step the

4    actions you took to investigate the charges for which I

5    was cited.

6              MS. PARKS:  Objection as to form.

7        Q.    Answer the question.

8        A.    It was what was observed.

9        Q.    That was it, what you observed?

10       A.    What was observed.

11       Q.    And what do you mean by that?

12       A.    The actions committed by you.

13       Q.    Which were?

14             MS. PARKS:  Objection.  Asked and

15       answered.  This was answered in Officer

16       Wadsworth's earlier testimony regarding the

17       reasons for your arrest.

18             MR. TOLSTON:  I need a five-minute

19       break.  I'm sorry.

20             (A recess was taken.)

21       Q.    (By Mr. Tolston)  Officer Wadsworth, was I

22    ever told I was under arrest before an attempt to

23    arrest was initiated?

24       A.    I don't recall.

25       Q.    Okay.  Was I ever told that if I didn't



Case 1:20-cv-04221-SEG   Document 172-1   Filed 12/02/22   Page 31 of 64
Case 1:20-cv-04221-SEG   Document 153-1   Filed 08/11/22   Page 126 of 255

KEITH WADSWORTH - December 13, 2021

126

1                    MS. PARKS:  Objection.  There are, as

2           stated previously, two different sections

3           that contain subsections 2A on that page.

4           Therefore, we would ask Plaintiff's counsel

5           to please refer to a specific heading on that

6           page to clarify for the record.

7                    MR. TOLSTON:  Ms. Parks, is there a 2A

8           other than the one that I directed your

9           client that begins, "Officers will respect

10          the first amendment rights," or is that the

11          only time that phrase appears on that page?

12          Q.    (By Mr. Tolston)  Mr. Wadsworth, looking at

13   the page I just directed you to and showed you out of

14   my tabbed book, do you see the phrase, "Officers will

15   respect the first amendment rights of citizens," as I

16   directed to you with my index finger?

17          A.    Yes.

18          Q.    Okay.  Can you read that statement, please.

19          A.    "Officers will respect the first amendment

20   rights of citizens as specified in this directive.

21   They will be knowledgeable of state laws and city

22   ordinances that are applicable in situations where

23   first amendment activity is occurring."

24          Q.    Thank you.  I would like for you to turn

25   two more pages in that same exhibit to Section 4.1.5,



KEITH WADSWORTH - December 13, 2021

146

1     A.     I see Officer Holland.

2     Q.     Okay.  And who was Officer Holland with?

3     A.     The screen's dark.

4     Q.     Would you like me to play the video?

5     A.     Somebody wearing a brown shirt.

6     Q.     Okay.

7            (Video plays.)

8     Q.     Officer Wadsworth, did you just hear, "Why

9  are you doing this?"

10    A.     Yes.

11    Q.     Who said that?

12           MS. PARKS:  Objection as to form.

13    Officer Wadsworth hasn't identified anyone

14    else in this video.

15    A.     I don't know who said that.

16    Q.     Do you recognize the voice, Officer

17 Wadsworth?

18    A.     No.

19    Q.     Does it sound like my voice, Officer

20 Wadsworth?

21    A.     The video and your voice now, no, it

22 doesn't.

23    Q.     I'm going to play the video again.

24           (Video plays.)

25    Q.     What did you hear in that clip of the



Case 1:20-cv-04221-SEG   Document 172-1   Filed 12/02/22   Page 33 of 64
Case 1:20-cv-04221-SEG   Document 153-1   Filed 08/11/22   Page 163 of 255

KEITH WADSWORTH - December 13, 2021

163

1            MS. PARKS:  -- if you have anything to
2      add.
3            MR. TOLSTON:  I'm sorry for
4      interrupting.
5      Q.    (By Mr. Tolston)  In the video that you
6  just watched, did I sound belligerent to you?
7      A.    I don't have anything else to add.
8      Q.    In the video that you just watched, did I
9  sound like I was being combative?
10            MS. PARKS:  Objection as to form.
11            You may answer.
12      A.    I don't have anything else to add.
13      Q.    In the video you just watched, did I seem
14  upset about being arrested?
15      A.    Yeah.
16      Q.    In the video did you recognize other
17  officers?
18      A.    Which part?
19      Q.    Any part of the video did you recognize any
20  other officer that you recognize?
21            MS. PARKS:  Objection.  Would you like
22      to specify one of the time stamps that you
23      announced?
24      Q.    In the video that you just watched, did you
25  notice any other officers you recognized?



1

1        IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF GEORGIA
2                   ATLANTA DIVISION

3   JUSTIN T. TOLSTON,              )
                                    )
4                    Plaintiff,     )
                                    )   CIVIL ACTION FILE
5         vs.                       )
                                    )   NO. 1:20-CV-04221
6   CITY OF ATLANTA, GEORGIA,       )
    et al.,                         )
7                                   )
                     Defendants.    )
8   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _)

9

10

11

12

13        Deposition of GARTRELL WALTON, taken on behalf

14   of the Plaintiff, at Wheeler Reporting Company,

15   Inc., 1600 Northside Drive, N.W., Suite 250,

16   Atlanta, Georgia, commencing on December 13, 2021,

17   at 7:44 p.m., before Christy L. Freyberg, Certified

18   Court Reporter, Registered Professional Reporter and

19   Notary Public within Georgia.

20

21

22   _____

23            WHEELER REPORTING COMPANY, INC.
                 1600 Northside Drive, N.W.
24                      Suite 250
                  Atlanta, Georgia  30318
25                     (404) 351-4577



 1      Q.      (By Mr. Tolston)  Okay.  You said there are

 2    five employees in the Office of Professional Standards;

 3    correct?

 4      A.      At this time currently, yes.

 5      Q.      Would the office investigate complaints

 6    more timely with more investigators?

 7              MS. PARKS:  Objection as to form.

 8         That's two different questions.

 9              MR. TOLSTON:  Answer the question if

10         you understand it.

11              MS. PARKS:  Objection as to form.

12         You've asked him actually about two different

13         titles from investigator versus other

14         personnel.

15      Q.      (By Mr. Tolston)  Investigators.  There are

16    currently five investigators.  How many investigators

17    would be necessary, from your training and experience,

18    to complete investigations within 180 days?

19              MS. PARKS:  Objection.

20              You may answer if you have knowledge.

21      A.      I don't have knowledge of that.

22      Q.      From your experience as an investigator for

23    14 years, you don't know if more investigators would

24    help you timely complete investigations?

25              MS. PARKS:  Objection as to form.  It



1    Q.    You can answer the question.

2    A.    I'm sorry.  Could you repeat, please.

3          MR. TOLSTON:  Madam court reporter,

4    can you read back the question.

5          (The last question was read back by

6    the court reporter, as follows:

7          Question:  "Okay.  So according to the

8    officers' statements, it would be impossible

9    for them to determine if I was walking or

10   driving the scooter because they did not see

11   me prior to contact?")

12         MS. PARKS:  And objection as to form.

13   Q.    (By Mr. Tolston)  You can answer the

14   question.

15   A.    I would say --

16         MS. PARKS:  Excuse me.  Let me clarify

17   my objection.  Objection as to form and also

18   vague.  There are numerous officers involved.

19   Q.    You can answer the question.

20   A.    I would say yes.

21   Q.    I would like to turn your attention to

22   Plaintiff's Exhibit 40.  It's here, Investigator

23   Walton.

24   A.    Oh.

25   Q.    What are you looking at on the screen?



1        A.      Okay.

2        Q.      It's your testimony today that officers

3   were rear-ended; correct?

4        A.      That's correct.

5        Q.      And so it was your testimony today that it

6   would have been impossible for them to observe whether

7   I was riding or walking the scooter; correct?

8        A.      They didn't specify.  They just said you

9   rolled into them with the scooter, if I recall.

10        Q.      Okay.  And just to clarify, when you said

11   earlier it would have been impossible for them to know,

12   you (inaudible)?

13              THE COURT REPORTER:  I didn't hear the

14        end of that.

15        Q.      When you stated it would have been

16   impossible for them to see whether I was walking or

17   driving the scooter, based on your understanding, all

18   three officers were faced the same direction; correct?

19        A.      Away from you, correct.

20        Q.      Okay.  Why did you ask Officer Holland did

21   they ask me to leave on my own accord?

22              MS. PARKS:  Objection as to form.

23              You may answer if you understand the

24        question.

25        A.      Basically I wanted clarity again as to why



# Attachment F

# Tolston Depo Excerpts

1

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF GEORGIA
2                    ATLANTA DIVISION

3   JUSTIN T. TOLSTON,              )
                                    )
4                    Plaintiff,     )
                                    )   CIVIL ACTION FILE
5         vs.                       )
                                    )   NO. 1:20-CV-04221
6   CITY OF ATLANTA, GEORGIA,       )
    et al.,                         )
7                                   )
                     Defendants.    )
8   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _)

9

10

11

12

13        Deposition of RODNEY BRYANT, taken on behalf of

14   the Plaintiff, at Wheeler Reporting Company, Inc.,

15   1600 Northside Drive, N.W., Suite 250, Atlanta,

16   Georgia, commencing on December 13, 2021, at 9:09

17   a.m., before Christy L. Freyberg, Certified Court

18   Reporter, Registered Professional Reporter and

19   Notary Public within Georgia.

20

21

22   _____

23           WHEELER REPORTING COMPANY, INC.
              1600 Northside Drive, N.W.
24                     Suite 250
              Atlanta, Georgia  30318
25                  (404) 351-4577



**RODNEY BRYANT - December 13, 2021**

9

```
 1   sit for this deposition?
 2        A.     I'm sorry?
 3        Q.     When did you become aware you would sit for
 4   this deposition?
 5        A.     I think it was Thursday, Wednesday or
 6   Thursday.
 7        Q.     Okay.  So you first became aware of this
 8   matter about a month ago when you were first asked
 9   questions and first became aware you would need to sit
10   for this deposition on Thursday?
11        A.     Yes.
12        Q.     What's your job title?
13        A.     Chief of police.
14        Q.     How long have you had that title?
15        A.     Since -- the official title since June 2021
16   and in the interim since last June of 2020.
17        Q.     Excuse me.  Who interviewed you for that
18   position?
19        A.     I didn't interview.
20        Q.     Who told you you would be appointed interim
21   chief?
22        A.     The mayor.
23        Q.     How many conversations did you have with
24   the mayor prior to being appointed interim chief about
25   being chief?
```



1    Children's Square in Iowa.

2              No.  To answer your question more

3    directly, I did not receive any compensation for my

4    trip to occupational health.

5        **Q.   Okay.  Mr. Tolston, are you now stating you**

6    **did not receive a concussion as you previously**

7    **testified?**

8        A.   I was not diagnosed, I don't believe, with a

9    concussion from that visit.  That was me using what I

10   thought it was at the time.

11       **Q.   And what made you believe, at the time, that**

12   **you had received a concussion?**

13       A.   The amount of pain -- actually, it was

14   reminiscent of the attack by Officer Wadsworth when I

15   was slammed on the ground during the arrest and lost

16   consciousness.  It was that -- the hitting of the

17   ground and that black -- the blackout.  Like, it's

18   just black, right.  The only thing I can compare it

19   to is like when you open your eyes and you kind of

20   see like the blue -- the blue pieces floating around.

21   That feeling is what caused me to believe I sustained

22   some type of head injury.

23       **Q.   And, Mr. Tolston, when did this injury occur**

24   **when you were employed as a youth worker in Iowa?**

25       A.   I'm not sure.  I would say 2013, maybe.

Page 34

1  trial?

2        A.   I don't believe so.

3        Q.   And do you recall the level of court where

4  this trial occurred?  For example, municipal court or

5  magistrate court --

6                    [Simultaneous talking.]

7        A.   County.

8        Q.   I'm sorry?

9        A.   County court.  County court.

10       Q.   So in --

11                   [Simultaneous talking.]

12       A.   Sarpy County Court.

13       Q.   I'm sorry.  Go ahead.

14       A.   It was in Sarpy County Misdemeanor Court, I

15  believe.

16       Q.   Okay.  And spell Sarpy for me.

17       A.   S-A-R-P-Y.

18       Q.   Okay.  Any other criminal charges that you

19  have not listed for us this morning?

20       A.   No.  Outside of the protest in 2011 -- or

21  charges from the protest in 2011, the protest in

22  2015, and the 2011 -- I think it's actually 2011 and

23  not 2012 for the possession of .3 grams, that's it.

24  Outside of traffic violations.

25       Q.   All right.  Have you ever been reprimanded

Page 41

1   protections.

2       Q.   Okay.   Now, we're going to like get into the

3   details, the incident that occurred on October 14th,

4   2018, in just a little bit.   But I want to know,

5   aside for the -- from the injuries that you claim you

6   received in this matter, what other health problems

7   have you had?

8       A.   Well, I had -- in my interrogatory, I said

9   that it healed approximately on the 24th of 2018,

10  because of the fact that the neck sprain that -- the

11  most that it's healed -- because I still have pain if

12  I do a certain angle.   So if I -- if I do a deep look

13  down, I have pain in the neck where it occurred.   But

14  it manifested again, and when I asked my mother, you

15  know, "Why would this" -- you know, "I wake up and my

16  neck is hurting," she said, "Well, have you ever had

17  any trauma to it?"   And I said, "Well, yeah.   When,

18  you know, I got arrested and slammed on my head."

19  She said, "Well, that may have caused it, and now

20  that may be why you're predisposed to the neck pain

21  that you're experiencing now."   And so I think that's

22  the best answer I can give you.

23      Q.   Okay.   So outside of any complications that

24  you are alleging from October 2018, what other health

25  issues have you had?

Page 57

1    the record.  The time is 12:06 p.m.

2    BY MS. PARKS:

3        Q.  All right, Mr. Tolston.  So now we're going

4    to start talking about the details of what occurred

5    on October 14th, 2018.  And just to clarify for the

6    record, is the date of October 14th, 2018, correct?

7                    You're muted.

8        A.  Yes.

9        Q.  Okay.  And is it accurate that the incident

10   that is the subject of your lawsuit occurred after

11   the time of 7 o'clock p.m. on October 14th, 2018?

12       A.  Approximately, yes.

13       Q.  And did this particular incident occur at

14   Piedmont Park?

15       A.  Yes.

16       Q.  Why were you at Piedmont Park on October

17   14th, 2018?

18       A.  I had an electric scooter that I ride around

19   for leisure.  I guess it was one of my hobbies, and

20   it was also my mode of transportation to Emory

21   because I stayed only about a mile-and-a-half, about,

22   from the school.  And so I was riding the scooter

23   around, and I noticed there was a lot of activity at

24   Piedmont Park.  Piedmont Park is only maybe a mile

25   from where I was staying on Virginia Highlands.  And

Elizabeth Gallo
COURT REPORTING, LLC

1  when I rode and I seen all the activity, I was like,

2  "Oh, okay.  So I'm going to ride around the track."

3  And when I was riding around the track and I got to

4  the part where the hill inclines pretty

5  substantially, there were a couple of women that were

6  struggling to carry a cart, like a toddler cart, one

7  of the red carts that you stack stuff in and then you

8  pull.  Well, they were attempting to pull -- one was

9  pulling and the other one was behind it pushing it up

10  the hill, and I ran over to them.  And her name was

11  Star, at least the name she gave me was Star, And I

12  helped them pull their stuff up.  And she was like,

13  "Well, you should hang out."  I was like, "What's

14  going on?"  She was like, "Oh, it's the parade.  It's

15  the festival today.  There are going to be

16  performances, there's going to be music, there's

17  going to be a lot of people."  And so I sat down with

18  them.  She said, "Here's a chair, sit down and hang

19  out with us."  And so that's why I was at Piedmont

20  Park.  I had no intention of even going that day.

21      Q.  Okay.  And was this -- was the activity

22  going on on October 14th regarding the Atlanta Pride

23  Festival?

24      A.  It was.  There was a lot of people, a lot of

25  performances, a lot of vendors.

Elizabeth Gallo
COURT REPORTING, LLC

1   Light, and the only reason I stopped to get something

2   from him was, one, because he had asked me

3   specifically; two, because Bud Light is my dad's

4   favorite drink and, you know, it brought a little

5   nostalgia and made me think of him; three, I don't

6   know -- a lot of times, there are these vendors in

7   the park that, you know, make their living or, you

8   know, a good portion of their income off of these

9   independent entrepreneurial things, and so I wanted

10  to support.  And so, I had gotten a bottle from this

11  man and I paid him, and I even told him he could keep

12  the change, and I'd opened it because I was thirsty.

13              I'd just helped take, you know, umpteen

14  bags to the car.  So after I helped them set up and

15  after I sat there with them for some time, they were

16  packing up to go to the car, and so I -- I broke a

17  sweat.  I, at least, transversed to the car three,

18  four, five times taking loads of stuff, the same

19  stuff that was too heavy for them to carry.

20              [Zoom technicality.]

21      Q.  Mr. Tolston, I'm going to stop you there.

22  One, your camera is no longer on.

23      A.  Oh, sorry.  I apologize.  That was battery.

24      Q.  And secondly, if you could just answer the

25  question that was asked, whether or not you had any

Page 64

1   alcohol, meaning did you consume any alcohol while in

2   attendance at the festival?

3      A.  Yes, like a swig.  A very small, small

4   amount, yes.

5      Q.  And what type of alcohol did you consume?

6      A.  I don't recall.

7      Q.  So is it your testimony that you only bought

8   the Bud Light, but did not drink that Bud Light?

9      A.  Right.  Because I was just supporting him.

10  I don't like Bud Light.  Bud Light is not my drink of

11  choice, if you will.  And so, I had thrown it on the

12  ground, right, but then I was like, "Don't be that

13  hypocrite.  Don't be that guy, and be the change in

14  the world.  There's a trash can probably 20 feet

15  away."  So I picked it back up and I was walking to

16  the trash when me and Officer Wadsworth had our date

17  with destiny.

18     Q.  Did you have a swig of beer while in

19  attendance at the festival?

20     A.  No.  I poured some out.

21     Q.  Did you have a swig of wine while in

22  attendance at the festival?

23     A.  No.  I don't believe so.  I don't recall

24  what type of drink it was, and it was while I was

25  there at their, like, tent that they had set up that

1   meadow and you're looking toward the hill, if you're

2   looking toward the AT&T symbol, that little circle

3   there, I was standing almost exactly where that water

4   droplet is.  That's exactly abouts where that

5   happened.

6        **Q.  All right.  Thank you.  Now, after your bump**

7   **into Officer Holland, how soon after did you**

8   **recognize that they were law enforcement officers?**

9        A.  Within seconds, because -- I was stunned for

10  a second.  You bump into somebody, right, and

11  somebody could -- could act completely

12  disproportionate and -- and go bananas, right?  Or

13  you can bump into somebody and look and say, "Oh,

14  shit, they're the police," and that was that moment

15  that I had then.  So it was like, oh, I'm saying --

16  I'm just bumping into somebody saying, "Sorry," and

17  then you look and you bump in -- and you look and

18  there are three uniformed police officers.  So you're

19  -- you kind of -- eyes as big as quarters, if you

20  will.  I was kind of stunned for a second like, "Oh,

21  shit."

22       **Q.  Okay.  Do you recall Officer Holland telling**

23  **you to be careful?**

24       A.  No, because he dispossessed me of my drink

25  before he said anything.  Or he said it in tandem.

Elizabeth Gallo
COURT REPORTING, LLC

1    happened next?

2            MR. TOLSTON:  Objection.  That's not a

3    fact that's in evidence.  Open container would

4    indicate that it was unlawfully possessed in the

5    position that it was in, and being that the map you

6    just showed showed that numerous alcohol vendors were

7    there at the festival, I object to the form of the

8    question.  Can you please restate your question?

9            [Simultaneous talking.]

10   BY MS. PARKS:

11       Q.  Okay.  Go ahead and answer the question,

12   please.

13       A.  Can you please restate it?

14       Q.  After Officer Holland poured out the

15   container that was open, what happened next?

16       A.  They tackled me to the ground.  And I -- he

17   cussed at me again -- he cussed at me again, "Keep it

18   fucking moving," and at that point, after -- so,

19   before, I was stunned and hadn't said really anything

20   to him.  And then, after he's cussed at me and poured

21   out what was to be trash, he cusses at me again, and

22   he's like, "Keep it fucking moving."  And at that

23   point, I'm like, "What is your issue?"  Like, "What's

24   the problem?"  And I even said, like, "What's the

25   problem?"  And, "That's it," and that's when he grabs

Page 83

1    that.  I don't recall that at all actually.  I

2    said -- if somebody grabs my wrist, I said it

3    normally, by habit, it's a reflex.  But I don't

4    believe, in that instance, I -- I did that.

5         Q.  So at the time that you were speaking with

6    Officer Holland and asked him what the issue was,

7    where exactly were your hands located?

8         A.  One was holding my scooter and the other was

9    freestanding, which is the hand he grabbed.

10        Q.  Where were your feet located?  Were they --

11   was one on the scooter or on the ground?

12        A.  They were on the ground.

13        Q.  And what hand were you holding the beverage?

14        A.  I want to say my right hand.

15        Q.  And upon Officer Holland pouring out the

16   beverage, what hand was on the scooter?

17        A.  Still my -- my left hand.

18        Q.  Upon Officer Holland grabbing your arm, do

19   you recall which arm he grabbed?

20        A.  I believe it was my right one.

21        Q.  And in what exact position was your left

22   hand?

23        A.  On the -- it was holding my scooter.  So my

24   right one was down by my side after being

25   dispossessed, and the left one was holding my scooter

Elizabeth Gallo
COURT REPORTING, LLC

1    [untranscribable vocalization], and I said, "No, that

2    was excessive force," and I told them that it was

3    wrong what they had just done to me.

4              And they presented me in front of a

5    superior officer, a black man, who was a little more

6    robust, he was stocky, maybe 5'10-ish, darkly

7    complected, had salt-and-pepper -- salt-and-pepper

8    hair, and they referred to him as "Sergeant."  And

9    I'm presented in front of him and I tell him the

10   whole story.  I tell him from the time that me and

11   the incident occurred, to the arrest, to the tackle,

12   to being picked up, and my scooter and all that, and

13   he offers to quid pro quo let me go if I do not get

14   the badge numbers and report the excessive force that

15   was used to arrest me and the procedure that was

16   done, or lack thereof.

17        Q.   What the was this officer's name?

18        A.   I didn't get it at the time.  I wasn't able

19   to get it.  My hands were cuffed.  I couldn't get a

20   picture of him.  I do remember seeing his badge, but

21   I don't recall his name.

22        Q.   Did the officers make you do a sobriety

23   test?

24        A.   No.

25        Q.   And what happened once you were in custody

Page 125

1  devices connected and are you ready to proceed?

2              MR. TOLSTON:  Correct.  I'm on two --

3  two separate devices.

4              MS. PARKS:  Okay.  Counsel for City

5  Defendants is now sharing on the screen Exhibit 18,

6  camera footage.  We will restart the playing of this

7  video at 13 minutes and 2 seconds marker.

8              (Whereupon a video clip was played.)

9  BY MS. PARKS:

10     Q.  All right.  Mr. Tolston, is it a fair

11  statement that you were initially seeking

12  compensation right after the incident an October

13  14th, 2018?  You're on mute.

14     A.  I told them I was going to sue them for

15  excessive force as soon as they picked me up off the

16  ground.  You don't brutalize people -- one of the

17  most fundamental rights is to be free of unwarranted

18  search and seizure.  And even if you are going to

19  arrest somebody, you don't batter them.  I didn't

20  pose a risk to the public and I was not resisting.

21  They had no right to batter me, right.

22              The king, right, is where we came from;

23  the futile days.  And they are not kings, they are

24  men, and you treat men with respect.  And I wasn't

25  respected.  I was beat.  I was beat by the police and

Elizabeth Gallo
COURT REPORTING, LLC

**RODNEY BRYANT - December 13, 2021**

12

1    Q.    How many have you conducted?

2    A.    A number -- I don't know.  I'll exaggerate

3  the number maybe, but as a supervisor to the chief of

4  police, well into the hundreds.

5    Q.    So you've investigated hundreds of

6  allegations of police brutality or misconduct?

7    A.    Either as the investigator or in the

8  disciplinary process.

9    Q.    How do you file a complaint against an APD

10  officer?

11    A.    You can file it written, orally, directly

12  to a supervisor, anonymously, according to OPS.

13    Q.    What frequency do you communicate with

14  Mayor Bottoms?

15    A.    We probably speak almost every week.

16    Q.    At what frequency do you speak in person

17  with Mayor Bottoms?

18    A.    Rarely due to COVID protocols.

19    Q.    How often do you exchange email

20  correspondence with Mayor Bottoms?

21    A.    Very rarely.

22    Q.    What's the nature of your interactions with

23  the Office of Professional Standards?

24    A.    They report directly to me.

25    Q.    How many investigations does OPS conduct



**RODNEY BRYANT - December 13, 2021**

14

1    Q.    More than 20?

2    A.    I don't know.

3    Q.    More than 100?

4    A.    I don't know.

5          MR. CALLINS:  I would object.  You've

6    asked that question.  He's answered it twice.

7          MR. TOLSTON:  I changed the number

8    just to show as the chief of police I believe

9    he should know the amount roughly or

10   approximately the number of allegations with

11   regard to the type of conduct that I'm

12   asking, especially with somebody that has

13   conducted personally hundreds of

14   investigations.

15         MR. CALLINS:  I'm just objecting to

16   preserve it for the record as to the form.

17         MR. TOLSTON:  Noted.  Your client can

18   answer.

19   Q.    (By Mr. Tolston)  More than 100?

20   A.    I don't know.

21   Q.    What misconduct qualifies as

22   unprofessional?

23         MR. CALLINS:  I would object to the

24   form as vague.

25   Q.    In the Atlanta standard operating


WR WHEELER
REPORTING
COURT REPORTING & VIDEO

1    provided him my copy.

2          MR. CALLINS: Okay. I've got it. All

3    right.

4    Q.   (By Mr. Tolston) What are we looking at in

5  Plaintiff's Exhibit 13?

6          MR. CALLINS: One moment, sir.

7    Q.   Chief Bryant?

8    A.   This is an administrative order by the

9  mayor ordering the chief operating officer to work with

10  the interim chief of police to implement and reform

11  police officers' compliance of body-worn cameras and

12  standards and operating procedures to implement

13  measures with deliberate speed which shall increase the

14  transparency to improve access to body-worn cameras.

15    Q.   What's the date at the top of that

16  administrative order? It's faint.

17    A.   Looks like July 2nd, 2020.

18    Q.   When was this order signed in relation to

19  you becoming chief of police?

20    A.   It would have been approximately 11 months.

21    Q.   After? After or prior to you becoming

22  interim chief of police?

23    A.   So your question was chief or interim

24  chief?

25          MR. CALLINS: Could you rephrase the



**RODNEY BRYANT - December 13, 2021**

18

1    question?

2            MR. TOLSTON:  Yes.

3            MR. CALLINS:  Thank you.

4    Q.    (By Mr. Tolston)  Were you interim chief of

5    police when this order was signed?

6    A.    Yes.

7    Q.    Prior to this order being signed, were you

8    aware that body camera activation and adherence to

9    protocol was an issue?

10          MR. CALLINS:  I would object to the

11        form.  You've mischaracterized that -- well,

12        there's not any evidence that body-worn

13        camera is an issue as you've phrased it.

14    Q.    The nature of Exhibit 13 is an order that

15    addresses compliance with body camera adherence.  Prior

16    to the signing of this executive order on July 2nd,

17    were you aware that adherence to body camera protocol

18    was an issue?

19          MR. CALLINS:  I would restate my

20        objection that that is a compound question.

21          MR. TOLSTON:  Your objection is noted.

22    Q.    (By Mr. Tolston)  Please answer the

23    question, Mr. Bryant.

24    A.    Can you repeat the question?

25    Q.    Prior to this order being signed on July



RODNEY BRYANT - December 13, 2021

1   2nd, were you aware adherence to body camera protocol

2   was an issue?

3       A.    Oh, absolutely.

4       Q.    How?

5       A.    Because we have a disciplinary process to

6   address it.

7       Q.    Go on.  Please elaborate.

8       A.    When --

9             MR. CALLINS:  I would object.  If you

10      have a question, you can ask him a question,

11      but asking him to elaborate without a

12      question, I think, is improper form.

13            MR. TOLSTON:  He said --

14      Q.    (By Mr. Tolston)  What issues were you

15  aware of with regard to adherence to body camera

16  protocol?

17      A.    Officers not turning on their body cameras

18  timely.

19      Q.    Was that the only issue?

20      A.    And not -- that I recall.  That I recall.

21      Q.    The only issue that gave rise to

22  administrative order 2028 was officers, from your

23  knowledge, not activating their body camera?

24            MR. CALLINS:  I would object.  You're

25      mischaracterizing his testimony.  He didn't



1  body-worn camera usage has increased from approximately

2  50 percent to 94 percent."

3     Q.    How were those metrics determined?

4     A.    I don't know because -- I don't know.

5     Q.    Okay.  How have you coordinated with the

6  chief operating officer to fulfill the obligations

7  outlined in this administrative order?

8     A.    Making sure -- most of our coordination

9  would be to ensure that we have what is needed to carry

10  out the order.

11     Q.    I'm going to turn your attention to the

12  last page of that administrative order.  Can you look

13  at page four beginning section two and read that for

14  me, please?

15     A.    "Specifically this reform must increase

16  compliance with body-worn camera from the current 94

17  percent must include the evaluation of potential

18  amendments to the Atlanta Police Department's standard

19  operating procedures requiring the verbal documentation

20  of the justification for an unauthorized deactivation

21  of the audio or video of the body-worn camera in the

22  real time and written documentation thereafter and

23  providing for the imposition of the disciplinary action

24  for a failure to comply with these procedures."

25     Q.    How can you fulfill that responsibility if



**RODNEY BRYANT - December 13, 2021**

24

```
 1  audited?
 2       A.    It's audited randomly.
 3       Q.    What's the likelihood that an officer would
 4  have their body camera audited in a month's time?
 5       A.    I don't know.
 6       Q.    In a week's time?
 7       A.    I don't know.
 8       Q.    In a year's time?
 9       A.    I don't know.
10       Q.    Is it possible that an officer could go an
11  entire year without ever having their body camera
12  audited?
13             MR. CALLINS:  Object as to form.
14             You can answer if you know.
15       A.    Using a random process, yes.
16             (Plaintiff's Exhibit 31 was marked for
17        identification and attached at the end of the
18        original transcript.)
19       Q.    I'm going to turn your attention to what's
20  been marked as Plaintiff's Exhibit 31.
21             MR. CALLINS:  Give us a minute to
22        locate that.  It might be in this stack.
23             THE WITNESS:  This is just 27.
24             MR. TOLSTON:  At the back of that,
25        Chief Bryant, should be 31.
```



WR WHEELER
REPORTING
COURT REPORTING & VIDEO

**RODNEY BRYANT - December 13, 2021**

36

1     Q.    What is the average length of time from

2  initial complaint to final disposition in the Office of

3  Professional Standards?

4     A.    It's very difficult to make an average.

5  They investigate different things.  An auto accident

6  may take a long time.  Some are very short so it's an

7  extreme range.

8     Q.    An excessive force claim, how long from

9  your experience conducting hundreds of investigations

10  would you say that an excessive force complaint should

11  take to investigate?

12     A.    Again, depends on -- they clearly vary.

13  Some we can do in three days.  Some takes much longer,

14  depending on the number of witnesses.

15     Q.    More than a year?

16     A.    Should not take more than a year.

17     Q.    Okay.  Number 14.  Can you please read 14,

18  please.

19     A.    "Mandate ACRB review of," -- I'm sorry.

20  "Mandate ACRB review of changes to APD standard

21  policies and procedures which -- operating procedures

22  which affect citizens.  At least 30 days in advance

23  establish a third-party recourse for disagreement."

24     Q.    Are all complaints to the Atlanta Citizen

25  Review Board duly investigated by the Office of



1           MR. CALLINS:  Yes, sir.

2           MR. TOLSTON:  That works.  Great.

3           (A recess was taken.)

4      Q.   (By Mr. Tolston)  Thank you for coming back

5  from that break, Chief Bryant.  I draw your attention

6  back to Exhibit 31, page 14.  Can you read point 28 for

7  me under reporting and transparency.

8      A.   "Revise data collection process to ensure

9  completeness to data and encourage compliance in data

10  collection policies."

11     Q.   What action has been taken on that?

12     A.   We digitalized our information as it

13  relates to use of force.

14     Q.   Earlier you said activation was an issue

15  with regard to APD officers.  When did automated

16  activation become implemented?

17     A.   I'm sorry?

18     Q.   When did automatic activation of body

19  cameras become implemented?

20     A.   I don't know.

21     Q.   Are body cameras used by Atlanta city

22  police officers manually activated?

23     A.   Yes.

24     Q.   Please explain that process.

25     A.   An officer has to tap his camera when he's



RODNEY BRYANT - December 13, 2021

54

1      A.      "While completing the arrest paperwork for
2  Tolston, Officer Wadsworth's body-worn camera," -- I'm
3  sorry -- "BWC shows Mr. Tolston complained of head
4  pain, and he falls out of the chair and onto the
5  floor."
6      Q.      Thank you.  Turning to that next page, can
7  you read that last sentence beginning -- second to last
8  sentence beginning with Mr. Tolston's allegation?
9      A.      "Mr. Tolston's allegation," -- I'm sorry.
10 Yeah.  "Mr. Tolston's allegation that he suffered a
11 concussion at the hands of the officer during the
12 incident cannot be proven, as he did not obtain his
13 report diagnosis until some two days after the incident
14 occurred and after a doctor at the festival failed to
15 find an injury or concussion attributed to his arrest."
16     Q.      Thank you.
17     A.      "The allegation -- "
18     Q.      That's enough.  Thank you.
19             (Plaintiff's Exhibit 8 was marked for
20         identification and attached at the end of the
21         original transcript.)
22     Q.      I'd like to turn your attention to
23 Plaintiff's Exhibit 8.  Chief Bryant, can you take a
24 second to familiarize yourself with Plaintiff's Exhibit
25 8?  What are you looking at?  Once you have a second to



Case 1:20-cv-04221-SEG Document 153-2 Filed 08/11/22 Page 108 of 341
Case 1:20-cv-04221-SEG Document 137-1 Filed 12/02/22 Page 63 of 64

RODNEY BRYANT - December 13, 2021

108

1           MR. CALLINS:  I'm going to object as
2       to form.  I'm not sure what providing medical
3       assistance means in this context.
4           You can answer it if you know.
5       A.      I'm confident that we would train people to
6   call because we have a signal for calling 911 so there
7   has to be some form of making a determination to call.
8       Q.      What type of signal?
9       A.      I don't know my signals and codes like I
10  used to.
11      Q.      It's okay.  I'll withdraw the question.
12              Were you consulted in the decision to hire
13  250 Atlanta police officers?
14      A.      Yes.
15      Q.      What was your response when consulted?
16             MR. CALLINS:  I'm sorry.  I'm going to
17      object as to form and foundation.
18      Q.      Are you familiar with Mayor Bottoms'
19  decision to hire 250 Atlanta police officers?
20      A.      Yes.
21      Q.      When was that decision made approximately?
22      A.      I know when she announced it.  I don't know
23  when she made her decision.
24      Q.      Did Mayor Bottoms consult you prior to that
25  decision?



**RODNEY BRYANT - December 13, 2021**

155

1  disposition?

2      A.    Yes.  It shows that -- well, no.  It shows

3  that there was a written reprimand.

4      Q.    And so item 22 states a letter of written

5  reprimand, and what's the name next to that?

6      A.    Wadsworth.

7      Q.    And what's the date next to that?

8      A.    3/16/20.

9      Q.    How much time passed from the date of the

10 arrest on October 14th, 2018, to March 16, 2020?

11     A.    A year and -- what's that?  About a year

12 and four months, five months.

13     Q.    Which is approximately almost three times

14 the timeframe you stated for a complaint to be

15 investigated?

16         MR. CALLINS:  I'm gonna object as to

17     form.  You're mischaracterizing the chief's

18     testimony.

19     Q.    You can answer the question.

20     A.    I'm sorry.  Repeat the question for me,

21 please.

22     Q.    Is the time that passed from the date of

23 the arrest to 3/16/20, the final disposition of the

24 letter of written reprimand for Wadsworth,

25 approximately four times the length you stated is

